**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| BELLE FOODS TRUST BANKRUPTCY ESTATE OF YARNELL'S ICE CREAM COMPANY, INC., FIRST IMPRESSIONS SALON, INC., and ROY MATTSON, individually and on behalf of all others similarly situated, | Case No. 3:13-cv-00454 (NJR)(SCW) |
| Plaintiffs, | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | |
| NATIONAL MILK PRODUCERS FEDERATION; COOPERATIVES WORKING TOGETHER; DAIRY FARMERS OF AMERICA, INC.; LAND O'LAKES, INC.; DAIRYLEA COOPERATIVE INC.; AGRI-MARK, INC. d/b/a CABOT CREAMERY COOPERATIVE, INC., | DEMAND FOR JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

I.      NATURE OF THE CASE .................................................................................1

II.     JURISDICTION AND VENUE .....................................................................8

III.    THE PARTIES...............................................................................................9

      A.      Plaintiffs.............................................................................................9

      B.      Defendants ........................................................................................11

      C.      Unidentified Co-Conspirators .........................................................15

IV.     FACTUAL ALLEGATIONS .......................................................................15

      A.      Defendants Combined to Effectuate Pre-production Output Restraints, Artificially Reduce Supply, Eliminate Competition, Significantly Reduce the Number of Dairy Producers Competing in the Market and Thereby Reduce Milk Production and Increase Prices Through Herd Retirement...........................15

            1.      The 2003 Herd Reduction Reduces Output. ............................16

            2.      The 2004 Reduction of Output. ...............................................18

            3.      The 2005 Reduction In Output. ...............................................20

            4.      In 2006 CWT Boasts of the Price Effects of Its First Three Rounds of Reductions. ...............................................................22

            5.      The 2007 Reduction In Output. ...............................................23

            6.      The Two Rounds of Reductions In 2008 – Time to Trim Output and Raise Prices. ...........................................................25

            7.      The Three Rounds of Herd Reductions In 2009 Methodically Reduced Supply, Eliminated Competition and Thereby Raised Prices...........................................................28

            8.      The 2010 Herd Reduction Again Boosts Prices Above Free Market Levels. ...........................................................................31

      B.      Defendants' Conspiracy Raises Milk Prices to Supracompetitive Levels Throughout the Class Period.................................................33

      C.      Defendants Are Not Entitled to the Limited Protections of the Capper-Volstead Act...............................................................................42

            1.      The Capper Volstead Act Grants Limited Antitrust Immunity to Agricultural Cooperatives.................................42

            2.      Defendants Do Not Qualify For Antitrust Immunity Under the Capper-Volstead Act......................................................43

i

V.      CLASS ACTION ALLEGATIONS ................................................................................46

VI.     ANTITRUST INJURY ...............................................................................................49

VII.    CLAIMS FOR RELIEF VIOLATION OF SHERMAN ACT § 1 ....................................49

VIII.   PRAYER FOR RELIEF ..............................................................................................52

IX.     DEMAND FOR JURY TRIAL ......................................................................................52

Direct purchaser Plaintiffs, Belle Foods Trust ("Belle Foods"), Bankruptcy Estate of Yarnell's Ice Cream Company, Inc. ("Yarnell's"), First Impressions Salon, Inc. ("First Impressions"), and Roy Mattson ("Mattson") (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated in the United States against Defendants National Milk Producers Federation; Cooperatives Working Together; Dairy Farmers Of America, Inc.; Land O'Lakes, Inc.; Dairylea Cooperative Inc.; and Agri-Mark, Inc. (collectively "Defendants").  Plaintiffs, by and through their attorneys, based on its individual experiences, the investigation of counsel, and information and belief allege as follows.

## I.      NATURE OF THE CASE

1.      Cooperatives Working Together ("CWT") and its members have engaged in a continuing contract, combination and conspiracy over the past eight years to limit the production of raw farm milk through premature "herd retirements" that require participating dairy farmers to destroy all of the dairy cows in all of their herds and, beginning on April 1, 2009, agree not to reenter the dairy farming business for at least a year.  The principal purpose and effect of this contract, combination and conspiracy has been to eliminate competition, significantly reduce the number of dairy farmers competing in the market and to produce both short term and long term increases in the price of raw farm milk and manufactured dairy products. Raw farm milk is the key ingredient or component in fluid milk products and other manufactured dairy products, including, but not limited to, cream, half & half, yogurt, dry milk, cottage cheese, cream cheese, sour cream, and ice cream.

2.      During the Class Period, Plaintiff Yarnell's purchased raw milk directly from Defendants.

1

3.      During the Class Period, Plaintiff Belle Foods purchased fluid milk products and other manufactured dairy products, which contained the price-fixed raw milk, directly from Defendants.

4.      During the Class Period, Plaintiff First Impressions purchased fluid milk products and other manufactured dairy products, which contained the price-fixed raw milk, directly from Defendants.

5.      During the Class Period, Plaintiff Mattson purchased fluid milk products and other fresh dairy products, which contained the price-fixed raw milk, directly from Defendants.

6.      Dairy farmers who are members of dairy owned agricultural cooperatives generally supply their milk to such cooperatives. The dairy cooperatives then in turn arrange for the sale of their members' raw milk either through the sale of the raw milk or the production of the raw milk into manufactured dairy products directly and/or through their subsidiaries.

7.      Founded in July of 2003, CWT is "a voluntary, producer-funded national program developed by the National Milk Producers Federation ("NMPF"), to strengthen and stabilize milk prices." CWT involves dairy producers in almost every state who are producing "almost 70% of the nation's milk."[1]

8.      CWT's individual producer and cooperative members finance CWT's programs by paying assessments based on their milk productivity.  As of July 7, 2010, as CWT was conducting its tenth and final herd retirement, members paid assessments of $0.10 per hundredweight (cwt) of raw farm milk produced.[2]

---

[1] http://www.cwt.coop/about/about_whatis.html.  Upon information and belief, CWT's website is no longer active.

[2] http://www.agweb.com/assets/import/files/Herd-retirement-bids-accepted-070710(1).pdf.

9.     Each member of CWT, including each defendant other than NMPF/CWT, agreed to and did in fact pay these assessments.  CWT in turn used these assessments to pay some members of CWT to prematurely retire (slaughter) their entire herd, and agree to refrain from milk production for a certain time – the practical effect of which is permanent retirement – in order to eliminate competition, significantly reduce the number of dairy farmers competing in the market and "strengthen and stabilize" raw farm milk prices.  As a result, competition was eliminated, the supply of raw milk as the primary ingredient or main input for production of fluid milk and manufactured dairy products was restrained and the "over-order" prices for raw milk and the prices for fluid milk and manufactured dairy products increased to artificial, supra-competitive levels. As described with greater particularity below, the "over-order" price for raw milk is the price charged and paid in excess of the minimum price set by federal or state milk marketing orders.

10.     Indeed, CWT's primary activity since inception has been to increase the profitability of dairy producers through coordinated herd retirements.  Through this program, dairy producers can submit bids for the price at which they will sell their entire herd to slaughter prematurely.  CWT provides a formula through which farmers can calculate their bids, essentially based on subtracting the price the farmer can recoup by selling the cows for slaughter at auction from their market value as producing dairy cows, with CWT paying the difference.[3]

11.     In order to participate in CWT's herd retirement program, dairy producers were required to complete and execute a "Dairy Herd Retirement Program Bid Form," which, if accepted by CWT, became a contract that was binding on the dairy producer.  A true and correct

---

[3] http://www.cwt.coop/calculator/index.html.

copy of the Dairy Herd Retirement Program Bid Form used in 2010 is appended as Exhibit "A" to this Complaint.

12.     Pursuant to the terms of the Dairy Herd Retirement Program Bid Form, dairy producers who participated in the Defendants' herd retirement program were required to agree to sell for slaughter their "entire dairy herd which means all of the producer's milking and dry cows and all of Producer's heifers that calve prior to CWT's farm audit (which cows and heifers are …referred to collectively as 'The Cows')."  This explicitly included "all of The Cows in which Producer holds an interest at any location."

13.     CWT then reviewed and tentatively accepted bids subject to farm visits by CWT auditors, who supervised the tagging of the herds for removal.  The producers were then required to ship their cows for slaughter within 15 days after completion of the audit. CWT made payment of the amount due to the farmer within 30 days of receiving verification that all cows had gone to slaughter.

14.     As hereinafter alleged, beginning on or about April 1, 2009, persons participating in CWT's herd retirement program were not only required to tender all of their dairy animals for slaughter but they were also required to withdraw entirely from dairy farming for at least one year.  Thus, beginning on or about April 1, 2009 the terms of the Dairy Herd Retirement Program Bid Form that participating farmers were required to execute provided that payment by CWT for "herd retirements" was to be made by CWT "in two installments – 90% upon verification of sale of the cows and 10% plus interest twelve months after completion of the [CWT] audit provided that neither the Producer nor the dairy facility, whether owned or leased, have been involved in the production and marketing of milk during that twelve month period."

4

CWT made payment of the initial 90% due to the farmer within 30 days of receiving verification that all cows had gone to slaughter.[4]

15.     The amount expended to fund the CWT Herd Retirement Program was enormous. In 2009, for example, CWT was spending $217 million toward herd retirements out of a total of $219 million in total revenue and carried over contributions.[5] Nearly the entire revenue of CWT was expended on "retiring herds" – that is, paying dairy farmers to exit dairy farming and thereby to cease competing – and with the effect of substantially constraining output and reducing the supply of raw milk.

