IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FIRST IMPRESSIONS SALON, INC., | ) | |
| ROY MATTSON, | ) | |
| BELLE FOODS TRUST, | ) | |
| GERRY WHITING, | ) | |
| KPH HEALTHCARE SERVICES d/b/a | ) | |
| Kinney Drugs, Inc., and | ) | |
| PIGGLY WIGGLY MIDWEST, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 13-CV-454-NJR-SCW |
| | ) | |
| NATIONAL MILK PRODUCERS | ) | |
| FEDERATION, | ) | |
| COOPERATIVES WORKING | ) | |
| TOGETHER, | ) | |
| DAIRY FARMERS OF AMERICA, INC., | ) | |
| LAND O'LAKES, INC., and | ) | |
| AGRI-MARK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is currently before the Court on the motion filed jointly by all Defendants seeking to dismiss the Third Amended Consolidated Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and to strike certain class allegations pursuant to Federal Rule of Civil Procedure 23(d)(1)(D) (Doc. 166).[1] For the reasons explained below, the motion is granted in part and denied in part.

---

[1] The Third Amended Consolidated Class Action Complaint (Doc. 182) is the operative complaint in this matter.

## BACKGROUND

These background facts were derived from the Third Amended Consolidated Class Action Complaint filed by Plaintiffs First Impressions Salon, Roy Mattson, Belle Foods Trust, Gerry Whiting,[2] KPH Healthcare Services, and Piggly Wiggly Midwest (Doc. 182). Plaintiffs allege that Defendants National Milk Producers Federation, Cooperatives Working Together, Dairy Farmers of America, Land O'Lakes, and Agri-Mark engaged in a nationwide conspiracy to prematurely slaughter dairy cows thereby limiting the production of raw milk and driving up prices for milk and milk products. More specifically, it is alleged that the National Milk Producers Federation is a trade association of dairy cooperatives that created Cooperatives Working Together ("CWT") in order to "strengthen and stabilize milk prices." Dairy Farmers of America, Land O'Lakes, and Agri-Mark, along with over 30 other dairy cooperatives and over 130 independent dairy farmers, joined CWT. CWT's members collectively produce almost 70% of the nation's milk. It is alleged that CWT used fees collected from its members to finance "herd retirement programs." These programs consisted of paying strategically chosen members to prematurely slaughter their dairy herds in order to limit the supply of raw milk, thereby artificially inflating the price of butter and cheese and the over-order price for raw milk to "supracompetitive" levels. Plaintiffs directly purchased raw milk, cheese, and/or butter at these inflated prices from one or more CWT members or their subsidiaries. Plaintiffs bring this putative class action on behalf of themselves and all other direct purchasers of raw milk, cheese, and butter, against Defendants for

---

[2] Gerry Whiting was substituted as Plaintiff for the Bankruptcy Estate of Yarnell's Ice Cream Company, Inc., on December 30, 2015 (Doc. 216).

violations of § 1 of the Sherman Antitrust Act.

D<span style="font-variant:small-caps">ISCUSSION</span>

*D<span style="font-variant:small-caps">EFENDANTS' </span>M<span style="font-variant:small-caps">OTION TO </span>S<span style="font-variant:small-caps">TRIKE</span>*

Defendants argue that Belle Foods Trust and the Bankruptcy Estate of Yarnell's Ice Cream Company are not adequate class representatives under Rule 23(d)(1)(D) and therefore allegations to that effect in the complaint should be stricken (Doc. 188-1, pp. 17–18). More specifically, Belle Foods Trust and Yarnell's are both involved in bankruptcy proceedings, which Defendants contend creates an inherent conflict of interest between these two Plaintiffs and the other potential class members (Doc. 188-1, p. 17). Because of the purported conflict of interest, Defendants contend they are not adequate class representatives (*Id.*). After this motion was briefed, Magistrate Judge Williams allowed Gerry Whiting to be substituted for Yarnell's as a Plaintiff in this matter (Doc. 216), however, Defendants believe that Whiting has the same conflicts of interest as Yarnell's (Doc. 192).