16.     The herd retirement program can in no way be construed as pro-competitive. Had CWT not instigated the "herd retirement program," individual dairy farmers would not have been inclined to prematurely retire their herds and effectively withdraw permanently from the production and sale of raw farm milk.

17.     The purpose and effect of the Defendants' herd retirement program was to permanently eliminate competition in the supply of raw farm milk, to significantly reduce the number of producers competing in the market for the production and sale of raw milk, to reduce the supply of raw farm milk and to thereby increase its "over-order" price and artificially inflate the price paid by direct purchasers of raw milk, fluid milk products and other manufactured dairy products, which were primarily composed of the price-fixed raw milk as the main input.

18.     By all accounts, the herd retirement program was a huge success for CWT and its members.  CWT financed ten rounds of herd retirements from 2003 to 2010, during which CWT was responsible for removing over 500,000 cows from production, reducing the nation's raw milk supply by approximately 10 billion pounds.  According to studies by Dr. Scott Brown at the

---

[4] http://www.cwt.coop/action/action_herd_faqs.html#c.
[5] http://www.cwt.coop/sites/default/files/pdf/CWT-Website-Financial-Report-2009.pdf.

University of Missouri that were commissioned by CWT, the CWT Herd Retirement Program, even controlling for other factors affecting price, more than doubled the price of raw farm milk in the last three years of the program alone, from $0.85/cwt in 2007 to $1.75/cwt by 2010. By the end of the program in 2010, it was responsible for a cumulative increase in milk price revenue of $9.55 billion. Further, Dr. Brown's studies indicate that "each herd retirement round has effects that extend forward years into the future,"[6] so that Defendants are still significantly profiting from previous herd retirements.

19.     The principle purpose underlying the formation and operation of CWT was to effectuate pre-production restraints on the output of milk, eliminate competition in the markets for raw milk and manufactured dairy products, significantly reduce the number of dairy producers competing in the market, and to thereby artificially inflate the price of raw milk and manufactured dairy products. Not only did CWT use herd retirements to restrain the supply of raw milk, but CWT also instituted the Reduced Production Marketing program. Through this program "dairy producers bid to be compensated for reducing their milk production."[7] Although this program was discontinued in September of 2004, it contributed to CWT's overall scheme to restrain the supply of milk in the United States and thereby raise the prices of raw milk, fluid milk products and other manufactured dairy products. CWT also operates an Export Assistance Program, which subsidizes exportation of dairy products. The intent of CWT's Export Assistance Program is to remove manufactured dairy products from the U.S. market; an alternative means to reduce supply and drive up prices. To continue supply restriction following the 2010 termination of the herd retirement program, CWT has ramped up its Export Assistance Program. For instance, in 2011, according to another analysis by Dr. Scott Brown, CWT set a new bench mark

---

[6] http://web.archive.org/web/20080301233800/http://www.cwt.coop/impact/impact_index.html.

[7] http://ems-mx4.sradev.com/CWT/about/newsletters/cwt_newsletter_103103.html.

by assisting dairy producers to remove 25% more dairy products from the market than in 2010, adding "an average of 22 cents per hundredweight on all milk marketed …[,] an increase in producer revenue of $120 million."[8]  Dr. Brown further notes the connection between manufactured dairy products and fluid milk supply: "[t]he 92.4 million pounds of cheese CWT assisted member cooperatives in selling in 2011 is equivalent to 905 million pounds of milk, the annual production of 43,100 cows."  As can be shown by CWT's programs, its goal is not only to affect the supply of raw milk but also fluid milk products and other manufactured dairy products.

20.     By manipulating the supply of milk through herd retirements, competition has been suppressed and the "over-order" prices for raw milk as well as the process of fluid milk and other manufactured dairy products, which incorporate raw milk as a key ingredient, have been supported at artificially high levels throughout the United States.  As a result, Plaintiffs and other direct purchasers of raw milk, fluid milk products and other manufactured dairy products have paid, and continue to pay, supracompetitive prices from 2008 to the present.

21.     Accordingly, on behalf of themselves and all others similarly situated, Plaintiffs bring this suit for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, for damages resulting from direct purchases of raw milk, fluid milk products and other manufactured dairy products, the prices of which were artificially increased through pre-production output restraints and the elimination of competition effectuated by defendants' concerted action in violation of the antitrust laws.

22.     Plaintiffs also seek injunctive relief to prevent or correct the effects of Defendants' violations of the antitrust laws. Defendants' unlawful conduct as alleged herein

---

[8] http://www.cwt.coop/sites/default/files/newsletters/CWT-News-1st-Qtr-2012.pdf

poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

## II.      JURISDICTION AND VENUE

23.     This Court has jurisdiction over the instant matter pursuant 28 U.S.C. §§ 1331, 1337(a) and the Clayton Act, 15 U.S.C. §§15(a) and 26.

24.     Venue is appropriate in this district under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period many of the Defendants transacted business, were found, or had agents in this district and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

25.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this district; (b) participated in the sale and distribution of milk throughout the United States, including in this district; (c) had substantial contacts with the United States, including in this district; and/or (d) was engaged in an illegal scheme and supply-reduction conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

26.     Throughout the Class Period, Illinois from its central location within the United States had significant milk production and ties to the milk industry. Indeed, Illinois produced over 50 million pounds of sour cream of which the primary component is raw milk in 2008.[9] Additionally, in 2009 Illinois produced over 82 million pounds of cheese, which is also primarily made from raw milk.[10] From 2007 to 2009, production of milk annually was up to nearly two

---

[9] http://future.aae.wisc.edu/collection/dairyproductsreport/DairProdSu_2010_13.pdf.

[10] http://future.aae.wisc.edu/collection/dairyproductsreport/DairProdSu_2010_13.pdf.

billion pounds.[11] Defendants are located in Virginia, Missouri, Minnesota, New York, and Massachusetts and all have and continue to have impacts on the Illinois' economy and Illinois' consumers of their products. Throughout the Class Period, Illinois had significant production of raw milk, fluid milk and other manufactured dairy products. Further jurisdictional contacts are alleged below.

### III.    THE PARTIES

#### A.    Plaintiffs

27.    Plaintiff Belle Foods Trust represents the interests of Belle Foods LLC, which is an Alabama limited liability company with its principal place of business in Birmingham, Alabama. Belle Foods Trust has the power to prosecute this lawsuit. "Belle Foods" herein refers to Belle Foods Trust as the successor in interest to Belle Foods LLC. Belle Foods owned and operated a chain of supermarkets through October 2013.

28.    Plaintiff Belle Foods purchased large quantities of manufactured dairy products, which contained the raw milk that was the subject of Defendants' anticompetitive conspiracy, directly from Dairy Farmers of America, Inc., Land O'Lakes, Inc., and Agri-Mark, Inc. d/b/a Cabot Creamery Cooperative, Inc. during the class period.  Belle Foods paid supracompetitive prices for manufactured dairy products from Defendants and was injured by the illegal conduct alleged herein.  Defendants through their scheme of herd retirements sought to manipulate the supply of raw milk, create pre-production output restraints, and thereby eliminate competition from the market place, to artificially inflate the price of raw milk, fluid milk products and other manufactured dairy products containing price-fixed raw milk as a key ingredient.

---

[11] http://future.aae.wisc.edu/data/annual_values/by_area/99.

29.     Plaintiff Bankruptcy Estate of Yarnell's Ice Cream Company, Inc. represents the interests of Yarnell's Ice Cream Company, Inc., an Arkansas corporation with its principal place of business in Searcy, Arkansas.  "Yarnell's" herein refers to Bankruptcy Estate of Yarnell's Ice Cream Company, Inc. as the successor in interest of Yarnell's Ice Cream Company, Inc. Yarnell's processes raw milk into dairy products such as ice cream. Randy Rice of Rice and Associates has been appointed Trustee for the Estate of Yarnell's Ice Cream Company, Inc. and Mike Roberts of Roberts Law Firm, P.A. has been appointed special counsel by the Bankruptcy Court of the Eastern District of Arkansas to represent Yarnell's in this action.

30.     Plaintiff Yarnell's purchased large quantities of raw milk directly from Dairy Farmers of America, Inc. during the class period.  Yarnell's paid supracompetitive prices for raw milk from Defendants and was injured by the illegal conduct alleged herein.  Defendants through their scheme of herd retirements sought to manipulate the supply of raw milk, create pre-production output restraints, and thereby eliminate competition from the market place, to artificially inflate the price of raw milk, fluid milk products and other manufactured dairy products containing price-fixed raw milk as a key ingredient.

31.     Plaintiff First Impressions Salon, Inc. is a Vermont corporation with its principal place of business in Woodstock, Vermont.

32.     Plaintiff First Impressions purchased fluid milk products and other manufactured dairy products, which contained the raw milk that was the subject of Defendants' anticompetitive conspiracy, directly from Defendant Agri-Mark via Agri-Mark's brand-owned store, Cabot Quechee Store, located in Quechee, Vermont. Plaintiff paid supracompetitive prices for fluid milk and other manufactured dairy product purchases from Defendants and was injured by the illegal conduct alleged herein.  Defendants through their scheme of herd retirements sought to

manipulate the supply of raw milk, create pre-production output restraints, and thereby eliminate competition from the market place, to artificially inflate the price of fluid milk products and other manufactured dairy products containing price-fixed raw milk as a key ingredient.