A motion to strike portions of a pleading is properly brought under Rule 12(f). *See* F<span style="font-variant:small-caps">ED</span>. R. C<span style="font-variant:small-caps">IV</span>. P. 12(f). It is well-established, however, that a disputed issue of law should not be decided on a Rule 12(f) motion. *See, e.g., Riemer v. Chase Bank, N.A.*, 275 F.R.D. 492, 494 (N.D. Ill. 2011) ("A motion to strike under Rule 12(f) is not a mechanism for deciding disputed issues of law or fact . . . ."); *Van Schouwen v. Connaught Corp.*, 782 F. Supp. 1240, 1245 (N.D. Ill. 1991) (citing *United States v. 416.81 Acres of Land*, 514 F.2d 627 (7th Cir. 1975)) ("[C]ourts are typically reluctant to decide disputed or substantial issues of law on a motion to strike."); *Garza v. Chicago Health Clubs, Inc.*, 347 F. Supp. 955, 963 (N.D. Ill. 1972) ("The Court is not unmindful that motions to strike under Federal Rule 12(f) are

not a favored means for disposition of substantial questions of law.") *See also* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1380 (3d ed.) ("A motion to strike under Federal Rule 12(f) is the appropriate remedy for the elimination of redundant, immaterial, impertinent, or scandalous matter in any pleading[.]")

Whether Belle Foods Trust and Yarnell's/Whiting are adequate class representatives is an issue of law that goes to the propriety of certifying a class; it cannot be decided on a motion to strike under Rule 12(f). To the extent Defendants are attempting to bring their motion to strike under Rule 23(d)(1)(D),[3] they are jumping the gun. The issue of adequacy, along with all of the other requirements of Rule 23, should be decided in the context of the motion for class certification, not a motion to dismiss.

*Defendants' Motion to Dismiss*

A majority of the arguments in the motion to dismiss relate to Plaintiffs' standing to assert their claims. In particular, Defendants argue that Plaintiffs Belle Foods Trust and KPH Healthcare Services, Inc. lack antitrust standing because they failed to sufficiently allege that they are direct purchasers. Defendants also argue that Plaintiffs lack antitrust standing to pursue claims for products they did not purchase, *i.e.*, Yarnell's cannot pursue claims based on the prices of butter and cheese, and all other Plaintiffs cannot pursue claims based on the price of raw milk. Finally, Defendants argue that Plaintiffs lack standing to sue for injunctive relief, or in the alternative, fail to state a claim for injunctive relief. Beyond the threshold issue of standing, Defendants argue that

---

[3] Defendants state in their motion that they are moving the Court "for an Order striking the class action allegations of plaintiffs Belle Foods Trust and Yarnell's Ice Cream Company Inc. pursuant to Federal Rule of Civil Procedure 23(d)(1)(D)" (Doc. 166, p. 1).

the entire complaint should be dismissed under the filed-rate doctrine. They also argue that certain claims are barred by the statute of limitations.

Almost all of Defendants' arguments seek dismissal under Federal Rule of Rule 12(b)(6) (Doc. 188). The purpose of a motion to dismiss under Rule 12(b)(6) is to address the legal sufficiency of a plaintiff's claim for relief, not the merits of the case or whether the plaintiff will ultimately prevail. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff, accept as true all well-pleaded facts, and draw all possible inferences in the plaintiff's favor. *See, e.g., Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). To survive a motion to dismiss, the complaint must allege facts sufficient to "'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Camasta*, 761 F.3d at 736 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "Determining whether a complaint states a claim upon which relief may be granted is dependent upon the context of the case and 'requires the reviewing court to draw on its judicial experience and common sense.'" *Camasta*, 761 F.3d at 736 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)).

Only one argument regarding Plaintiffs' standing to seek injunctive relief invokes Rule 12(b)(1) as the basis for dismissal (Doc. 188). This argument is properly understood as a facial challenge because Defendants contend that the complaint lacks sufficient allegations to suggest that any injury Plaintiffs suffered as a result of Defendants'

conduct is still ongoing and likely to continue (Doc. 188-1, p. 29). *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) ("Facial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction.") "When evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly–Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015).

**1.  Antitrust Standing of Belle Foods Trust, Inc. and KPH Healthcare Services**

Defendants argue that Plaintiffs Belle Foods Trust, Inc. and KPH Healthcare Services failed to sufficiently allege that they were direct purchasers and therefore they lack anti-trust standing to sue (Doc. 188-1, pp. 11–15). The Court agrees as to Belle Foods Trust, but disagrees as to KPH Healthcare Services.