33.     Plaintiff Roy Mattson is a resident of Woodstock, Vermont.

34.     Plaintiff purchased fluid milk products and other fresh dairy products, which contained the raw milk that was the subject of Defendants' anticompetitive conspiracy, directly from Defendant Agri-Mark via Agri-Mark's brand-owned store, Cabot Quechee Store, located in Quechee, Vermont. Plaintiff paid supracompetitive prices for his fluid milk and other fresh dairy product purchases from Defendants and was injured by the illegal conduct alleged herein. Defendants through their scheme of herd retirements sought to manipulate the supply of raw milk, create pre-production output restraints, and thereby eliminate competition from the market place, to artificially inflate the price of fluid milk products and other fresh dairy products containing price-fixed raw milk as a key ingredient.

**B.     Defendants**

35.     Defendant National Milk Producers Federation ("NMPF") is a trade association that was established in 1916 and is based in Arlington, Virginia.  The members of NMPF's 31 cooperatives, over 40,000 dairy producers, make the majority of the nation's milk supply. NMPF "promote[s] the economic well-being of dairy producers and their cooperatives through coordinated industry efforts."[12]  NMPF manages Cooperatives Working Together, which was formed for the primary purpose of effectuating pre-production output restraints with respect to raw milk, reducing supply and eliminating competition, thereby strengthening and stabilizing raw farm milk prices through nationally orchestrated herd retirements.  According to NMPF, the

---

[12] http://www.nmpf.org/.

"dairy farmer cooperative associations of the National Milk Producers Federation (NMPF)

represent two-thirds of the nation's 60,000 commercial dairy farmers[.]"

36.     Defendant Cooperatives Working Together ("CWT") "is a voluntary, producer-

funded national program developed by NMPF, to strengthen and stabilize milk prices."  While it

is a separately-funded program, CWT is organized within the existing operating structure of

NMPF. Dairy farmers in almost every state, producing almost 70% of the nation's milk,

participate in CWT.  These producers are either members of the 35 cooperative members of

CWT, or one of over 130 independent dairy farmers who are members of CWT.  The CWT

Committee establishes policies and oversees CWT's programs and activities.  The CWT

Committee consists of the NMPF Board of Directors, representatives from participating

cooperatives that are not members of NMPF, and representatives for independent producer

members of CWT.[13] CWT's website indicates that dairy farmers in every state invest in CWT.  A

major member of CWT is Dairy Farmers of America, Inc.

37.     Defendant Dairy Farmers of America, Inc. ("DFA") has its headquarters and

principal place of business in Kansas City, Missouri.  DFA is the largest dairy farmer

cooperative in the country and is a vertically integrated cooperative that not only engages in the

production of raw milk, but also markets, hauls, processes, bottles and distributes raw milk.

DFA has nearly 16,000 members in 48 states responsible for over 1.8 million cows.[14]  In 2007,

DFA was the 29th largest private company in the United States with $11.1 billion in revenue.[15]

DFA's Chairman of the Board, Randy Mooney, is also the Chairman of NMPF.  Twelve of

DFA's executives are on NMPF's Board of Directors, which also places them on the CWT

---

[13] http://www.cwt.coop/about/about_whatis.html; http://www.cwt.coop/cwt_faqs.html.

[14] http://www.dfamilk.com/.

[15] http://money.cnn.com/galleries/2008/fortune/0805/gallery.private_companies.fortune/29.html.

Committee.  DFA is and has been a contributing member of CWT.  As such it has agreed to and in fact paid assessments of $0.10 per hundredweight (cwt) of milk produced to CWT in order to finance pre-production output restraints, reduce supply, eliminate competition and thereby illegally strengthen and stabilize milk prices through nationally orchestrated herd retirements. DFA had knowledge that the CWT assessments were being used to fund herd retirements and sold raw milk directly to Plaintiff Yarnell's. DFA also sold manufactured dairy products directly to Plaintiff Belle Foods.  On or about April 1, 2014, DFA and Defendant Dairylea merged.

38.     Defendant Land O'Lakes, Inc. ("Land O'Lakes") is the second largest cooperative in the nation with 3,200 producer members and 1,000 member cooperatives comprised of over 300,000 producers.  Located in Arden Hills, Minnesota, Land O'Lakes handles 12 billion pounds of milk annually and does business in all 50 states.[16] Land O'Lakes is a vertically integrated cooperative that not only engages in the production of raw milk, but also markets, hauls, processes, bottles and distributes raw milk.  Land O'Lakes is and has been a contributing member of CWT.  As such it has agreed to and in fact paid assessments of $0.10 per hundredweight (cwt) of milk produced to CWT in order to finance preproduction output restraints, reduce supply, eliminate competition and thereby strengthen and stabilize milk prices through nationally orchestrated herd retirements. Land O'Lakes had knowledge that the CWT assessments were used to fund herd retirements, and sold manufactured dairy products directly to Plaintiff Belle Foods.

39.     Defendant Dairylea Cooperative Inc. ("Dairylea") was founded in 1907 and is headquartered in Syracuse, New York.  It is the fifth largest U.S. dairy cooperative with over

---

[16] http://www.landolakesinc.com/company/default.aspx.

2,000 members and selling more than 6 billion pounds of milk annually.[17]  Dairylea is and has

been a contributing member of CWT.  As such it has agreed to and in fact paid assessments of

$0.10 per hundredweight (cwt) of milk produced to CWT in order to finance pre-production

output restraints, reduce supply, eliminate competition and thereby strengthen and stabilize milk

prices through nationally orchestrated herd retirements. Dairylea had knowledge that the CWT

assessments were used to fund herd retirements.

40.     Defendant Agri-Mark, Inc. ("Agri-Mark") is located in Methuen, Massachusetts,

and markets more than 300 million gallons of milk each year for more than 1,300 producer

members.[18]  Agri-Mark is and has been a contributing member of CWT. As such it has agreed to

and in fact paid assessments of $0.10 per hundredweight (cwt) of milk produced to CWT in

order to finance pre-production output restraints, reduce supply, eliminate competition and

thereby strengthen and stabilize milk prices through nationally orchestrated herd retirements.

Agri-Mark does business under the name Cabot Creamery Cooperative, Inc. in Vermont. Agri-

Mark sold manufactured dairy products directly to Plaintiff Belle Foods. Agri-Mark also owns

the brand Cabot Cheese and, upon information and belief, owns several "Cabot" stores, which

sell Cabot products directly to consumers. These stores include Cabot Visitors Center located in

Cabot Vermont, Cabot Annex Store located in Waterbury Center, Vermont, Cabot Quechee

Store located in Quechee, Vermont, and Cabot Farmers' Annex located in Portland, Maine. Agri-

Mark sold manufactured dairy products directly to Plaintiffs First Impressions and Roy Mattson

at the Cabot Quechee Store located in Quechee, Vermont.

---

[17] http://www.dairylea.com/.

[18] http://www.agrimark.net/public/ourcoop.php.

C.     **Unidentified Co-Conspirators**

41.     Various other persons, firms, and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

42.     The true names and capacities, whether individual, corporate, associate, or representative is unknown to Plaintiffs at this time.  Plaintiffs may amend this Complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery.

43.     At all relevant times, milk producers, milk trade groups, and others, referred to herein as "co-conspirators," as well as other various persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

44.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## IV.     FACTUAL ALLEGATIONS

A.     **Defendants Combined to Effectuate Pre-production Output Restraints, Artificially Reduce Supply, Eliminate Competition, Significantly Reduce the Number of Dairy Producers Competing in the Market and Thereby Reduce Milk Production and Increase Prices Through Herd Retirement**

45.     CWT used its website and Defendant members to actively recruit milk producers throughout the United States to fund the herd retirement program. Through press releases, which were contemporaneously posted to CWT's website, and newsletters, which incorporated information from the press releases and were also contemporaneously posted to CWT's website,

NMPF and CWT communicated with their fellow cartel members.  These communications allowed for the success of the scheme at issue.  In fact, through 2008, CWT's website stated: "It is vital that CWT members see their investment at work.  Review our informative newsletters to learn more about CWT."[19]  The website also explained that members can "track CWT creation, implementation, and impact through past press releases."[20] Members were able through the website to proactively keep track of the impact that the CWT herd retirements were having on the price of milk.

### 1.     The 2003 Herd Reduction Reduces Output.[21]

46.     In a July 11, 2003 press release, the NMPF announced that the herd retirement program aimed: "to strengthen farm milk prices will begin this summer, following action this week by the National Milk Producers Federation Board at their summer meeting in Washington, DC.  'Now that we've reached the critical mass needed to move forward with this innovative program, Cooperatives Working Together, we are eager to finalize specific program details and implement the plan as quickly as possible,' said Jerry Kozak, NMPF President and CEO. Participating producers will begin their investment by contributing the 5 cents per hundredweight assessment on their July milk.  These contributions will be used to implement a multi-dimensional program to reduce milk supplies by 1.2 billion pounds over a 12-month period." Members of CWT financially contributed to the herd retirement program.  Without this contribution from a substantial number of members, such as the Defendants, CWT and its members would not have been successful in effectuating preproduction output restraints,

---

[19] http://web.archive.org/web/20040218150134/http://cwt.coop/about/about_newsletters.html.
[20] http://www.cwt.coop/about/about_news_releases.html.
[21] http://www.cwt.coop/about/about_news_releases2003.html.

artificially limiting supply, eliminating competition and thereby raising milk prices to
supracompetitive levels.