Private citizens may bring civil actions to enforce the Sherman Act. 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent. . . ."). The Supreme Court has endorsed several limiting principles, however, so that "not all persons who have suffered an injury flowing from [an] antitrust violation have standing to sue . . . ." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (citation omitted). The limitation at issue here is the direct purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729–30 (1977). *Illinois Brick* held that "only direct purchasers may sue sellers who violate the antitrust laws; the purchaser's

customers (the "indirect" purchasers) may not." *State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1477 (7th Cir. 1991) (parenthetical in original). The rationale behind the indirect purchaser bar is that allowing every person along a chain of distribution to claim damages arising from a single violation of the antitrust laws would create a risk of duplicative recovery against the violator. *Id.* Additionally, even if there was a way to prevent duplicative recovery, it would be nearly impossible for a court to determine what portion of the overcharge was absorbed by the direct purchaser and what portion was passed on to the indirect purchaser. *Id.*

A. <u>Belle Foods</u>

It is undisputed that Belle Foods is an indirect purchaser—the complaint alleges that Belle Foods purchased butter and cheese from C&S Wholesale Grocers, who had previously purchased those products directly from Defendants (Doc. 182; Doc. 206). Plaintiffs argue that even though Belle Foods is an indirect purchaser it still has standing to bring this antitrust suit based on the cost-plus exception to the indirect purchaser rule (Doc. 206).

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court suggested that there may be an exception to the ban on suits by indirect purchasers when the indirect purchaser received the goods from the direct purchaser pursuant to a pre-existing cost-plus contract. *In re Bulk Petroleum Corp.*, 796 F.3d 667, 677 (7th Cir. 2015), *cert. denied sub nom. Kentucky Dep't of Revenue v. Bulk Petroleum Corp.*, 136 S. Ct. 1162 (2016); *Burris*, 935 F.2d at 1477. "In a cost-plus contract, a customer has an obligation to purchase a fixed quantity of the good at a price that is equal to the supplier's cost plus a

contractually predetermined markup." WILLIAM B. RUBENSTEIN, NEWBURG ON CLASS ACTIONS § 20:7 (5th ed.). Consequently, the direct purchaser is able to pass on the entire overcharge to its customer and, furthermore, it is "insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price." *Illinois Brick Co.*, 431 U.S. at 736; *Simon v. KeySpan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012); NEWBURG ON CLASS ACTIONS § 20:7. This means that courts are able to circumvent the complicated task of determining who absorbed what portion of the overcharge is avoided because 100% of it goes to the indirect purchaser. And, because the direct purchaser did not absorb any of the overcharge or lose any sales, it suffered no anti-trust injury, which eliminates the risk of duplicative liability for the antitrust violator. *Simon*, 694 F.3d 202; NEWBURG ON CLASS ACTIONS § 20:7. Because neither of the concerns underlying the indirect purchaser ban is implicated, an indirect purchaser may have "standing to sue if they are able to demonstrate that a pre-existing contract locked them into a fixed quantity of purchases at a fixed profit margin . . . ." NEWBURG ON CLASS ACTIONS § 20:7.

That being said, the Supreme Court "made it clear that this exception would rarely apply, if indeed it still could be invoked at all." *In re Bulk Petroleum Corp.*, 796 F.3d at 677 (citing *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990)). *See also Burris*, 935 F.2d at 1478 ("The [Supreme] Court's interpretation of the cost-plus exception appears so narrow . . . as to preclude its application in any case . . . .") Plaintiffs do not cite to, and the Court is unaware of, any case in which the Supreme Court or the Seventh Circuit explicitly recognized the cost-plus exception and/or found that it applied (*see* Doc. 206).

The Court also is unable to definitively ascertain that C&S Wholesale Grocers suffered an antitrust injury. Simply looking at the contract between C&S and Belle Foods does not permit the Court to determine with any certainty that C&S bore no portion of the overcharge and passed 100% of it onto Belle Foods. It also does not permit the Court to determine with any certainty that C&S's sales and profits were unaffected. Consequently, the Court cannot conclude that the cost-plus exception applies, and Belle Foods' claims are barred by the indirect purchaser rule. Accordingly, the portion of Defendants' motion to dismiss regarding Belle Foods standing to sue is granted, and Belle Foods is dismissed as a Plaintiff in this matter.

B.  KPH Healthcare

Defendants argue that KPH failed to properly allege antitrust standing because it does not plausibly allege a direct purchase from any Defendant (Doc. 188-1, p. 14). In response, Plaintiffs state that KPH's purchase data was provided to Defendants in discovery (Doc. 206, p. 11). In particular, KPH purchased butter and/or cheese from Defendant Agri-Mark and CWT member Upstate Niagara (*Id.*). Additionally, KPH was assigned claims from Shadow Cross Farms, Monument Farms, and Spragues Dairy, Inc., all of whom bought butter and cheese from Agri-Mark (*Id.* at pp. 11–12). These facts cure any infirmities in the complaint and demonstrate that KPH was a direct purchaser and therefore has standing to sue. Accordingly, the portion of Defendants' motion to dismiss regarding KPH's standing to sue is denied.