47.     On July 23, 2003, NMPF announced that CWT would begin accepting farmer
bids for participation in the first herd retirement.  These bids stipulate how much each producer
would accept to sell his/her entire milking herd.  By September 16, 2003, "2,038 bids were
submitted for the herd retirement program (under which a producer will be paid for selling
his/her herd of milk cows)" and "approximately 33,000 cows will be culled due to the herd
retirement program … which will reduce the nation's milk output by 580 million pounds."
According to CWT, the producer must agree to sell "all cows in which producer has an
ownership interest, regardless of where the cows are located" even if the producer owns multiple
dairies.[22]  Thus, the program in effect put smaller farmers out of business, while unfairly
increasing the profits of agribusiness giants. The herd retirements not only raised the profits
realized on the sale of raw milk to supracompetitive levels but also allowed "giant" companies,
such as DFA, to sell the raw milk as a component in fluid milk products and other manufactured
dairy products and thereby artificially inflate the price of those dairy products to
supracompetitive levels.  These "giant" companies sell those dairy products at artificially inflated
prices directly to Plaintiffs, as well as through their subsidiaries.

48.     In an October 2, 2003, press release, NMPF explained that "[i]n order to ensure
the integrity of the herd retirement process, those farms whose bids have been tentatively
accepted are now being contacted by CWT field auditors shortly before the auditors visit the
farms.  That process will continue until all the farms have been audited, and the herds have been

---

[22] http://www.cwt.coop/action/action_herd_faqs.html.

tagged for removal.  To date, nearly half the 300 farms have been audited, and are now being

liquidated."  By October 23, 2003, those audits were complete.

49.     In that same press release, Jerry Kozak, NMPF President and CEO, stated

"[w]e've moved very quickly to reduce milk supplies – which is what CWT is all about."

50.     The national scope of the herd retirements is evidenced in the following chart:[23]



**2003 CWT Herd Retirement**

|  | Region I | Region II | Region III | Region IV | Region V | Total |
|---|---|---|---|---|---|---|
| Total Bids | 350 | 338 | 707 | 360 | 283 | 2038 |
| Accepted Bids | 40 | 32 | 141 | 54 | 32 | 299 |
| Pounds of Milk | 54.6 Million | 59.1 Million | 111.6 Million | 146.6 Million | 237.3 Million | 609.2 million |
| Number of Cows | 2,848 | 3,342 | 6,463 | 8,190 | 11,881 | 32,724 |
| Average Bid | $3.86 | $4.00 | $3.94 | $4.08 | $4.20 | $4.02 |

**cwt** Cooperatives Working Together

        2.      **The 2004 Reduction of Output.**[24]

51.     "After six months of operation, the dairy industry's historic self help program,

Cooperatives Working Together [and therefore CWT's Defendant members], has already had a

sizeable impact on dairy producer prices.  According to new analysis released by the National

---

[23] Regions I, II, III, IV, and V were renamed Northeast, Southeast, Midwest, Southwest, and West.  *See* http://www.cwt.coop/sites/default/files/pdf/past-herd-retirements-110810.pdf.
[24] http://www.cwt.coop/about/about_news_releases2004.html.

Milk Producers Federation, CWT will ultimately return nearly 60 cents per hundredweight for America's dairy farmers through this fall."

52.     The first round of herd retirement was so successful at effectuating preproduction output restraints, reducing supply, eliminating competition and thereby raising milk prices that on September 13, 2004, NMPF announced a second round of herd retirement: "Starting October 1st, 2004, CWT will begin accepting bids from dairy farmers willing to sell their entire milking herds to CWT.  The bidding window will be open through October 29th, after which CWT staff will review the bids submitted.  Producers who wish to bid must be paying the five cent per hundredweight CWT membership assessment, either through their cooperative, or directly. CWT also announced today that it has received a number of additional participation commitments recently, bringing the total percentage of milk production contributing to the program to 70.1% of the nation's milk supply."

53.     By November 17, 2004, CWT accepted 378 bids from farmers seeking to retire their milking herds, representing approximately 51,700 cows. The cumulative impact of Defendants' anticompetitive conduct in 2004 was to reduce the supply of milk by over 0.5%, which – as intended – caused the price of raw milk, and fluid milk products and other manufactured dairy products which incorporate milk, to rise above competitive levels.

54.     The across-the-country impact of this program is evidenced by the following chart:

19

# 2004 CWT Herd Retirement

|  | Region I | Region II | Region III | Region IV | Region V | Total |
|---|---|---|---|---|---|---|
| **Total Bids** | 97 | 134 | 261 | 134 | 110 | 736 |
| **Accepted Bids** | 53 | 39 | 150 | 72 | 49 | 363 |
| **Pounds of Milk** | 68.9 Million | 62.1 Million | 141.9 Million | 284.0 Million | 351.5 Million | 908.4 million |
| **Number of Cows** | 3,871 | 4,066 | 8,479 | 16,184 | 17,878 | 50,478 |
| **Average Bid** | $5.32 | $4.76 | $5.22 | $5.47 | $5.42 | $5.24 |



**cwt** Cooperatives Working Together

### 3.  The 2005 Reduction In Output.[25]

55.    By July 2005, the producers of "[n]early three-quarters of the nation's milk supply" were contributing to CWT.  During that same time period, CWT determined that its funds would be "primarily devoted to the retirement program," and on August 10, 2005, announced a third herd retirement round.

56.    CWT explained that the "first two programs reduced cow numbers by more than 83,000, representing reduced milk production equivalent to 1.6 billion pounds.  Since CWT began operations in the summer of 2003, dairy prices have been at or above historical averages, preserving millions of dollars in income for dairy farmers."  However, "CWT estimates that there will be approximately 70,000 cows in this third retirement program to reach its goal of reducing future milk output by 1.9 billion pounds.'" Despite the market's inclination to naturally

---

[25] http://www.cwt.coop/about/about_news_releases2005.html.

correct the price of milk, Defendants continued their efforts to artificially force the price of milk

upward by intentionally restraining the supply through additional herd retirements.

57.      "'Based on our feedback from those whose bids we have accepted previously, we

know that most producers view the decision to sell their herds through CWT as a long-term

commitment which results in them exiting the business permanently,' said Walt Wosje, Chief

Operating Officer of CWT." According to a survey conducted by CWT, only 12% of those

retiring their herds through the CWT program planned on engaging in dairy farming again.

Indeed, as discussed below, in later, progressively larger herd retirement rounds, CWT sought to

even further reduce the percentage of dairy farmers reentering the market by adding the

requirement that farmers retiring herds through the program eliminate their entire herd and not

engage in any milk production for at least one year.  By September 2005, membership in CWT

reached 74% of the nation's milk supply, with nearly 50 dairy cooperatives and more than 300

individual farmers.  CWT reiterated that since it "started operations in July 2003, farm-level milk

prices have been consistently above historic averages." In other words, CWT had been

successful at artificially raising the price of milk.  "In July 2003, dairy farmers took a historic

step by coming together to fund a producer led program to take control of milk pricing by

managing the supply of milk and dairy products available in the domestic market."[26] By

restraining the supply of fluid milk and other manufactured dairy products and otherwise

eliminating competition, Defendants' members were able to charge supracompetitive prices for

both raw milk, fluid milk and other manufactured dairy products sold either through the

Defendants and/or their subsidiaries.

---

[26] http://www.cwt.coop/sites/default/files/pdf/final_year_end.pdf

58.     To obstruct the market's inclination to return to competitively-priced milk,

Defendants continued their herd retirements to intentionally restrain supply, intentionally

eliminate competition and thereby inflate milk prices. On December 5, 2005, Mr. Kozak

explained that "[c]ow numbers and production per cow were both on the rise.  Experience tells

us that can be a formula for dramatic milk price drops.  That's why we initiated this most recent

herd retirement. … We are pleased with the size program we were able to execute.  This is our

biggest retirement to date." Defendants through this herd retirement eliminated 1.2 billion

pounds of milk of the nation's annual supply.

### 4.     In 2006 CWT Boasts of the Price Effects of Its First Three Rounds of Reductions.[27]

59.     On September 26, 2006, CWT announced that an "independent economic analysis

of the impact of Cooperatives Working Together has found that the historic dairy self-help

program has raised farmers' prices by at least 40 cents per hundredweight since it began

operations in 2003.  The analysis was performed by Dr. Scott Brown of the University of

Missouri, a nationally-known farm policy expert who is often called on by the U.S. Congress to

assess agricultural economic issues.  Brown examined the impact of CWT's three herd

retirements, plus its ongoing export assistance program, while also taking into consideration

other factors affecting the dairy supply in 2003-2006, such as the relative shortage of Canadian

dairy replacements.  His analysis showed that CWT alone was responsible for a minimum 40

cent average increase in prices from 2004-06, apart from the other factors affecting the market."

60.     Dr. Brown stated, "At the start of CWT, I was skeptical about the long-term

effects that CWT would have on dairy farmers' prices, but the evidence is clear that this program

has raised the price that all farmers have received since it first began removing cows at the end of

---

[27] http://www.cwt.coop/about/about_news_releases2006.html.