**2. Plaintiffs' Antitrust Standing to Bring Claims for Products They Did Not Purchase**

The complaint alleges that "[a]s a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their business and property in that they have paid more for raw milk, butter, milk and cheese than they otherwise would have paid in the absence of Defendants' unlawful conduct" (Doc. 182, ¶145). Defendants interpret this allegation to mean that each Plaintiff is stating a claim for damages based on purchases of raw milk, purchases of butter, and purchases of cheese (*see* Doc. 188-1, pp. 15–17). But Defendants contend that Yarnell's does not have standing to bring claims for purchases of cheese or butter because elsewhere in the complaint Yarnell's alleged only that it purchased raw milk (*Id.* at p. 16). Similarly, Defendants contend the other Plaintiffs do not have standing to bring claims for purchases of raw milk because they alleged only that they purchased butter or cheese, (*Id.*). Consequently, according to Defendants, there is a whole laundry-list of "claims" that must be dismissed (*see Id.* at p. 17).

Plaintiffs do not directly counter Defendants' argument (*see* Doc. 206). But even without any input from Plaintiffs, the Court is not inclined to agree with Defendants. It appears they are overanalyzing and unnecessarily complicating the highlighted allegation. A fair reading of that allegation, in the context of the complaint taken as a whole, simply reflects that Plaintiffs and the putative class members are seeking to recover damages for their collective purchases of raw milk, butter, and cheese at inflated prices. It cannot fairly be read to allege that each Plaintiff is trying to recover damages for purchases they never actually made. FED. R. CIV. P. 8(e) ("Pleadings must be

construed so as to do justice."). Accordingly, this portion of Defendants' motion to dismiss is denied.

### 3. Plaintiffs' Antitrust Standing to Bring Claim for Injunctive Relief

Defendants argue that Plaintiffs' claims for injunctive relief must be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs do not have standing to seek an injunction (Doc. 188-1, p. 28–30). According to Defendants, Plaintiffs do not have standing because they have not set forth any allegations that suggest Defendants' conduct is likely to cause them harm in the future (*Id.*) For that same reason, Defendants argue that Plaintiffs' claims for injunctive relief also must be dismissed under Rule 12(b)(6) because they have not sufficiently pleaded entitlement to an injunction as a matter of law (Doc. 188-1, pp. 30–31). The Court disagrees with both arguments.

"To seek an injunction under § 16 of the Clayton Act, a private plaintiff must allege 'threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 364 (7th Cir. 1990) (quoting *Cargill Inc. v. Monfort of Colorado Inc.*, 479 U.S. 104, 113 (1986)). *See also Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000) ("[T]he Supreme Court has made clear that in order to invoke Article III jurisdiction a plaintiff in search of prospective equitable relief must show a significant likelihood and immediacy of sustaining some direct injury.")

In the complaint, Plaintiffs allege that Defendants engaged in anticompetitive conduct from 2003 until 2010, when the herd retirement programs were stopped (Doc.

182, ¶¶1, 4, 14, 91, 143). Defendants argue that because CWT stopped retiring herds years ago, any injury Plaintiffs might have suffered no longer is continuing; furthermore, Plaintiffs did not allege that the herd retirement programs are like to be resumed (Doc. 188-1, p. 30).

In response, Plaintiffs argue they have put forth a number of allegations that make future injury plausible (Doc. 206, pp. 30–32). Specifically, Plaintiffs point to allegations showing that Defendants were able to engage in a conspiracy for over eight years, and as a result of that conspiracy, Defendants directly control a huge portion of the nation's milk supply (74% by 2005), and they increased milk revenue by billions of dollars (Doc. 206, p. 31; Doc. 182, ¶¶ 1, 60, 63). Plaintiffs claim that "[t]he same market conditions and opportunities to conspire that facilitated Defendants' long-running conspiracy continue today" (Doc. 206, p. 31). But even if Defendants do not resume herd reduction programs, Plaintiffs allege that expert studies indicated each round of herd retirement that was conducted "has effects that extend forward years into the future" (Doc. 182, ¶14). Therefore, it is plausible that Plaintiffs and other direct purchasers are still paying supracompetitive prices and Defendants are still profiting from previous herd retirements (Doc. 182, ¶¶14, 16, 100).

In viewing the complaint in a light most favorable to Plaintiffs and drawing all inferences in their favor, the Court concludes that it contains enough factual information to plausibly suggest Plaintiffs may continue to suffer injuries in the future and therefore may be entitled to injunctive relief. Accordingly, the portion of Defendants' motion seeking to dismiss Plaintiffs' claims for injunctive relief based on lack of standing and

failure to state a claim is denied.

### 4.  Filed-Rate Doctrine

Defendants argue that Plaintiffs' claims are barred by the filed-rate doctrine (Doc. 188-1). The Court disagrees.