2003." According to his evaluation, the "cumulative impact of CWT from the start of 2004 through the first half of 2006 is $1.97 billion in additional producer revenue," as "the milk price impact has grown with each herd retirement program" and with the "normal attrition of cows in a herd [being] taken into consideration in determining the effect on milk production in the years following a herd removal." Mr. Kozak concluded that even though CWT has "seen both rising and falling prices since 2003, there is no question that prices overall are better because of CWT." As Dr. Brown's study indicated, without the illegally, anticompetitive conspiracy orchestrated and funded by Defendants, the price of raw milk, fluid milk and other manufactured dairy products would have been lower.

### 5.    The 2007 Reduction In Output.[28]

61.    On February 6, 2007, CWT announced a fourth herd retirement. Yet again, just as the market was naturally correcting the price of milk, Defendants took anti-corrective measures and instituted another supply restraint through a fourth herd retirement.

62.    CWT further explained that this retirement "will remove more than one billion pounds of milk, or 0.6% of the nation's dairy supply, in an effort to help strengthen and stabilize farm-level milk prices.  USDA projects a 2.3 billion pound increase in milk production for 2007 and this action by CWT effectively reduces that projection by 45 percent."  By June 6, 2007, the fourth round was complete. Defendants had yet again effectively blocked the natural downward shift in milk prices.

63.    Knowing that the price of milk would eventually decline again, and recognizing that the herd retirements were very effective at eliminating competition and artificially inflating the price of milk, Defendants committed to sticking with the program.  "Kozak said that even

---

[28] http://www.cwt.coop/about/about_news_releases2007.html.

with the record high farm prices of this summer, 'producers recognize that we will need CWT in the future to help stabilize prices.  The track record of the past four years shows what we can accomplish with this unique program when our industry works together.'"

64.     On September 20, 2007, CWT released the results of further economic analysis by Dr. Brown.  He evaluated the impact of CWT's 2007 herd retirement, and its export assistance program activities during the first half of 2007, in addition to reviewing the effects of CWT's past activities.  Dr. Brown's analysis showed that CWT's programs helped raise farm-level milk prices by 75 cents per hundredweight this year, up from 67 cents in 2006, 42 cents in 2005, 18 cents in 2004, and 5 cents in the brief time it operated in 2003.

65.     Dr. Brown stated, "CWT has had a growing influence on the financial returns of dairy farmers.  My economic models account for the variety of supply and demand factors affecting prices, including the fact that in response to CWT, some producers have added cows and produced more milk."  He continued, "[w]hen you separate out all the other factors affecting milk production, the fact remains that CWT has boosted the milk check of each farmer by 75 cents per hundredweight this year."  According to his assessment, U.S. dairy cow numbers were a net 66,000 head fewer than they would have been without Defendants' ongoing activities. While purportedly increasing the "check of each farmer," Defendants had – even as early as 2007, prior to the most aggressive rounds of herd retirements – eliminated over one thousand four hundred dairy farmers from the market and caused Plaintiffs to pay higher prices for raw milk, fluid milk products and other manufactured dairy products.

6.       **The Two Rounds of Reductions In 2008 – Time to Trim Output and Raise Prices.[29]**

66.      In June 2008, the CWT Committee endorsed a continuation of the herd retirement program, at the membership assessment level of 10 cents per hundredweight, through calendar year 2009.

67.      On June 3, 2008, CWT announced its fifth herd retirement.  In a 2008 newsletter, CWT explained that "[d]airy farmers need to remember that CWT is a national program … Some regions of the country may be squeezed before other regions, but overall the benchmarks will tell CWT when to execute a herd retirement so to strengthen and stabilize dairy farmer milk prices."[30]

68.      By September 15, 2008, CWT completed the farm audits of its fifth herd retirement round, resulting in the removal of 24,860 cows representing 436 million pounds of milk.

69.      This prompted another economic analysis from Dr. Brown, who noted that his economic models account for the variety of supply and demand factors affecting farm-level milk prices: "When you separate out all the other factors affecting milk production, the fact remains that CWT has boosted the milk check of each farmer by 71 cents per hundredweight this year."

70.      In 2008, the prices for milk were on a downward trend, and the Defendants took additional, aggressive action to reduce output, eliminate competition and to control and increase prices. On October 24, 2008, CWT announced its sixth herd retirement.  "As farm-level milk prices drop to their lowest level in 18 months, CWT officials said it was time the program offered its members another opportunity to retire their herds to trim overall national milk

---

[29] http://www.cwt.coop/about/about_news_releases2008.html.

[30] http://www.cwt.coop/about/about_newsletters2008.html.

production, and strengthen prices going into 2009." The Defendants took this action despite the

fact that the costs of dairy feed and diesel fuel had dropped.

71.     By December 10, 2008, CWT had accepted 184 bids in its second 2008 herd

retirement, and by February 2009, CWT had eliminated another one billion pounds of raw milk

and another 186 dairy farms from the market. The success of this second 2008 herd retirement

proved that CWT's aggressive action would enable Defendants to continue to artificially inflate

the price of raw milk, fluid milk and manufactured dairy products which incorporate raw milk,

the price of which had been artificially enhanced through the output restraints and elimination of

competition effectuated by Defendants' concerted action.

72.     As with each of CWT's herd retirements, this one impacted all regions of the

U.S.:

## 2008-2 Herd Retirement Results

| Region | Total Cows | Total Milk (Million lbs.) | Dairies | Bred Heifers | Bid Price per cwt. |
|---|---|---|---|---|---|
| Northeast | 2,295 | 43.7 | 22 | 25 | $6.47 |
| Southeast | 3,750 | 65.4 | 28 | 58 | $6.48 |
| Midwest | 3,290 | 64.4 | 48 | 37 | $6.20 |
| Southwest | 17,522 | 304.6 | 39 | 641 | $6.36 |
| West | 23,773 | 497.9 | 49 | 459 | $6.87 |
| Totals | 50,630 | 976.0 | 186 | 1,220 | $6.49 |



73.     The unlawful agreement and conspiracy among Defendants is evidenced by the presentation made by NMPF's COO at an October 29, 2008 "Town Hall Meeting" where he explained the logistics and benefits of the retirement program before concluding that "continued operation of the CWT program is essential for producers to continue to receive benefits from the program:"





### 2nd 2008 Herd Retirement Timeline

✓October 24, 2008 > Bid process opens
✓November 24, 2008 > Postmark deadline for submitting bids
✓Nov. 25 – Dec. 5, 2008 > Independent audit firm bid analysis
✓December 8-10, 2008 > Bids reviewed, final selection by
                             CWT staff
✓December 15, 2008 > Farm audits begin
✓January 12, 2009 > All bidders receive notification

**7.    The Three Rounds of Herd Reductions In 2009 Methodically Reduced
        Supply, Eliminated Competition and Thereby Raised Prices.[31]**

74.    On February 11, 2009, CWT's members, including Defendants, approved a

change in program policy that required all members whose bids were accepted in future herd

retirement programs to agree to cease dairy production for one year.

75.    On April 1, 2009, CWT announced its seventh herd retirement.  Mr. Kozak stated,

"We all recognize that 2009 is shaping up to be among the toughest years on record for dairy

farmers, but CWT will help shorten the price plunge farmers are facing, and speed the recovery."

This would be another opportunity for Defendants to block the downward trend of milk prices by

restraining supply, significantly reducing the number of dairy producers competing in the market

and otherwise eliminating competition.

---

[31] http://www.cwt.coop/about/about_news_releases2009.html.

76.     By May 13, 2009, CWT had accepted 388 bids representing 2 billion pounds of farm milk production capacity, making it the largest single herd retirement carried out in the six-year history of CWT.

77.     By July 2, 2009, CWT completed the farm audits of its seventh herd retirement round, removing 367 herds in 41 states, comprised of 1.96 billion pounds of farm milk. "The national dairy herd will be noticeably smaller this summer as a result of CWT," said Jim Tillison, Chief Operating Officer of CWT.

78.     On July 10, 2009, CWT announced that it would conduct its eighth herd retirement. "Carrying out a second herd retirement right on the heels of the largest-ever herd retirement should give us a double-barreled attack on milk production in a very short period of time, resulting in a farm level price recovery several months sooner than would otherwise occur," Kozak said.

79.     By September 24, 2009, CWT finished the farm audits for its eighth herd retirement, removing 1.5 billion pounds of farm milk.

80.     On October 1, 2009, CWT announced its ninth herd retirement (and the third retirement in 2009). "This third herd retirement of 2009, along with a stabilizing global economy, should further accelerate the recovery in dairy farmers' prices," said Mr. Kozak. By ramping up their aggressive supply-reduction initiatives in 2009, Defendants were able to maximize their anticompetitive impact on milk prices.

81.     Defendants continued to conspire to significantly reduce the supply of milk, significantly reduce the number of dairy producers competing in the market, eliminate competition and thereby hike prices to a supracompetitive level despite an economic downturn. By October 27, 2009, CWT had accepted 154 bids from the fourth herd retirement conducted in

the previous 12 months, representing 517 million pounds of farm milk.  Said Mr. Kozak, "We felt it was important to help milk prices continue to strengthen by conducting another herd retirement as soon as we completed farms audits for the previous round."

82.     In November 2009, Dr. Brown provided another economic evaluation of CWT's herd retirement program.  His "analysis showed that the combined effect of CWT's cow-removal programs, as well as its export assistance program, helped raise farm-level milk prices by $1.54 per hundredweight this year, and added $2.4 billion to farm-level milk receipts in a year when dairy income is expected to shrink by more than $10 billion because of the global recession."  He explained that his econometric model "allows for the effects of the CWT to be separated from everything else that has occurred in the industry during the operation of CWT."[32]

83.     This chart shows the impact of CWT's three 2009 herd retirements on prices:

---

[32] http://www.cwt.coop/sites/default/files/pdf/ScottBrownCWTNovember2009.pdf.