The filed-rate doctrine comes into play when an entity is required to file rates for its services with a governing regulatory agency and the agency has been given exclusive authority by federal statute to set, approve, or disapprove the rates. *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 607 (7th Cir. 2013). The doctrine forbids an entity from charging any rate that is different than the one properly filed and approved; this protects consumers from unreasonable or discriminatory rates.[4] More important to Defendants' argument, the doctrine also prohibits consumers from filing lawsuits challenging properly filed and approved rates; this protects the entity from attacks on its regulated rates,[5] prevents courts from becoming enmeshed in rate-making, and preserves "the agency's primary jurisdiction over reasonableness of rates."[6]

The filed-rate doctrine is typically utilized in litigation involving a common

---

[4] *Sec. Servs., Inc. v. K Mart Corp.*, 511 U.S. 431, 435 (1994) ("The purpose of the filed rate doctrine is 'to ensure that rates are both reasonable and nondiscriminatory . . . .'" (citing *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990)); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority."); *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 867 (9th Cir. 2013) ("[T]he initial *raison d'être* for the doctrine concerned stabilizing rates and preventing pricing discrimination amongst ratepayers.").

[5] *See Simon v. KeySpan Corp.*, 694 F.3d 196, 204 (2d Cir. 2012) ("Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers.") (citation omitted); *Cohen*, 735 F.3d at 607 ("The doctrine protects public utilities and other regulated entities from civil actions attacking their rates if the rates must be filed with the governing regulatory agency and the agency has the authority to set, approve, or disapprove them."); *Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001) (explaining that a customer cannot ask the court in a civil rights or antitrust suit to invalidate or modify a rate).

[6] *Arkansas Louisiana Gas Co.*, 453 U.S. at 577–78; *Simon*, 694 F.3d at 205 ("[I]f customers were allowed to challenge the rate in court, varying litigation outcomes might result in non-uniform rates."); *Arsberry*, 244 F.3d at 562 ("The filed-rate doctrine . . . is based . . . on historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently . . . .")

carrier or public utility. *See, e.g., Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922) (railroads); *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) (natural gas); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) (electricity); *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) (telecommunications). Defendants' argument requires the Court to determine whether the filed-rate doctrine applies to raw milk. This requires a brief summary of the federal government's role in setting milk prices.

The Agricultural Marketing Agreement Act of 1931 ("AMAA") authorizes the Secretary of Agriculture to regulate the nation's milk markets by issuing Federal Milk Marketing Orders ("FMMOs" or "milk orders") for ten different geographic regions. *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 471 (7th Cir. 2009); *Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*, 462 F.3d 249, 254 (3d Cir. 2006) (citations omitted). Within these orders, the Secretary classifies raw, unprocessed milk into four categories according to its end use and establishes minimum prices for each category. *White Eagle Co-op.*, 553 F.3d at 471. "Class I milk includes fluid milk processed and bottled as a beverage; Class II milk includes soft milk products such as cottage cheese, sour cream, yogurt and ice cream; Class III includes hard cheese and cream cheese; and Class IV includes raw milk used for butter and dry milk powder." *Id.* "Instead of setting specific prices to be paid for each Class, the Secretary has established a formula by which the price for each Class is determined monthly based on the average nationwide wholesale prices from the previous month." *Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agr.*, 573 F.3d 815, 818 (D.C. Cir. 2009).

The Secretary also establishes a uniform "blend" price, which is essentially a weighted average of the price of all classes of milk sold in the region. *Cloverland-Green Spring Dairies*, 462 F.3d at 254. Handlers must pay the uniform blend price for milk, and dairy producers within a region receive the guaranteed uniform blend price, regardless of the end use to which the milk is put. *White Eagle Co-op.*, 553 F.3d at 470, 471.[7] This results in some handlers paying producers less than the market value for the milk they purchase while other handlers pay more. *Id.* at 471. To remedy this imbalance, the AMAA created a method for adjustments in payments among handlers so that the final amount paid by each handler equals the market value of the milk they use, while all producers in an area receive the same average, or blended, price per unit of milk. *Id.* at 470; *Arkansas Dairy Co-op*, 573 F.3d at 818–19.