*December 2009 All Milk price is an estimate.

CWT explains that these herd retirements were "made possible by the financial commitment of tens of thousands of dairy farmers" who "have in just a matter of months moved milk prices for all producers back to where they were a year ago."[33]

84.     According to the analysis of Dr. Brown, milk prices in 2009 "would have averaged $1.66 less had the CWT program not been in business – actively removing cows and, thus, reducing milk production in a timely manner."[34]

### 8.     The 2010 Herd Reduction Again Boosts Prices Above Free Market Levels.[35]

85.     On May 27, 2010, CWT announced its tenth herd retirement.  Mr. Kozak stated, "It is our belief that a herd retirement at this time will add to the positive momentum already building and should result in speeding up the milk price recovery already in progress."

86.     By July 7, 2010, CWT accepted 194 bids on what would be its last herd retirement, representing 653,893,409 pounds of farm milk.

---

[33] http://www.cwt.coop/sites/default/files/newsletters/CWTNewsDecember2009.pdf.

[34] http://www.cwt.coop/sites/default/files/newsletters/CWTNewsJune2010.pdf.

[35] http://www.cwt.coop/about/about_news_releases2010.html.

87.     In total, Defendants were responsible for removing 506,921 cows from production and for eliminating 2,802 dairy farms from the market, resulting in the removal of 9.672 billion pounds of raw milk as summarized in the following chart:[36]

## Summary of Herd Retirements

| Herd Retirement | Farms Accepted | Cows Removed | Pounds of Milk Removed (billion lbs.) | Average Herd Size |
|---|---|---|---|---|
| 2003 | 299 | 32,724 | 0.609 | 109 |
| 2004 | 363 | 50,478 | 0.908 | 139 |
| 2005 | 442 | 64,069 | 1.174 | 145 |
| 2007 | 333 | 52,783 | 1.001 | 159 |
| 2008-1 | 201 | 24,585 | 0.432 | 122 |
| 2008-2 | 186 | 50,630 | 0.976 | 272 |
| 2009-1 | 367 | 101,040 | 1.960 | 275 |
| 2009-2 | 274 | 74,113 | 1.523 | 270 |
| 2009-3 | 150 | 25,340 | 0.505 | 169 |
| 2010 | 187 | 31,159 | 0.584 | 167 |
| Total | 2,802 | 506,921 | 9.672 | 181 |

cwt Cooperatives Working Together

88.     On October 26, 2010, CWT voted to focus the program exclusively on building export markets and no longer fund herd retirement.  The refocused program was to be funded at two instead of ten cents per hundredweight.  Mr. Kozak claimed that the herd retirement program "has reached a point of diminishing returns, where there were a declining number of member farms that were expecting to use CWT as a means to liquidate their herds."

89.     In a June 8, 2011, press release, NMPF noted that the CWT program no longer funds herd retirements or cow removals, and will focus exclusively on assisting member organizations with dairy exports, assuming it could obtain commitment by mid-November of a 70% membership participation level.[37]

---

[36] http://www.cwt.coop/sites/default/files/pdf/past-herd-retirements-110810.pdf.

[37] http://www.cwt.coop/about/about_news_releases.html.

**B.      Defendants' Conspiracy Raises Milk Prices to Supracompetitive Levels Throughout the Class Period**

90.      As a direct result of the Defendants' and co-conspirators' reduction in output of farm milk and the elimination of thousands of competitors from the market, the "over-order" prices of raw milk prices throughout the Class Period were supracompetitively higher than they would have been with competition.

91.      In a 2008 report, Dr. Brown illustrated the effect of herd retirement on "U.S. Dairy Cows" in an analysis that "allows for the effects of the CWT to be separated from everything else that has occurred in the industry during the operation of the CWT program":



92.      Dr. Brown then summarized the effect of the CWT program, funded by Defendant members, on increasing the "US All Milk Price:"

**Effect of the CWT Program on the US All Milk Price \***

| Year | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 * |
|---|---|---|---|---|---|---|
| US All Milk Price | $12.55 | $16.13 | $15.19 | $12.90 | $19.13 | $19.08 |
| CWT Herd Retirement Impact | $0.05 | $0.16 | $0.44 | $0.55 | $0.62 | $0.57 |
| CWT Export Assistance Impact | NA | $0.01 | $0.01 | $0.09 | $0.16 | $0.14 |
| TOTAL CWT Impact | $0.05 | $0.17 | $0.45 | $0.64 | $0.77 | $0.71 |

93.     Dr. Brown concluded his 2008 report by describing the success of the CWT

program, funded by Defendants:



**CWT Summary Points**

- **2008 Bottom Line:**
  - CWT will increase producers' milk prices by $0.71 per cwt
  - The herd retirement program added $0.57 per cwt to milk prices and the export assistance program added $0.14 per cwt

- **On Average Over the 2004 to 2008 Period:**
  - CWT will increase producers' milk prices by $0.55 per cwt
  - The herd retirement program added $0.47 per cwt to milk prices and the export assistance program added $0.08 per cwt

- The CWT program has generated an additional $4.6 billion in milk market receipts at a program cost of $0.3 billion

- Continued operation of the CWT program is essential for producers to continue receive benefits from the program

94.     In Dr. Brown's January 2011 Report, entitled "The Economic Effects of the CWT Program," he analyzed the cumulative effect of the ten herd retirements.[38]

95.     Again, his analysis, as Dr. Brown presented previously, "allows for the effects of the CWT to be separated from everything else that has occurred in the industry during the operation of the CWT program."[39]

96.     First, Dr. Brown analyzed the impact CWT's herd retirements have had on raw milk prices each year since its inception.  CWT states, "The beauty of CWT herd retirements is that the impact of each herd retirement lasts several years.  Each herd retirement completed builds on and adds to those that have been carried out before."



---

[38] http://www.cwt.coop/sites/default/files/pdf/Economic-Effects-of-CWT-January-2011.pdf.
[39] 2008 CWT Town Hall Meeting Presentation.

97.     In the above chart, each color represents the effect of a herd retirement on raw milk prices over time.  There were ten rounds of herd retirements, each represented by one of the ten colors in the chart.  The blue represents the effects of the first herd retirement, which occurred in 2003 and affected prices in 2004 through 2006.  The red represents the effects of the second herd retirement, which occurred in 2004 and affected prices in 2004 through 2007.  The green represents the effects of the third herd retirement, which occurred in 2005 and affected prices in 2005 through 2008, and so on.  Thus, the later herd retirements are likely still to be affecting prices through to the present, especially after the addition – in advance of the four record-breaking 2009 herd reductions – of the policy restraining farmers from reentering the dairy farming business for at least a year after they accepted a CWT payment in exchange for retiring their entire herd.

98.     The above chart also shows that the effect on raw milk price of the 2004 herd retirement was $0.20 per cwt increase.  The cumulative continuing impact of the subsequent herd retirement rounds was $0.50 per cwt in 2005; $0.60 per cwt in 2006; $0.86 per cwt in 2007; $0.78 per cwt in 2008; $1.61 per cwt in 2009; and $1.75 per cwt in 2010.

99.     Another chart from Dr. Brown's analysis shows the cumulative impact on producer revenue that the ten herd retirements have had:

36



100.    This chart shows that as of 2010, CWT's restraints on milk production in the form of premature herd retirements had increased cumulative raw milk price revenues by over $9.5 billion.

101.    Moreover, Defendants' impact on farm (raw) milk prices affects retail milk prices, as "[r]etail prices roughly track farm prices."[40]  Jim Dunn, Professor of Agricultural Economics at Pennsylvania State University, explains that "retail prices do fall with farm prices, as well as rise."[41]  In his July 2011 report entitled "Dairy Outlook," he graphs the direct relationship between farm and retail milk prices:[42]

---

[40] http://www.modbee.com/2010/10/23/1396934/got-retail-milk-price-basics.html.

[41] http://www.agweb.com/news/news.aspx?ArticleId=305612.

[42] http://dairyoutlook.aers.psu.edu/reports/DairyOutlookjul11.pdf.



102.    From the above chart, it is plain to see that retail milk prices closely follow raw milk prices over time.  Thus, by manipulating the supply of farm milk through herd retirement, price competition has been suppressed or eliminated and, as a result, direct purchasers of fluid milk and manufactured dairy products have paid supracompetitive prices.  Milk demand is highly price inelastic and a relatively small decrease in raw milk supply can cause – and as shown by Dr. Brown's analyses, has caused – a substantial increase in price due to the lack of suitable alternatives. Non-milk products, such as soy based products, whose primary component or main input is not raw milk, are not interchangeable with fluid milk or other manufactured dairy products.

103.    Jerry Kozak, President and CEO of National Milk Producers, recognized in an August 2004 newsletter that CWT's various supply-reducing measures at the farm milk level had

38

an almost immediate effect on retail prices.[43] CWT's own newsletter included the below chart which clearly shows that average retail prices very closely tracked average raw milk prices.[44]



Dotted line is projected.

104.    Moreover, prices have been supported at artificially high levels throughout the United States.  The minimum pricing of nearly all of the raw farm milk produced in the United States is regulated by state and federal milk marketing orders; the raw milk prices in unregulated areas move in tandem with the prices in regulated areas.  Currently ten federal marketing orders regulate the minimum price of 70 percent of all raw milk produced in the country according to region.  Most of the remainder is regulated by other state marketing orders (Maine, Montana, Nevada, Virginia), and a small portion is not regulated by any marketing order.