"Although the AMAA mandates a minimum price, it does not mandate a maximum price." *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 859 (9th Cir. 2013) (quoting *Farmers Union Milk Mktg. Coop. v. Yeutter*, 930 F.2d 466, 468–69 (6th Cir. 1991)). *See also Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 276 (D. Conn. 2003) ("[The AMAA] establishes only minimum pay prices for milk. It does not forbid the payment of prices above the minimum set by a milk order." (quoting *Servais v. Kraft Foods. Inc.*, 631 N.W.2d 629, 631 (Wis. Ct. App. 2001), *aff'd*, 643 N.W.2d 92 (Wis. 2002))). "Handlers cannot pay less than the blend price, but they are allowed to pay as much as they want. In times of relative scarcity, handlers can and do negotiate premiums, known

---

[7] In the dairy industry, dairy farmers are commonly called "producers," and they sell raw milk to "handlers," who process the raw milk into fluid milk or other dairy products for resale to consumers or serve as intermediaries to those who do. *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 469–70 (7th Cir. 2009).

as 'over-order' prices, for the sale of the milk." *Carlin*, 705 F.3d at 859 (quoting *Farmers Union Milk,* 930 F.2d at 468–69). "Thus, market forces are allowed to intrude on this regime on occasion, though only in one direction." *Carlin*, 705 F.3d at 859 (quoting *Farmers Union Milk,* 930 F.2d at 468–69). *See also In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2008 WL 2368212 (E.D. Tenn. June 6, 2008) ("While Congress did authorize the Secretary of Agriculture to set certain minimum prices, Congress specifically left the determination of milk prices above this floor to market forces.").[8]

Very few courts have addressed whether the filed-rate doctrine applies to minimum raw milk prices set in the milk orders. The Ninth Circuit Court of Appeals is the only federal appellate court that has done so, and it concluded the filed-rate doctrine does apply to minimum milk prices. *Carlin*, 705 F.3d at 873. At least four district courts have reached the same conclusion. *Edwards v. California Dairies, Inc.*, No. 11-04766-JSW (E.D. Cal. Oct. 30, 2012) (Doc. 123, pp. 7–9);[9] *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 894 (N.D. Ill. 2011) ("[T]he Court holds that the filed rate doctrine is generally applicable to government minimum milk rates, even in cases of fraud."); *Southeastern Milk*, 801 F. Supp. 2d at 733 ("[T]his Court now concludes that the filed-rate doctrine does in fact bar plaintiffs' claim . . . [that] directly challenge[s] the federal minimum blend prices."); *Ice Cream Liquidation*, 253 F. Supp. 2d at 276 ("As plaintiff seems to concede, any claim challenging [the FMMOs] or the

---

[8] A subsequent order in the same case is also relevant and cited to by this Court later in the discussion. It is available at *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 732–35 (E.D. Tenn. July 14, 2011). When referencing either order, the case name will be the same: *Southeastern Milk,* but the citation will differ.

[9] A summary of this order was provided in a subsequent order in the same case, which is available at *Edwards*, No. 1:14-MC-00007-SAB, 2014 WL 2465934, at *2 (E.D. Cal. June 2, 2014), *reconsideration denied,* 2014 WL 3420991 (E.D. Cal. July 14, 2014) ("The filed rate doctrine applies to the minimum prices set for raw milk under the FMMOs.")

[minimum milk] rates themselves clearly would be barred by the filed rate doctrine."). *See also Servais*, 631 N.W.2d at 634 ("[T]he filed rate doctrine precludes substituting the judgment of a court for the judgment of the USDA as to what constitutes a reasonable minimum pay price . . . .").

Importantly, however, most courts have found the filed-rate doctrine does not apply to any aspect of milk pricing aside from the minimum rates. For example, in 2003, an ice cream manufacturer brought a federal antitrust suit against several dairy cooperatives alleging the cooperatives conspired to inflate the price of butter traded on the Chicago Mercantile Exchange in order to "increase above competitive levels the wholesale prices of milk, cream, and butter that they charged their customers." *Ice Cream Liquidation*, 253 F. Supp. 2d at 266. The defendants moved to dismiss the plaintiff's claims based on the filed-rate doctrine. *Id.* at 274. With respect to cream and butter, those prices were "allegedly set by 'industry practice,'" and the court thus concluded they "would not be encompassed by the 'filed rate doctrine.'" *Id.* at 275. As for wholesale milk prices, the court found the plaintiff was not challenging the minimum milk prices but rather "inflated wholesale milk prices in excess of the minimum milk prices." *Id.* at 276. Because those prices "were neither regulated nor approved by the USDA," the plaintiff was "not asking the Court to engage in judicial rate-making . . . nor to create discriminatory rates that would apply to some handlers and not others." *Id.* That meant neither of the underlying purposes of the filed-rate doctrine was implicated, so the motion to dismiss based on the filed-rate doctrine was denied. *Id.*