105.    The federal milk marketing orders regulate the price producers receive for sale of their raw farm milk by setting minimum prices that processors must pay for raw farm milk. These prices vary depending on end use for the milk, pursuant to a system designed to ensure an

---

[43] http://ems-mx4.sradev.com/CWT/about/newsletters/cwt_newsletter_082004.htm

[44] http://ems-mx4.sradev.com/CWT/about/newsletters/cwt_newsletter_082004.htm

adequate supply of milk is available for each class of use ("classified pricing").  The federal milk marketing orders cover all fluid milk products (Class I) and manufactured dairy products, such as fluid cream products, yogurts, or perishable manufactured products (Class II); spreadable and hard manufactured cheese (Class III); and butter and dried milk products (Class IV).[45]  However, while processors pay different prices for milk in each category of use (Classes I-IV), producers are paid a weighted average or "blended" price for the milk they sell under each federal milk marketing order.  Under this "pooling system" all producers receive the same price for the milk they sell under any given federal milk marketing order, regardless of how it is ultimately used.

106.    Although the federal milk marketing orders set minimum prices, they do not regulate the prices charged and paid in excess of the minimum prices established by applicable milk marketing orders. The price charged and paid for raw milk in excess of the minimum prices established by applicable milk marketing orders is referred to as the "over-order" price. Defendants' conduct inflated the raw milk over-order prices to supracompetitive levels.

107.    Prices of fluid milk products and manufactured dairy products respond to market events, including changes in the supply of raw milk.  Because regulated raw milk prices throughout the country are calculated according to formulas linked to wholesale market prices of cheese, butter, non-fat dry milk, and whey, regulated raw milk for wholesale fluid milk and manufactured dairy product prices in various regions tend to move in parallel fashion. Thus, Defendants manipulated prices throughout the dairy marketing chain by systematically reducing the supply of raw milk across the nation— increasing prices of raw milk to supracompetitive levels above the over-order prices, thereby successfully increasing wholesale prices of fluid milk products and manufactured dairy products.

---

[45] http://www.ers.usda.gov/briefing/dairy/definitions.htm; 7 C.F.R. §1000.40

108.    The CWT herd retirement program reduced the supply, and raised the over-order price, of raw farm milk, and thus raised the price of the key ingredient for a broad range of dairy products.  Higher prices of raw milk subsequently resulted in higher prices of fluid milk products and other manufactured dairy products and harmed direct purchasers of those products, such as Plaintiffs.

109.    Upon information and belief, Defendants at each level of the supply chain conspired to manipulate and reduce the supply of raw milk, to significantly reduce the number of dairy producers competing in the market, and to eliminate competition with the intent of controlling, increasing and fixing the price of raw farm milk, as well as fluid milk and manufactured dairy products. Direct purchasers of fluid milk products and other manufactured dairy products paid higher prices for dairy products than they would have paid had Defendants not funded the herd retirement program and reduction in supply of raw milk.

110.    Further, the only way in which the herd retirement program could be effective is with the organized conspiracy of the Defendant members of CWT; individual producers could not effectuate the intended raw milk supply reduction alone. "67% represents the minimum level of participation [of milk cooperatives and producers in the U.S.] CWT needed to reach. However, to maximize the effectiveness of CWT's programs in 2009 and 2010 that number needs to grow." (emphasis in original). "CWT reached that goal, thanks to 35 dairy cooperatives and nearly 400 individual dairy farmers making the investment that gives CWT the resource necessary to achieve its milk reduction goals."[46] Without the "investment" of the $0.10 per hundredweight (cwt) of raw milk produced by each Defendant member of CWT and the agreement to use that funding for herd retirements to restrain the supply of raw milk produced,

---

[46] http://www.cwt.coop/sites/default/files/newsletters/CWTNewsMarch2009.pdf.

Defendants would not have been able to accomplish their goal to "strengthen and stabilize milk prices."[47]

### C. Defendants Are Not Entitled to the Limited Protections of the Capper-Volstead Act.

#### 1. The Capper Volstead Act Grants Limited Antitrust Immunity to Agricultural Cooperatives

111. The Capper-Volstead Act, passed in 1922 as the Co-operative Marketing Associations Act, (P.L. 67-146)(7 U.S.C. 291, 292), grants certain agricultural producers an exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. Capper-Volstead Act, § 1.These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes." *Id.*

112. The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which absent the Act, would been run afoul of the Sherman Antitrust Act.

113. Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

114. Further, Capper-Volstead requires that protected cooperatives be "operated for the mutual benefit of the members thereof" and limits the immunity provided by the Act to cooperatives that afford equal corporate suffrage rights to its members, providing "that no

---

[47] http://www.cwt.coop/about/about_whatis.html.

member of the association is allowed more than one vote because of the amount of stock or

membership capital he may own therein."

115.     The limited protections of the Capper-Volstead Act evaporate unless the

organization engaging in the coordinated efforts is *exclusively* made up of producers.  If even one

member of a cooperative organization is not a producer, the limited protection of the Capper-

Volstead Act will not apply.

116.     Even if an individual producer independently qualifies as a Capper-Volstead

entity, that individual producer loses Capper-Volstead immunity when the individual producer

conspires with a non-Capper-Volstead entity.

### 2.     Defendants Do Not Qualify For Antitrust Immunity Under the Capper-Volstead Act.

117.     The plain language of the Capper-Volstead Act does not provide immunity for

pre-production output restraints: Congress did not grant the cooperatives the power to restrict

supply, only the power to assist producers in marketing the available supply of agricultural

products. USDA itself has recognized in various published documents that it is illegal for

cooperatives to restrain members' production. The herd retirements orchestrated by CWT and its

members went beyond merely setting the price for raw milk, but instead sought to restrain the

supply of raw milk, eliminate competition and thereby artificially inflate the prices of raw milk,

fluid milk and manufactured dairy products. CWT and its members, therefore, are not entitled to

the protections of the Capper-Volstead Act.

118.     The activities of CWT and its members, including Defendants, as described

herein, were anticompetitive and predatory.  CWT did not collectively process, prepare for

market, handle, or market any of the products of its members as required by the Capper-Volstead

Act.  CWT performed no activities that promoted market efficiency and had no legitimate

business justification for its existence. Its sole purpose was, and remains, to facilitate the conspiracy to reduce the supply of raw farm milk available in the U.S. and drive up the prices.

119.    CWT does not qualify as a Capper-Volstead entity. Members of CWT include non-producers, such as United Ag Services Cooperative, Inc. and National Farmers Organization, whose membership includes entities that produce no milk.

120.    NMPF, which contains numerous cooperatives that are not members of CWT, retains ultimate authority over CWT operations.  Per its bylaws, CWT is subject to the general supervision and direction of the NMPF, and NMPF has retained the power to amend CWT's bylaws, which are part of NMPF's bylaws.  Moreover, CWT's organizational structure vests automatic, *ex officio* representation on the CWT committee with NMPF's Board of Directors, who are not all CWT members.[48]  These circumstances defeat the equality of corporate suffrage that members of CWT are entitled to, effectively defeating the one-member-one-vote condition to Capper-Volstead immunity.  Moreover, the fact that non-members have influence over the direction of CWT, without paying dues and while benefiting from the herd retirements' industry-wide effect, puts the conduct of the defendants outside of the immunity afforded by the statute.[49]

---

[48] http://www.cwt.coop/sites/default/files/pdf/cwt_by_laws.pdf.

[49] In particular, seven out of forty NMPF Board of Directors members and one out of seven NMPF Officers are not affiliated with a CWT member cooperative.  The seven directors from non-CWT organizations are:  (1) Steve Schlangen, Associated Milk Producers Inc.; (2) Ed Welch, Associated Milk Producers Inc.; (3) Tim den Dulk, Continental Dairy Products, Inc.; (4) Randy Geiger, Manitowoc Milk Producers Coop.; (5) Albert Knegendorf, Ellsworth Cooperative Creamery; (6) Dennis Donahue, Manitowoc Milk Producers Coop.; and (7) Brad Bouma, Select Milk Producers.  The officer from a non-CWT organization is Assistant Treasurer Mike McCloskey, Select Milk Producers, Inc.   This means that, per CWT bylaws, there are at least six policy-setting CWT Committee members who represent dairy cooperatives that are not themselves members of CWT, but still materially benefit from CWT policies despite not paying dues.  This conflict of interest makes plain that CWT is not operated for the mutual benefit of its members but for the benefit of interested and involved non-members as well.

121.   Thus, CWT and its members do not enjoy the limited immunities of Capper-Volstead, and neither does NMPF for having created and conspired with a non-exempt entity

122.   Further, Capper-Volstead requires that protected cooperatives be "operated for the mutual benefit of the members thereof" and limits the immunity provided by the Act to cooperatives that afford equal corporate suffrage rights to its members, providing "that no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein."   NMPF, which contains numerous cooperatives that are not members of CWT, retains ultimate authority over CWT operations.  Per its bylaws, CWT is subject to the general supervision and direction of the NMPF, and NMPF has retained the power to amend CWT's bylaws, which are part of NMPF's bylaws.  Moreover, CWT's organizational structure vests automatic, *ex officio* representation on the CWT committee with NMPF's Board of Directors, who are not all CWT members.[50]  These circumstances defeat the equality of corporate suffrage that members of CWT are entitled to, effectively defeating the one-member-one-vote condition to Capper-Volstead immunity.  Moreover, the fact that non-members have influence over the direction of CWT, without paying dues and while benefiting from the herd retirements' industry-wide effect, puts the conduct of the defendants outside of the immunity afforded by the statute.[51]  Thus, CWT does not qualify as a Capper-Volstead entity.