In *Southeastern Milk*, the court employed similar, though not identical, logic. In

this case, purchasers and retailers of processed milk alleged the defendants conspired to lessen competition for sales of processed milk, to unreasonably restrain trade, and to monopolize. 2008 WL 2368212 at *1–2. The defendants moved to dismiss the plaintiffs' claims based on the filed-rate doctrine. *Id.* at *4. The court noted that, based on the allegations in the complaint, plaintiffs did "not appear to be challenging the minimum prices set by the Secretary of Agriculture but rather the elimination of competition and the fixing of over-order premiums paid to dairy farmers." *Id.* at *7.[10] Once again, the court noted that "those aspects of milk pricing are not regulated by the Department of Agriculture." *Id.* The court went on to explain that "[w]hile Congress did authorize the Secretary of Agriculture to set certain minimum prices, Congress specifically left the determination of milk prices above this floor to market forces." *Id.* Because the plaintiffs' complaints "clearly assert that the defendants have stifled competition and fixed prices to the extent they are determined by market forces," the filed-rate doctrine was not implicated. *Id.* After the factual record was developed, however, the court determined that plaintiffs were, in fact, challenging the federal minimum blend price and the court would have to recalculate that price to figure out plaintiffs' damages. 801 F. Supp. 2d at 734. Therefore, the court ruled those claims were barred by the filed-rate doctrine. *Id.*

Most recently, indirect purchasers of milk and milk products brought a class action alleging that dairy cooperatives and trade associations conspired to conduct herd retirement programs in order to artificially inflate milk prices in violation of the antitrust laws of several states. *Edwards*, No. 11-04766-JSW, at Doc. 123. The court found it

---

[10] Interestingly, the plaintiffs were accusing the defendants of conspiring to eliminate or reduce the over-order price, as opposed to inflating it.

"significant" that the USDA does not approve, authorize, or otherwise regulate over-order prices and concluded the filed-rate doctrine was not implicated because plaintiffs' claims were "premised on the over-order prices of raw milk which resulted in higher wholesale and retail prices of milk and fresh milk products," not the minimum price of milk set in the milk orders. *Id.* at pp. 8, 9, 10.

There is one case that seems to be an outlier, which Defendants rely on (Docs. 188-1, 209). In *Cheese Antitrust Litigation*, direct purchasers alleged the defendants conspired to manipulate the price of milk futures and spot cheese traded on the Chicago Mercantile Exchange in order to charge inflated prices for those products. 767 F. Supp. 2d 880, 886 (N.D. Ill. 2011). The court held that the filed-rate doctrine barred the plaintiffs' claims based on pleading nuances. First, the court noted the complaint alleged that the government minimums were manipulated and inflated, but did not "contain a single allegation" that the over-order premiums the plaintiffs paid were "fixed, manipulated, or unfair in any way." *Id.* Therefore, the plaintiffs were not challenging "the size of the over-order premiums they paid," just the fact they were added on to an inflated minimum price. *Id.* In other words, the court assumed that the over-order premium was a customary, fixed amount that never changed, and thus the plaintiffs would have paid the same amount for a premium even in the absence of the defendants' conduct. That means the inflated prices the plaintiffs paid had nothing to do with the over-price premium; the prices were inflated solely because the minimum rate was inflated. Consequently, the court concluded that the plaintiffs' claims were based on the government minimum rate, not the over-order premiums. *Id.* Second, the court

explained that the plaintiffs "[did] not propose, nor can the Court conceive of a method for calculating damages" that did not require the court to determine the minimum price that would have set absent the defendants' conduct. *Id.*

Here, Plaintiffs' allegations are more analogous to those in *Ice Cream Liquidation, Southeastern Milk*, and *Edwards*, than those in *Cheese Antitrust Litigation*. First, unlike *Cheese Antitrust Litigation*, Plaintiffs allege that prices beyond the regulated minimum price of milk were inflated and unfair. Specifically, Plaintiffs allege that "[t]he effect of Defendants' conduct . . . has been to artificially inflate the over-order prices of raw milk, as well as the price of butter and cheese, in the United States." (Doc. 182, ¶¶93, 139). The complaint also makes clear that Plaintiffs are not seeking damages based on the increases to the regulated minimum prices; they are only seeking damages based on increases to the over-order price of raw milk (classes I and II), the price of butter, and the price of cheese (Doc. 206, p. 21; Doc. 182, ¶¶111–114, 139, 134(d), 143(d), 144–145). Neither the over-order price of milk nor the price of butter and cheese is set, approved, or otherwise regulated by the Secretary of Agriculture (Doc. 182, ¶¶106, 108). They are determined by market forces (Doc. 182, ¶¶107, 108). Therefore, the filed-rate doctrine would not apply.