---

[50] http://www.cwt.coop/sites/default/files/pdf/cwt_by_laws.pdf.

[51] In particular, seven out of forty NMPF Board of Directors members and one out of seven NMPF Officers are not affiliated with a CWT member cooperative.  The seven directors from non-CWT organizations are:  (1) Steve Schlangen, Associated Milk Producers Inc.; (2) Ed Welch, Associated Milk Producers Inc.; (3) Tim den Dulk, Continental Dairy Products, Inc.; (4) Randy Geiger, Manitowoc Milk Producers Coop.; (5) Albert Knegendorf, Ellsworth Cooperative Creamery; (6) Dennis Donahue, Manitowoc Milk Producers Coop.; and (7) Brad Bouma, Select Milk Producers.  The officer from a non-CWT organization is Assistant Treasurer Mike McCloskey, Select Milk Producers, Inc.  This means that, per CWT bylaws, there are at least six policy-setting CWT Committee members who represent dairy cooperatives that are not themselves members of CWT, but still materially benefit from CWT policies despite not paying

123.    Further, NMPF and CWT are well aware that the U.S. Supreme Court has long held that the Capper-Volstead Act does not wholly exempt agricultural associations from antitrust laws and does not permit cooperatives to engage in predatory, anticompetitive conduct. Acreage reductions, production restrictions, and collusive conduct to "retire" herds and eliminate competing producers from the market are not protected activities under the Capper-Volstead Act. Therefore, even if the Defendants met the antitrust exemption requirements of the Capper-Volstead Act, immunity does not extend to the Defendants' concerted activity as described herein.

124.    For all of the above reasons, the Capper-Volstead Act's limited protection from antitrust liability does not apply to Defendants.

## V.    CLASS ACTION ALLEGATIONS

125.    Plaintiffs bring this action on behalf of themselves and all persons and entities similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure with respect to damages and injunctive/declaratory relief sought herein, and as representatives of the following class ("the Class"):

> All persons or entities in the United States who, from December 6, 2008 to the present, purchased directly from one or more Defendants, or their subsidiaries or joint-ventures, one or more of the following: (i) raw milk; (ii) fluid milk products and/or manufactured dairy products.

126.    Excluded from the class are (1) Defendants and their co-conspirators; (2) any entity in which Defendants have a controlling interest; (3) Defendants' officers, directors, and employees; (4) and Defendants' legal representatives, successors, and assigns. The proposed Class is both ascertainable and the Class members share a well-defined community of interest in

---

dues. This conflict of interest makes plain that CWT is not operated for the mutual benefit of its members but for the benefit of interested and involved non-members as well.

common questions of law and fact.  Furthermore, this action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements. The relevant market is the market in the United States for fluid milk products and other manufactured dairy products, which incorporate the price-fixed raw milk as a primary ingredient or main input.

127.     Plaintiffs do not know the exact number of Class members at the present time. However, due to the nature of the trade and commerce involved, there are hundreds, if not thousands, of class members, geographically dispersed throughout the United States such that joinder of all Class members is impracticable.

128.     The common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to individual circumstances of any Class member include, but are not limited to, the following:

> (a)     Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy to limit production, restrain output, significantly reduce the number of dairy producers competing in the market, eliminate competition and thereby artificially increase the prices of raw milk, fluid milk products, and manufactured dairy products, sold in the U.S. by restricting raw milk production through herd retirements;
>
> (b)     The duration and extent of the alleged contract, combination or conspiracy;
>
> (c)     Whether Defendants and their co-conspirators were participants in the contract, combination or conspiracy alleged herein;

      (d)      The effect of the contract, combination or conspiracy on the over-order prices of raw milk, fluid milk products and manufactured dairy products in the United States during the Class Period;

      (e)      Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

      (f)      Whether the alleged contract, combination or conspiracy violated the Sherman Act § 1.

129.      Questions of law and fact common to members of the Class predominate over any questions which may affect only individual members.

130.      Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are not antagonistic to the claims of the other Class members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate.  Plaintiffs have retained competent counsel experienced in complex antitrust and consumer protection class action litigation and will prosecute this action vigorously.

131.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome on the courts if individual litigation of numerous cases would proceed.  By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented in this Complaint, presents fewer management difficulties,

conserves the resources of the parties and of the court system, and protects the rights of each Class member.

132.    Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues.

133.    Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing Class members with a method for the redress of claims that may not otherwise warrant individual litigation.

## VI.    ANTITRUST INJURY

134.    The effect of Defendants' conduct as described herein has been to artificially inflate the over-order prices of raw milk and the prices of fluid milk products and manufactured dairy products, as described herein, in the United States.  By manipulating the supply of raw milk through an agreement to conduct and pay for herd retirements, prices have been supported at artificially high levels throughout the United States, and, as a result, direct purchasers of raw milk, fluid milk products and manufactured dairy products have paid supracompetitive prices.

## VII.    CLAIMS FOR RELIEF

### VIOLATION OF SHERMAN ACT § 1

135.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

136. Defendants are *per se* liable under Section 1 of the Sherman act for the injuries and damages caused by their contract, combination and conspiracy in restraint of trade as alleged herein.

137. There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

138. The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated, among other ways, by the following acts:

(a) Prior to the Class Period, raw milk prices could not be maintained due to a fluctuating imbalance of supply over demand – after spurts of high prices, producers would add more production capacity and prices would fall again.

(b) Against this backdrop, the Defendants acted in concert with competitors, with and through CWT and other trade groups, and with non-member conspirators, and contracted, conspired, and combined to effectuate a substantial reduction of the production of raw milk and to eliminate thousands of otherwise competing dairy farms from the market, which allowed for a series of substantial supracompetitive increases in the over-order prices of raw milk and the prices of fluid milk product and manufactured dairy product prices to direct purchasers of such dairy products.

(c)    Defendants conspired to substantially reduce raw milk production through ten phases of herd retirements, which removed over two thousand dairy farms from the market, which removed 500,000 cows from production and which reduced the nation's raw milk supply by over 9.672 billion pounds. These actions were extraordinary, non-competitive, and contrary to economic fundamentals.

(d)    To maintain their overarching conspiracy to restrain output and production, to significantly reduce the number of dairy producers competing in the market, to eliminate competition and to thereby supracompetitively raise the over-order prices of raw milk and the prices of fluid milk products and other manufactured dairy products, Defendants took significant steps throughout 2003 to 2010, which resulted in supracompetitive prices for fluid milk products and other manufactured dairy products throughout the Class Period.

139.    The conspiracy had its intended effect, as Defendants benefited from their supply constraints on raw milk and the elimination of competition, both of which artificially inflated the prices of raw milk, fluid milk products and other manufactured dairy products, as described herein.

140.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their business and property in that they have paid more for raw milk, fluid milk products and/or other manufactured dairy products than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown but will be determined after discovery and upon proof at trial.

141.     Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class members pray for relief as set forth below:

A.     Certification of the action as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.     That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.     A judgment for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

D.     By awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.     The costs of this suit, including reasonable attorney fees;

F.     Such injunctive relief as is appropriate to remedy the significant threat of continuing injury posed by Defendants' violations of the antitrust laws; and

G.     Such other and further relief as the Court deems just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiffs on behalf of themselves and all others similarly situated hereby requests a jury trial on any and all claims so triable.

Dated:  October 10, 2014.

Respectfully submitted,


 /s/  *Charles Barrett*
Charles Barrett
CHARLES BARRETT, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
Facsimile: (615) 515-3395
Email: charles@cfbfirm.com

Don Barrett
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095-0927
Telephone: (662) 834-9168
Facsimile: (662) 834-2628
Email: dbarrett@barrettlawgroup.com

Dianne M. Nast
Daniel N. Gallucci
Erin C. Burns
NASTLAW LLC
1101 Market Street
Suite 2801
Philadelphia, Pennsylvania 19107
Telephone: (215) 923-9300
Facsimile: (215) 923-9302
Email: dnast@nastlaw.com
Email: dgallucci@nastlaw.com
Email: eburns@nastlaw.com

Michael Roberts
Debra Gaw Josephson
Stephanie E. Smith
Jana K. Law
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
Mailing Address: P.O. Box 241790
Little Rock, Arkansas 72223
Telephone:  (501) 821-5575
Facsimile:  (501) 821-4474
Email:  mikeroberts@robertslawfirm.us
Email: debrajosephson@robertslawfirm.us
Email: stephanieegner@robertslawfirm.us
Email: janalaw@robertslawfirm.us

Joseph Kohn
Robert J. LaRocca

53

KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968
Email: jkohn@kohnswift.com
Email: rlarocca@kohnswift.com

Arnold Levin
Michael D. Fishbein
Frederick S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
Email: alevin@lfsblaw.com
Email: mfishbein@lfsblaw.com
Email: flonger@lfsblaw.com

*Attorneys for Plaintiffs Belle Foods Trust,
Bankruptcy Estate of Yarnell's Ice Cream
Company, Inc., First Impressions Salon, Inc.,
and Roy Mattson.*