This conclusion is bolstered by Plaintiffs' claim that their damages can be determined without requiring the Court to recalculate the federally regulated minimum price of raw milk (Doc. 206, pp. 23–25; *see* Doc. 182, ¶¶62–63, 67–68, 85–87, 94–103, 111). Whether that claim is true and borne out by the parties' expert reports is a question that is not appropriately decided on a motion to dismiss.

For these reasons, the Court does not believe that the filed-rate doctrine applies to Plaintiffs' claims. Accordingly, the portion of Defendants' motion seeking to dismiss Plaintiffs' claims based on the filed-rate doctrine is denied.

**5. Statute of Limitations**

The statute of limitations is an affirmative defense that generally would not be brought pursuant to a motion to dismiss. FED. R. CIV. P. 8(c). However, "the statute of limitations may be raised in a motion to dismiss if 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)).

In the complaint, Plaintiffs claim to represent a class that made purchases dating back to December 6, 2008 (Doc. 182). Defendants argue that under the Sherman and Clayton Acts, Plaintiffs can only recover damages they incurred in the four years before they filed suit (Doc. 188-1, p. 27). This lawsuit was filed on May 10, 2013, and therefore according to Defendants, Plaintiffs can recover only for damages dating back to May 10, 2009 (Doc. 188-1, p. 27). Plaintiffs disagree (Doc. 206). They believe the class period can reach back to December 6, 2008, because the statute of limitations was tolled during the pendency of another previously-dismissed putative class action: *Blakeman v. National Milk Producers Federation, et al.*, Case No. 12-cv-1246-GPM-PMF (S.D. Ill.).

*Blakeman* was filed on December 7, 2012, and tolled the statute of limitations for all unnamed class members until the suit was dismissed. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974); *Knauf Insulation, Inc. v. S. Brands, Inc.*, 820 F.3d 904, 907–08 (7th Cir. 2016) ("The statute of limitations governing Sherman Act claims is only

four years, 15 U.S.C. § 15b, though of course it's tolled (postponed — stops running) once a suit is brought within the limitations period.") (citations omitted). The issue here is whether the named Plaintiffs were part of the proposed class in *Blakeman*. If so, tolling applies, and Plaintiffs are entitled to damages for incidents that date back to four years before *Blakeman* was filed, rather than four years before this suit was filed.

The proposed class in *Blakeman* included all persons and entities who directly purchased from Defendants "fluid milk products, and/or fresh dairy products (including, but not limited to, processed milk, cream, half & half, yogurt, dry milk, cottage cheese, cream cheese, sour cream, and ice cream)." *Blakeman* at Doc. 2. Here, Plaintiffs seek to recover for purchases of raw milk, cheese, and butter (Doc. 182, ¶129). Defendants argue that these purchases would not have been included in the *Blakeman* had it gone on to be certified (Doc. 188-1, p. 28), which Plaintiffs dispute (Doc. 206, p. 30). Based on the parties' briefs, however, the Court is unable to make a determination.

The Court suspects that "raw milk" cannot be considered a "fluid milk product" or a "fresh dairy product" but is unable to say for certain because neither party defines these terms or cites to any source that does (*see* Docs. 188-1, 206, 209). As for cheese and butter, these items are indubitably "dairy products" (*see* Doc. 209, p. 6). But are they "*fresh* dairy products"? Plaintiffs say yes (Doc. 206, p. 30). Defendants say no; they imply that "fresh dairy products" are "perishable" and therefore do not include cheese and butter because those are "storable" dairy products (Doc. 209, p. 6). Again, the Court imagines these terms have precise meanings in the extensively-regulated dairy industry, but once again neither party provides those definitions or cites to any source that does

(*see* Docs. 188-1, 206, 209). The Court will not attempt to navigate the tangle of statutes and regulations in order to fill in the blanks and decipher the contours of the parties' arguments.

At this point, the Court is unable to determine whether the raw milk, cheese, and butter purchases that Plaintiffs seek to recover for in this action would have been part of the *Blakeman* class. Therefore, the Court is likewise unable to determine the applicable statute of limitations for Plaintiffs' claims. Accordingly, the portion of Defendants' motion to dismiss regarding the statute of limitations is denied.

## CONCLUSION

As set forth above, Defendants' joint motion to strike certain class allegations (Doc. 188) is **DENIED**, and Defendants' joint motion to dismiss (Doc. 188) is **GRANTED in part and DENIED in part**. The motion to dismiss is granted as to Defendants' argument that Belle Foods Trust lacks antitrust standing, and Belle Foods Trust is hereby **DISMISSED** as a Plaintiff in this matter. All other arguments are denied.

IT IS SO ORDERED.

DATED:   October 5, 2016

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**