**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **FIRST IMPRESSIONS SALON, INC.,** | ) | |
| **ROY MATTSON, GERRY WHITING,** | ) | |
| **KPH HEALTHCARE SERVICES d/b/a** | ) | |
| **Kinney Drugs, Inc., and** | ) | |
| **PIGGLY WIGGLY MIDWEST, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:13 -CV-00454-NJR-SCW** |
| | ) | |
| **NATIONAL MILK PRODUCERS** | ) | |
| **FEDERATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, District Judge:**

Defendants' Motion to Strike the Expert Testimony of Dr. Michael Reed (Doc. 262) and Plaintiffs' Second Renewed Motion for Class Certification (Doc. 245) are pending before the Court. For the reasons set forth below, the Court denies Defendants' Motion to Strike and grants Plaintiffs' Motion for Class Certification.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs, First Impressions Salon, Inc., Roy Mattson, Gerry Witting, Piggly Wiggly Midwest, LLC, and KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. (collectively "Buyers") filed this action on behalf of themselves and all others similarly situated in the United States. (Doc. 182). The Third Amended Consolidated Complaint alleges Defendants National Milk Producers Federation, Cooperatives Working Together (CWT); Dairy Farmers of America, Inc.; Land O'Lakes, Inc.; Dairylea Cooperative Inc.;

and Agri-Mark, Inc. (collectively "Producers"), violated the Sherman Act, 15 U.S.C. §1, by entering into a conspiracy to reduce milk output through a Herd Retirement Program, where entire herds of dairy cows were slaughtered, thereby limiting the production of raw milk and driving up prices for butter and cheese. (Doc. 182, ¶ 1). Buyers further claim they, and others similarly situated, directly purchased cheese and/or butter at these inflated prices from one or more CWT members or their subsidiaries. (Doc. 182, ¶ 17).

Producers admit to the existence of the Herd Retirement Program (Doc. 288, 24:23; Doc. 252, ¶¶ 4, 7, 8, 11), but deny competition was suppressed or that the prices of butter or cheese were artificially inflated (Doc. 252, ¶ 17).

Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and 23(c)(4), Buyers seek certification of a class consisting of the following two subclasses:

(1) All persons and entities in the United States that purchased butter directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013; and

(2) All persons and entities in the United States that purchased cheese directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013.

(Doc. 245, p. 23).

## ANALYSIS

## I. MOTION TO STRIKE EXPERT DECLARATION OF DR. REED

Federal Rule of Civil Procedure 12(f) provides, "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or

scandalous matter." FED. R. CIV. P. 12(f). Motions to strike are generally disfavored. *See*

*Heller Fin., Inc. v. Midwhey Powder Co*, 883 F. 2d 1286, 1294 (7th Cir. 1989).

On April 7, 2016, Buyers withdrew the expert report and opinions of their

previously identified agricultural expert, Dr. Ronald Knutson. (Doc. 227, p. 1; Doc. 235,

p. 1). Approximately six weeks later, on May 26th, Buyers informed the Court they

wanted to submit a new class certification motion that did not rely on opinion testimony

by a retained expert. (Doc. 235, p. 5). The Court entered a new scheduling order that

specifically addressed the briefing schedule for the amended class certification motion.

(Doc. 241). That scheduling order gave Buyers until December 5, 2016, to file their reply

brief and allowed Buyers to include an *expert rebuttal report* in the reply brief with leave

of Court. (Doc. 241) (emphasis added).

Producers argue the report should be stricken because it is not proper rebuttal

evidence on the issue of class certification.[1] In summary, Producers allege any claims

that Dr. Reed's report is responding to Dr. Murphy or Dr. Novakovic (Producers'

experts) is merely pretext for introducing undisclosed, new affirmative opinion

---

[1] Producers also argued in the original motion that the report should be stricken because Buyers did not formally seek or receive leave of Court to file the report. The parties originally intended that Buyers would file a motion for leave to submit an expert rebuttal report so the Court could address the propriety of that report on the front end of Plaintiffs' reply brief. (*See* Doc. 241). That plan fell by the wayside, however, due to an unfortunate misunderstanding between the Court's law clerk and Plaintiffs' counsel. The Court, after discussions with counsel, decided to instead address the propriety of the rebuttal report through Producers' Motion to Strike (Doc. 262) and Buyers' response to that motion (Doc. 272). Despite this agreement, during the recent hearing Producers renewed their argument that the rebuttal testimony should be stricken for failing to formally receive leave of court. Producers allege that additional language not included in the Court's order is applicable—specifically, language in the Stipulated [Proposed] Order requiring not only that Plaintiff's received leave of court to file the document, but also that "good cause" be shown for inclusion of the report. (Doc. 262-1, p. 3). Assuming such language is in fact applicable, despite being absent from the final order, Producers make no argument as to why good cause is not shown here. Given that the parties and Magistrate Judge Williams clearly anticipated the filing of a rebuttal expert's report, and no reason for the exclusion of the report has been proffered other than a technical violation, the Court finds good cause existed for inclusion of the rebuttal report.

evidence. (Doc. 262-1, p. 5). The Court disagrees.

Upon careful review, the Court finds Dr. Reed's expert report directly responds to, and rebuts, the methodology and opinions of Producers' experts. The first five paragraphs of Dr. Reed's report outline his training and experience and summarize his findings. Paragraph 6 of the report responds to Dr. Novakovic's statements that: (1) the dairy market has specific characteristics that make it difficult to predict the impact of a particular exogenous shock (Doc. 249-2, p. 7); and (2) that "[a]ny general statements about causation will lack robustness because, absent some effort to isolate causal effects, one cannot know how any particular event affected the dairy market….but tracing the specific effects to specific causes is not easy" (Doc. 249-2, p. 30). Dr. Reed disagrees with and provides an analysis of why it is possible to isolate such effects and how Dr. Brown's original methodology, which is criticized by Dr. Novakovic, provides just such an analysis. Because Dr. Reed is responding directly to the expert opinion of Dr. Novakovic, one of Producers' experts, this is proper rebuttal evidence.

Paragraphs 7-9 of Dr. Reed's report respond to Dr. Novakovic's opinion that the numerous cheese and butter products on the market and the different commercial channels for these products mean it cannot be presumed the reduction in raw milk supply would affect each product and customer in the same way. (Doc. 249-2, p. 8). Dr. Reed disagrees with Dr. Novakovic's conclusion and explains why, in his expert opinion, the form that the products take—sliced cheese, block cheese, butter—is irrelevant to the question of whether the Herd Retirement Program reduced the supply of raw milk and, by extension, raised the prices of butter and cheese as determined on

the open market. Thus, paragraphs 7-9 appear to be direct rebuttal of the expert report of Dr. Novakovic.

Paragraphs 10-23, and 27, respond to the declarations of Drs. Murphy and Novakovic that cheese products are highly differentiated and therefore prices for these differentiated cheese products are not related to the Chicago Mercantile Exchange (CME) base cheese price (Doc. 249-1, pp. 12, 33, 47), as well as Dr. Murphy's overall critique of the use of the CME by Dr. Brown in his original analysis (Doc. 249-1, pp. 40-42). Dr. Reed rebuts these opinions, arguing agricultural economics literature is clear the CME butter and cheese prices determine the entire constellation of wholesale butter and cheese prices in the United States. (Doc. 261-1, ¶ 10). He then goes on to summarize the literature showing that restricting the quantity of raw milk that is processed into milk, cheese, or other dairy products can change the entire constellation of prices within the dairy industry, and are related to the CME. (Doc. 261-1, ¶¶ 11-19). Thus, these paragraphs directly rebut Producers' experts' opinions.

Paragraphs 24-25 respond to Dr. Murphy's use of quarterly prices (average prices over a three-month period) to conclude that CME cheese prices are not reflective of market prices. (Doc. 249-1, pp. 21-22). Dr. Reed's expert opinion is that analysis using quarterly data is not appropriate, and any correlation (or lack of correlation) among prices using quarterly data are not indicative of pass-through, because such aggregated data masks too many price fluctuations that occur on a daily basis. (Doc. 261-1, ¶ 25). These paragraphs, therefore, appear to rebut both the methodology and conclusions of Dr. Murphy's report.

Paragraph 26 responds to Dr. Novakovic's opinion that Dr. Brown's model was not designed to address the complexities of the impact of the Herd Retirement Program on wholesale prices of cheese and butter and therefore cannot be a basis for finding common impact. (Doc. 249-2, p. 54; Doc. 249-1, p. 27). Dr. Reed responds directly to this expert opinion and states Dr. Brown's analysis provides a credible measure of common impact and explains how those numbers can be used to calculate aggregate impact that represents class-wide damages. (Doc. 261-1, ¶ 26). Thus, this paragraph rebuts Producers' experts' claims regarding the capacity of Dr. Brown's model.

Paragraphs 28-38 respond to Dr. Murphy's opinion that Producers might not pass through their increased costs of production from butter and cheese (due to higher raw milk prices) to their customers. (Doc. 249-1, pp. 35-43). Dr. Reed disagrees with Dr. Murphy's methodology, arguing Dr. Murphy fails to consistently focus his analysis on the wholesale market for processed dairy products and instead provides retail-level speculation for a wholesale level phenomenon. (Doc. 261-1, ¶¶ 28-30). Dr. Reed analyzes the research on pass-through, including a critique of some of the research relied on by Dr. Murphy and his use of that research in his analysis. (Doc. 261-1, ¶¶ 30-33). Further, Dr. Reed explains why in his expert opinion Dr. Murphy's focus on pricing points is irrelevant to determining pass-through and contradicts the prevailing literature. (Doc. 261-1, ¶¶ 35-38). Because these paragraphs critique both the methodology and conclusions of Producers' expert witness, they are rebuttal evidence.

Paragraphs 43-46 of Dr. Reed's report respond to Dr. Novakovic's claim that the Herd Retirement Program only operated to remove farmers who were already exiting

from the business (Doc. 249-2, p. 54), explaining that being required to slaughter entire herds has a lasting impact on milk cow numbers and therefore prices. Thus, these paragraphs directly rebut claims by Producers' expert.

Finally, paragraphs 47-49 respond to Producers' experts' overall methodologies and conclusions. Dr. Reed states that, in his expert opinion, Drs. Novakovic and Murphy's reports are not credible because they: (1) use an incorrect time period for comparison of pricing resulting in a flawed analysis; (2) misstate the usefulness of CME data in pricing butter and cheese; (3) fail to describe Dr. Brown's model accurately enough to support a meaningful opinion; (4) make statements contrary to the published literature in the field; and (5) do not acknowledge information in Producers' own documents that are contrary to the facts they cite, which leads them to an incorrect conclusion. As a result, Dr. Reed's statements in these paragraphs are rebuttal of both the methodology and conclusions of Producers' experts.

Because Dr. Reed's expert report responds directly to the methodology, analysis, and opinions of Producers' experts, the Court finds the report is proper rebuttal evidence. The Motion to Strike Expert Testimony of Dr. Michael Reed is therefore denied.

## II. MOTION FOR CLASS CERTIFICATION

Under Federal Rule of Civil Procedure 23(a), certification of a class is appropriate where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Additionally, when a plaintiff seeks class certification under Rule 23(b)(3), the representative must demonstrate that common questions of law or fact predominate over individual issues and that a class action is superior to other methods of adjudicating the claims. Fed. R. Civ. P. 23(b)(3); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

The party seeking class certification has the burden of proving the elements of Rule 23 are met. *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982). A court's analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim. *Id.* at 160. The district court may only examine the merits of the underlying claim to the extent necessary to determine whether common questions exist, not whether the class members can ultimately prevail on the merits of their claims. *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *See also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

## A. RULE 23(A) ANALYSIS

### Numerosity

The numerosity requirement is met where the class is so numerous that joinder is "impracticable." Fed. R. Civ. Pro. 23(a)(1). A plaintiff need not establish the exact size of the class in order to satisfy the numerosity requirement. *Vergara v. Hampton*, 581 F.2d 1281, 1284 (7th Cir. 1978). Historically, although no specific number is required, courts have found the requirement satisfied when there are at least forty class members. *See Chandler v. Southwest Jeep Eagle*, 162 F.R.D. 302, 307 (N.D. Ill. 1995).

Here, Buyers rely on sales data obtained during discovery reflecting thousands of nationwide entities that purchased butter and/or cheese directly from one or more members of the CWT during the Class Period. (Doc. 245, p. 24). Producers did not directly address the numerosity element in their briefs and declined to address it in oral argument. (Doc. 288, 15:24-16:1). The Court therefore finds the numerosity element met.

*Commonality*

Commonality requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[W]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (citing *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010)). A single common question is sufficient to meet the requirements of Rule 23(a)(2). *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 359 (2011).

Here, Buyers argue the relevant question is whether Producers violated federal antitrust laws when members of CWT adopted and implemented the Herd Retirement Program for the express purpose of increasing raw milk, cheese, and butter prices. (Doc. 245, p. 26). Buyers allege this question is common to every direct purchaser of butter and cheese during the class period. (Doc. 245, p. 6). Other district courts have held that a question regarding the existence of a conspiracy in restraint of trade creates a question common to all potential plaintiffs. *In re Ready-Mixed Concrete Antitrust Litig.,* 261 F.R.D. 154, 167 (N.D. Ill. 2009); *Sebo v. Rubenstein,* 188 F.R.D. 310, 313 (N.D. Ill. 1999); *In re Foundry Resins Antitrust Litig.,* 242 F.R.D. 393, 405 (S.D. Ohio May 2, 2007); *In re Infant*

*Formula Antitrust Litig.*, No. MDL 878, 1992 WL 503465, at *4 (N.D. Fla. Jan. 13, 1992).

Most notably, the Northern District of California addressed this issue in a case involving

the same defendants and the same Herd Retirement Program. *Edwards v. Nat'l Milk*

*Producer's Fed'n.*, No. C-11-04766, 2014 WL 4643639 (E.D. Cal. Sept. 16, 2014).[2] The

Northern District of California found that "whether [the Herd Retirement Program]

violated the indirect purchaser antitrust laws" was a common question for purposes of

class certification. *Id.* at *6.

It is difficult to discern Producers' argument on the Commonality question. The

Memorandum in Opposition (Doc. 249) does not directly address this element.

Producers' briefs and oral argument could be construed to raise the argument that no

commonality exists because the market for milk and cheese is too widely varied, with

numerous products and pricing structures, to allow for the use of common facts. (Doc.

249, p. 16; Doc. 288, 16:2-25:6).

A similar argument was raised in *In re Sulfuric Acid Antitrust Litigation*, No. 03 C

4576, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007). In that case, the defendants argued no

commonality existed because sulfuric acid was distributed in various forms throughout

a variety of different markets. *Id.* at *3. They claimed the jury would have to analyze each

individual agreement with each individual producer in each individual market to

establish the conspiracy element. *Id.* The court rejected this argument, noting that proof

of a conspiracy for Sherman Act purposes requires only a "conscious commitment to a

common scheme designed to achieve an unlawful objective." *Id.* (citing *Monsanto Co. v.*

---

[2] *Edwards* involved the same Producers as the current action, but the claim was raised under state antitrust law. *Edwards*, 2014 WL 4643639, at *6.

*Spray-Rite Service Corp.,* 104 S.Ct. 1464, 1469 (1984)). The court specifically stated that variations in the market had no impact on whether the defendants entered into those markets with a higher floor price resulting from a conspiracy. *Id.* at *4. Because the issue of whether or not the conspiracy existed was common to all putative class members, regardless of the form the product took or the market it was purchased in, the court found the commonality requirement was met. *Id.* at *4.

Here, like in *Sulfuric Acid,* Buyers allege a conspiracy resulted in a perceived floor price that was higher than it would have been without the conspiracy. The issue of the existence of the conspiracy is the common question that needs to be answered for purposes of liability. Thus, like the different products and markets in *Sulfuric Acid,* the fact that Producers' alleged conspiracy produced butter and cheese products that were sold in various markets is irrelevant to the question of whether they entered into a common scheme to achieve an unlawful objective. This Court finds, therefore, the commonality element is met.

### *Typicality*

Class representative's claims must be typical of those of the class members. Fed. R. Civ. P. 23(a)(3). A claim is typical if it arises from the same event, practice or course of conduct as the claims of other class members and is based on the same legal theory. *De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983). The representatives' claims do not have to be identical to the class members, just substantially similar. *Ruiz v. Stewart Assocs., Inc.,* 171 F.R.D. 238, 242 (N.D. Ill. 1997); *Binion v. Metropolitan Pier and Exposition Auth.,* 163 F.R.D. 517, 525 (N.D. Ill. 1995). Further, similarity of legal theory

controls over dissimilarity in the facts. *See De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983).

Buyers argue typicality exists here because, like all other members of the proposed class, Buyers bought butter and/or cheese directly from Producers during the period when Producers allegedly engaged in anti-trust behavior. (Doc. 245, p. 27). Producers counter that typicality cannot be shown, raising different arguments against typicality based on whether the Buyers at issue were retail or individual buyers.

Regarding retail buyers, most of the arguments raised by Producers were ruled on previously by this Court and are therefore moot.[3] Remaining is Producers' argument that Piggly Wiggly can only be considered a class representative for purposes of a butter class because it did not suffer any injury from its purchases of cheese. (Doc. 249, p. 21). The basis of Producers' argument is that Piggly Wiggly bought its cheese from Swiss Valley Farms, who was not a member of CWT until 2012, after the Herd Retirement Program was discontinued. (Doc. 249, p. 20). Buyers counter that the effects of the Herd Retirement Program were cumulative and had at least a three year effect, extending into 2013, after Swiss Valley Farms joined the CWT. (Doc. 261, p. 8, citing Doc. 261-4, pp. 8-9). Because evidence exists to support the claim Piggly Wiggly suffered damages as a result of its purchasing both butter and cheese products, Piggly Wiggly meets the typicality

---

[3] In their earlier Motion to Dismiss, Producers argued KPH lacked standing because its assignments were invalid and the only purchases KPH made directly were from an unnamed party (Upstate Niagara) that resold cheese and butter made by others. (Doc. 249, p. 20). This Court found, however, that KPH purchased butter and/or cheese from Defendant Agri-Mark and that the assigned claims were all from purchasers who had also bought butter and cheese from Agri-Mark. (Doc. 250, p. 9). As a result, the Court held KPH had standing to sue. (Doc. 250, p. 9). Producers again raise this issue in their supplemental brief, clothed in the language of typicality. (Doc. 290, p. 11). The Court declines the invitation to revisit this issue and reminds Producers the correct method for requesting reconsideration of a prior ruling is to file a motion pursuant to Federal Rule of Civil Procedure 60.

requirement for certification purposes, regardless of whether that claim is ultimately successful.

Further, the case law does not support Producers' contention that Buyers can only be considered typical for the specific type of product bought. Courts have consistently held where the named class members' claims are based on the same legal theory or arise from the same course of conduct, factual differences in the type of product purchased does not defeat typicality. *In re Foundry Resins Antitrust Litig.*, 242 F.R.D. 393, 406 (S.D. Ohio 2007) (differences in date, size, manner, or conditions of purchase, the type of purchaser, or other concerns do not defeat typicality where the claims are based on the same legal theory or course of conduct); *In re Vitamins,* 209 F.R.D. 251, 261 (D.D.C. 2002) (typicality does not require products purchased, methods of purchase, or even damages of the named plaintiffs be the same as absent class members); *Bulk Extruded Graphite Prods. Antitrust Litig.*, Case No. Civ. 02-6030, 2006 WL 891362, at *6 (D.N.J. Apr. 4, 2006) (different purchasing positions does not mean class representatives claims are atypical, where all class members alleged purchase of products whose price was inflated as the result of a price fixing conspiracy). Thus, Piggly Wiggly can properly represent both butter and cheese purchasers, regardless of whether the facts ultimately support a finding that it purchased cheese from a CWT member during the relevant time period.

In oral argument and supplemental briefing, Producers additionally argued KPH does not qualify as a direct purchaser and therefore is not typical of the class members. (Doc. 288, 25:18-26:12). Under *Illinois Brick,* the Supreme Court held that only first tier purchasers—those purchasing directly from the antitrust violators—can make a claim

under the Clayton Act. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 (1977). Producers recognize this Court has previously ruled that KPH qualifies as a direct purchaser based on purchased butter and/or cheese from Defendant Agri-Mark and Defendant CWT member Upstate Niagara. (Doc. 290, p. 11, n. 10; Doc. 250, p. 9). Producers argue, however, that subsequent discovery shows the plaintiffs lack direct purchaser standing but fail to explain what that newly discovered evidence includes. Further, Producers' cited case law is unpersuasive. The only mandatory authority Producers cite is *In Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599 (7th Cir. 1997). In that case, the Court discussed in *dicta* a hypothetical situation in which plaintiff pharmacies were seeking damages for an overcharge passed onto them by wholesalers. *Id.* at 605. In the hypothetical, the pharmacies did not directly purchase their products from the antitrust violator, but rather an intermediary wholesaler, and thus the court determined they would not qualify as direct purchasers. *Id.* Here, however, buyers allege, and the Court previously found, KPH was a direct purchaser of products from participants in the Herd Retirement Program—the alleged antitrust violators. Thus, unlike the pharmacies in *In re Brand Name,* Buyers did not purchase their products through an intermediary, and therefore qualify as direct purchasers.[4]

Regarding the individual buyers, Producers also allege First Impression Salon and Mattson's claims are not typical. (Doc. 249, p. 22). The argument against First

---

[4] During oral argument Producers also attempt to re-litigate the question of whether KPH was properly assigned claims. Specifically, Producers argued that consideration is needed for a valid assignment. (Doc. 288, 27:4-6). The case cited by Producers, *Bailey v. Prudence Mutual Casualty Co.,* 429 F.2d 1388 (7th Cir. 1970), however, is inapposite. In that case, the Court simply found a valid assignment existed because there was consideration. *Id.* at 1389. Nowhere in the decision does the Court state that consideration is necessary for there to be a proper assignment. Thus, the Court finds no basis for reversing its earlier determination that KPH qualifies as a direct purchaser.

Impression Salon is similar to the arguments against Piggly Wiggly *supra*—that First Impressions only bought one of the two products and paid different negotiated prices than other buyers. (Doc. 249, p. 22). For the reasons discussed above, the Court finds these arguments unpersuasive.

Producers argue Roy Mattson is not typical of the other class members because individual consumer plaintiffs are unable to represent industrial, food service, or retail buyers. (Doc. 249, p. 23). Producers cite to *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008), for this broad statement. The Court notes, first, that this case does not stand for the proposition that an individual purchaser can never represent industrial or retail purchasers. Rather, the court found in *In re GPU* that the claims were not typical because the evidence needed to prove the conspiracy impacting individual purchasers was different from the evidence needed to prove the conspiracy impacting wholesale purchasers. *Id.* at 490. This difference in required proof meant the individual plaintiffs had no incentive to prove the antitrust violations of the wholesale purchasers. *Id.* Conversely here, there is only one potential conspiracy at issue, the Herd Retirement Program, and the evidence necessary to prove that alleged conspiracy is the same for Mr. Mattson, any unnamed individual class members and any unnamed industrial or retail class members.

The Court, therefore, finds the typicality requirement met.

### *Adequacy*

Rule 23 also requires the proposed class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The interests of the named

plaintiffs and class members must be sufficiently aligned to ensure the class representative has an incentive to pursue and protect the claims of the absent class members. *See Amchem Prods., Inc.*, 521 U.S. at 591. In order to be an adequate representative, the named representative must have a sufficient interest in the outcome to ensure vigorous advocacy while having no interest antagonistic to the interests of the class.[5] *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986); *Chapman v. Worldwide Asset Mgmt., L.L.C., No. 04 C 7625,* 2005 WL 2171168, at *4 (N.D. Ill. Aug. 30, 2005).

Buyers' counsel states Plaintiffs have no known conflicts with other members of the class, and their interests are aligned because they, like all direct purchasers, have been injured by the same conduct. (Doc. 245, p. 28). Producers argue Piggly Wiggly and KPH are not adequate representatives because they participate in only one of three retail channels through which cheese and butter are sold. (Doc. 249, p. 21).

Producers' argument is in effect that purchasers in these other retail channels may negotiate different prices and therefore Piggly Wiggly and KPH do not have aligned interests. (Doc. 249, p. 21-22). In support of their contention, Producers cite to *Deiter v. Microsoft*, 436 F.3d 461 (4th Cir. 2006), and *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430 (8th Cir. 1999). The decision in *Deiter*, however, was based on typicality, not adequacy.[6]

---

[5]  Proposed counsel also must demonstrate their ability to litigate the case vigorously and competently on behalf of the named and absent class members. *Riordan v. Smith Barney*, 113 F.R.D. 60, 64 (N.D. Ill. 1986). The Court has no doubt that Buyers' counsel is competent, and Producers do not suggest otherwise.

[6]  The Court declines to apply this case to the earlier typicality analysis. In *Deiter*, proof of a central element of the claim, that defendant overcharged Deiter due to a monopoly, did not necessarily prove that the excluded class members were also overcharged. *Deiter*, 436 F.3d at 468. Conversely here, any differences between various retailers of butter and cheese do not impact any of the claims or defenses raised because the question is whether the Herd Retirement Program was implemented for the express purpose of increasing raw milk, cheese, and butter prices in violation of federal antitrust laws. Plaintiffs have the same interest in proving that violation as other retail buyers of the products, regardless of differences in the amount each paid.

Producers' citation to this case for purposes of the adequacy analysis is therefore misplaced.

The Court finds Producers' other case similarly unpersuasive. In *In re Milk Prods.,* the court found the named plaintiff was not an adequate representative of the class because its limited geographical location meant different evidence was necessary to prove its conspiracy than class members in other geographic locations. *In re Milk Prods.,* 195 F.3d at 436. The other class members were also required to prove an additional element of "unlawful effect" that the named plaintiff did not have to prove—suggesting the named plaintiff would not have a sufficient incentive to pursue litigation of that issue. *Id.* at 437. Again, there is no such factual discrepancy here. The Herd Retirement Program either violated federal antitrust laws or it did not. Differences in sales processes or the amount paid by the identified class members do not go to the underlying legal claim and therefore do not defeat adequacy. *In re Carbon Black Antitrust Litig.,* No. 03-10191-DPW, 2005 WL 102966, at *14 (D. Mass. Jan. 18, 2005) (the overarching question is the conduct of the defendants, not the specific damage calculation or relevant bargaining power among the Buyers"); *Fears v. Wilhemina Model Agency, Inc.,* No. 02 Civ. 4911, 2003 U.S. Dist. LEXIS 11897, at *18 (S.D.N.Y. July 15, 2003) (noting when addressing the adequacy requirement that "[a]ll the class members share a common interest in proving the existence, scope and effect of defendants' ongoing price fixing"); *In re Vitamins,* 209 F.R.D. at 262 ("[B]ecause the plaintiffs have alleged an overarching single conspiracy...all named plaintiffs will have the same incentive to [litigate] the case as an absentee class member. This incentive is in no way diminished by

the fact that...the named representatives may have used different methods of purchase.").

Producers additionally argue that First Impressions and Mattson, as individual buyers, are unable to adequately represent the interests of any retail class members. (Doc. 249, p. 23). Because these buyers only purchased small amounts of products for their own consumption, Producers argue they do not have the same nature of proof required to establish their claims as large commercial purchasers. (Doc. 249, p. 23). In support of their argument, Producers again cite to *In re GPU*. That case, however, does not stand for the proposition cited. Only one representative plaintiff was dismissed, and his dismissal was on the grounds he had attempted to contrive litigation. *In re GPU,* 253 F.R.D. at 498. Not only were the remaining two plaintiffs both found to be adequate representatives, but the basis for attacking their adequacy was never the argument that as individuals they were unable to represent retail class members. *Id.*

Because Buyers appear to have a sufficient interest in the outcome to ensure vigorous advocacy, while having no interest antagonistic to the interests of the class, the Court finds the named representatives all meet the adequacy requirement.

### B. RULE 23(b) ANALYSIS

Under Rule 23(b)(3), a plaintiff must show that common questions of law and fact predominate over questions affecting only individuals, and that the class action is superior to other available methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *Amchem Products, Inc.*, 521 U.S. at 615. When determining whether predominance and superiority are satisfied, courts turn to the "elements of the

underlying cause of action." *Messner v. North Shore University HealthSystem*, 669 F.3d 802,

815 (7th Cir. 2012) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184

(2011)).

### *Applicable Legal Standard*

Buyers' Complaint is brought under Section 1 of the Sherman Act, 15 U.S.C. §1,

which outlaws every agreement in "restraint of trade." *State Oil Co. v. Khan*, 522 U.S. 3, 10

(1997). The Supreme Court has limited this prohibition, however, to only those restraints

of trade that are unreasonable. *Id.* The first step in deciding whether a practice is illegal

under the Sherman Act is to determine which standard of analysis is applicable. Courts

have established three categories of analysis—*per se*, quick-look,[7] and Rule of

Reason—for determining whether actions have anticompetitive effects, though the

methods often blend together. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999) ("The

truth is that our categories of analysis of anticompetitive effect are less fixed than terms

like '*per se*,' 'quick look,' and 'Rule of Reason' tend to make them appear). All of these

methods of analysis are meant to answer the same question: "whether or not the

challenged restraint enhances competition." *Id.* (citing *National Collegiate Athletics Ass'n v.*

---

[7] The "quick look" standard falls somewhere between the *per se* and Rule of Reason methodologies. This middle standard is applied when the defendant's conduct—while not *per se* illegal—appears likely to have anticompetitive effects, such as higher prices or reduced output. *Id.* Where the plaintiff shows a horizontal agreement to fix prices exists, anticompetitive effect is established without requiring additional evidence. *Agnew v. NCAA*, 683 F.3d 328, 337 (7th Cir. 2012) (citing *Law v. NCAA*, 134 F.3d 1010, 1020 (10th Cir. 1998)). Instead, the burden shifts to the defendant to produce a plausible procompetitive justification for the behavior. *Id.* If no legitimate justification is found, the Seventh Circuit has held that no further market power analysis is necessary, and the practice is condemned. *Id.* at 336. But if justifications are found, a full Rule of Reason analysis may be required. The Court notes the quick-look approach is often used when a restraint would normally be considered illegal *per se*, but "a certain degree of cooperation is necessary if the [product at issue] is to be preserved." *Bd. of Regents*, 468 U.S. at 117. Here, the Court considers it unlikely the parties could prove cooperation in milk production is necessary to preserve the product. Additionally, neither party has argued this standard is applicable. Thus, the Court finds it unnecessary to perform an analysis under the quick-look standard.

*Board of Regents of Oklahoma,* 468 U.S. 85, 104 (1984).

*Per Se Standard*

Certain agreements or practices, "because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. R'y. Co. v. U.S.,* 356 U.S. 1, 5 (1958). Under the *per se* rule, a presumption of unreasonableness is created based on a "longstanding judgment that the prohibited practices by their nature have 'a substantial potential for impact on competition.'" *FTC v. Superior Court Trial Lawyers Assn.,* 493 U.S. 411, 433, (1990) (quoting *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 16 (1984)). Under the *per se* framework, therefore, a restraint is presumed unreasonable and the need to prove actual anticompetitive impact in the *prima facie* case is eliminated. *National Collegiate,* 468 U.S. at 100; *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342 (1990); *See also Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 127 S.Ct. 2705, 2712-13 (2007); *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133-34 (1988).[8]

Among those agreements the Supreme Court has declared to be unlawful *per se* are horizontal output restrictions—agreements among competitors at the same level of distribution that have "the purpose and effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity..." *Socony-Vacuum Oil,* 310 U.S. 150, 223 (1940); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 893 (2007).

---

[8] Plaintiffs are still required to show "the conspiracy caused *them* an injury" in order to recover damages, but this is a separate inquiry from whether there was a Sherman Act violation. *Atl. Richfield,* 495 U.S. at 341, 344.

*Rule of Reason Standard*

Under the "rule of reason" standard, the fact-finder weighs all of the circumstances of the case in deciding whether a restrictive practice, on balance, unreasonably restrains competition. *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50 (1977). Factors relevant to determining whether the restraint is reasonable include: defendant's intent and purpose in adopting the restriction; the structure of and conditions within the market; the presence of economic or legal barriers inhibiting competitors ability to respond to the conduct; relative competitive positions and market power of the defendants, demonstrated impact of the conduct on prices, products or other facets of competition within the market; and apparent justifications for the restrictions. *Id.* at 49, n. 15. The Seventh Circuit also requires proof of an actual anticompetitive effect in order to prove a violation of the rule of reason. *Agnew v. National Collegiate Athletic Ass'n,* 683 F.3d 328, 335 (7th Cir. 2012).

*Analysis*

Here, Buyers argue the *per se* standard applies because the Herd Retirement Program qualifies as a horizontal output restriction or agreement to reduce competition. (Doc. 245, p. 20). The Supreme Court has been clear that the constriction of supply is a *per se* violation because "it is the 'essence of price fixing,' whether it is accomplished by agreeing on a price which will decrease the quantity demanded, or by agreeing upon an output, which will increase the price offered." *FTC v. Superior Court Trial Lawyer's Ass'n.*, 493 U.S. 411, 423 (1990) As Judge Posner stated in *General Leaseways, Inc. v. National Truck Leasing Ass'n,*

An agreement on output also equates to a price-fixing

agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects.

*General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 594-95 (7th Cir. 1984).

It is uncontested that Producers are horizontal competitors in the production and sale of raw milk, butter, and cheese. (Doc. 252, ¶¶ 35-40). Further, Producers do not contest they conceived of, operated, and participated in the Herd Retirement Program from 2003 through 2010. (Doc. 288, 24:23; Doc. 252, ¶¶ 4, 7, 8, 11). If Buyers are successful in proving the Herd Retirement Program was an agreement to restrict output, that program would qualify as a *per se* violation of federal antitrust laws, and a Rule of Reason analysis is not necessary. Although the *per se* test is likely applicable here, it is not necessary to reach a conclusion on the issue because the Court finds Buyers have produced sufficient evidence to support certification under either standard.

### Predominance

Rule 23(b) permits class certification where questions of law or fact common to class members "predominate" over questions that are individual to members of the class. *Messner,* 669 F.3d at 815 (citing 7AA Wright & Miller, *Federal Practice & Procedure* § 1778 (3d. ed. 2011)). The Supreme Court has recognized that "predominance is a test readily met in certain cases alleging…violations of the antitrust laws." *Amchem,* 521 U.S. at 625. Predominance is a qualitative, not quantitative, analysis. *Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014). Common issues need only predominate, not outnumber

individual issues. *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Thus, the presence of even a single common issue may establish predominance. *Id*. When assessing predominance, a court's inquiry is limited to determining whether common evidence could suffice to make out a *prima facie* case for the class. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1060 (7th Cir. 2016). The plaintiffs need not prove they will ultimately win on the merits. *See id.*; *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010)(citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001) (a court may take a peek at the merits before certifying a class, but this peek must be limited to determining whether individual questions predominate over common ones)).

Buyers bring this action under the threefold damages provision of Section 4 of the Clayton Act, 15 U.S.C. § 15. (Doc. 245, p. 29). In order to succeed on their claim, Buyers must prove a violation of antitrust law; that the antitrust violation caused injury; and measurable damages—although individual proof of this element of a claim under the Clayton Act is not an obstacle to a showing of predominance. *Messner v. Northshore University Health System*, 669 F.3d 802, 815 (7th Cir. 2014).

*Violation of Antitrust Laws*

Buyers allege the facts regarding the adoption and implementation of the Herd Retirement Program are not in dispute (Doc. 245, p. 30), and Producers do not argue otherwise. What remains, therefore, is the question of whether that program was an unlawful restraint of trade. Buyers identify two legal issues relevant to that question and common to the class: (1) whether the adoption and implementation of the Herd Retirement Program by the members of CWT was a conspiracy that unreasonably

restrained trade, and (2) whether such conduct is immune from antitrust consequences under the Capper-Volstead Act and the Filed Rate Doctrine. (Doc. 245, p. 30). Plaintiffs allege, and this Court agrees, that these legal questions are common to all members of the proposed class and are proper to resolve in a single hearing.

If the *per se* rule is ultimately determined to apply, no further inquiry would be necessary to establish a *prima facie* case. If something more than the *per se* standard is applicable, however, Buyers also would need to show common evidence exists to prove the Herd Retirement Program injured or impacted members of the proposed class. *Messner,* 669 F.3d at 816.

*Antitrust Injury/Impact*

Antitrust impact requires plaintiffs to have common evidence to show the antitrust violation injured members of the proposed class. *Messner,* 669 F.3d at 816. Buyers rely primarily on evidence from Producers' own agricultural economist, Dr. Scott Brown, to show the impact of the Herd Retirement Program on the butter and cheese markets. (Doc. 245, pp. 31-34). Dr. Brown was hired by Producers to provide an analysis of the effects of the Herd Retirement Program prior to its implementation. (Doc. 245, p. 16). A three step statistical analysis, similar to the type of analysis he uses in his work for the United States Congress, was produced by Dr. Brown. (Doc. 245, p. 16). Buyers allege Dr. Brown's analysis concluded the Herd Retirement Program would result in a "nation-wide, across-the-board reduction in the supply of raw milk," which would lead to a substantial reduction in the supply of butter and cheese that would "inevitably produce across-the-board increases in the price of those commodities." (Doc. 245, p. 32).

Buyers further argue the market structure, including the inelasticity of demand for dairy products and the CWT members' market power over raw milk, furnishes common evidence of antitrust impact for Rule 23(b)(3) purposes. (Doc. 245, p. 33).

Producers disagree, citing to reports from Drs. Novokovic and Murphy, claiming Dr. Brown's study is flawed and therefore cannot provide common evidence of impact. Specifically, Producers argue Dr. Brown's study provides only aggregate or averaged data (Doc. 249, pp. 24-25), rather than evidence of the price experience of individual class members, and therefore is not proof of antitrust impact. (Doc. 249, pp. 24-25). The Courts generally disagree, however, holding that common proof of impact is possible even when individual damage amounts differ or are uncertain. *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 56-57 (D. Mass. 1981) (common proof could establish class-wide injury even though amount of damage to each plaintiff was uncertain); *In re Domestic Air Transp.*, 137 F.R.D. 677, 689 (N.D. Ga. 1991) (holding common impact satisfied because alleged price-fixing resulted in an "artificial" base price, even though actual fares were discounted or negotiated); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3rd Cir. 1977) (where the claim involves a nationwide conspiracy resulting in increased prices, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price); *Hedges Enterprises, Inc. v. Continental Group, Inc.*, 81 F.R.D. 461, 475 (E.D. Pa. 1979) (finding sufficient evidence of common impact when plaintiffs showed artificial increase in "base" price).[9]

---

[9] The only case relied on by Producers for their argument is a California district court case where the court found a correlation analysis was insufficient to show class wide impact. *In re GPUs,* 253 F.R.D. at 493-94.

Further, Buyers introduced a rebuttal report by Dr. Reed criticizing the methodology and conclusions of Drs. Novokovic and Murphy, Producers' experts. Other courts have stated, and this Court agrees, that class certification is not the appropriate time to engage in a "battle of the experts." *In re Sulfuric Acid Antitrust Litigation*, No. 03 C 4576, 2007 WL 898600, at *8 (N.D. Ill. Mar. 21, 2007); *In re Potash*, 159 F.R.D. 682, 697 (D. Minn. 1995); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 319 (E.D. Mich. 2000). As stated above, at the class certification stage a plaintiff only needs to show the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members. *Messner*, 669 F.3d at 818. Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to individual members of the class. *In re Linerboard Antitrust Litig.*, 305 F.3d at 152.

The relevant question here is whether any given price that was charged for butter or cheese was higher than it would have been in the absence of the alleged conspiracy.[10] It appears Dr. Brown's evidence could prove such impact and therefore common evidence exists to show potential injury to members of the proposed class.

Dr. Brown did not, however, produce a correlation analysis; rather he completed a regression analysis. (Doc. 245, p. 33). Producers do not explain how the finding *In re GPUs* about the inadequacy of a correlation analysis proves Dr. Brown's regression analysis is insufficient evidence of common impact.

[10] In their supplemental brief, Producers also argue the methodology used by Buyers runs afoul of the filed-rate doctrine. (Doc. 290, p. 7). This issue was already raised by Producers and ruled on by this Court. Specifically, the Court earlier determined the filed-rate doctrine was not applicable. (Doc. 250, p. 20). Producers focus on other language in the Order that "[t]his conclusion is bolstered by Plaintiffs' claim that their damages can be determined without requiring the Court to recalculate the federally regulated minimum." (Doc. 250, p. 20). For some reason, Producers read this language to suggest the Court's Order means Buyers can only recover if they are able to prove their case without requiring the Court to recalculate the regulated minimum milk prices. (Doc. 290, p. 8). Producers argue Buyers cannot do so, but provide no evidence in support of that claim. The Court declines to revisit its earlier decision based on Producers' misrepresentation of its earlier order and broad unsupported conclusions.

*Damages*

Buyers allege Dr. Brown's analysis provides a reliable statistical methodology to calculate damages for all purchasers—the per-pound increases in butter and cheese prices caused by the Herd Retirement Program. (Doc. 245, p. 33; Doc. 261, p. 18). Producers argue damages cannot be calculated on an aggregate basis or by reference to a common formula and will require individualized proceedings. (Doc. 249, p. 30).[11]

The Seventh Circuit has been clear that variations in individual damage amounts stemming from common impact will not defeat class certification. *Mullins v. Direct Digital LLC,* 795 F.3d 654, 671 (7th Cir. 2015) ("The need for individual damages determinations at a later stage of the litigation does not itself justify the denial of certification."); *Messner*, 669 F.3d at 815 (predominance is not negated just because proof of individual damages may be required under the Clayton Act); *Hardy v. City Optical, Inc.,* 39 F.3d 765, 771 (7th Cir. 1994) (fact that damages may be different for each member of the class does not prevent certification).

Plaintiffs need only show they have "realistic methodologies for establishing damages on a class wide basis." *In re Brand Name Prescription Drugs Antitrust Litig.*, Nos.

---

[11] Producers also raise an argument that Buyers' reliance on Dr. Brown's analysis is contrary to *Comcast v. Behrend*. (Doc. 249, p. 28). In *Comcast v. Behrend,* the Supreme Court held that evidence of damages in a class action must measure only those damages attributable to plaintiff's theory of liability. 133 S.Ct. 1426, 1433 (2013). In *Comcast,* the plaintiff's expert calculated damages based on all four theories of antitrust liability advanced by the plaintiffs. *Comcast,* 133 S.Ct. at 1434. The Supreme Court stated that such a methodology might have been sound if all four theories of antitrust impact remained in the case. *Id.* Because only one such antitrust theory remained by the time of trial, however, the experts' calculations were not limited to the single legal theory upon which liability was premised. *Id.* Producers argue Buyers model similarly fails because it "does not measure increases to prices *not* caused by changes in the regulated prices of raw milk." (Doc. 249, p. 29). This is not the issue raised by *Comcast.* Producers are arguing that Dr. Brown's method is inaccurate, not that it measures damages on a theory of liability that is not before the court. Because Buyers have put forward a model that measures damages based on the Herd Retirement Program, and that is the only theory of liability they have alleged, they have met their burden for purposes of class certification.

94 C 897, MDL 997, 1994 WL 663590, at *5 (N.D. Ill. Nov. 18, 1994). Reasonable estimates of class-wide harm are sufficient "where the theory of harm is that the entire market price of a product was inflated as a result of a conspiracy." *Kleen Prods.*, 306 F.R.D. 585, 605 (N.D. Ill. 2015) (citing *Loeb Indus. Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002)).

Further, there are adequate judicial processes for addressing variations in individual damages, including: (1) bifurcating liability and damage trials; (2) appointing special masters or magistrates to preside over individual damage proceedings; (3) decertifying the class after the liability trial; (4) establishing presumptions or inferences of reliance or causation which are predicates to damage entitlements; (5) using the defendants' transactional records to compute individual damages; and (6) creating sub-classes. *Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

Because proof of damages in the aggregate is sufficient for class certification purposes, and this Court has adequate methods for ultimately determining individualized damages, Buyers have met their burden of showing they are capable of providing evidence of class-wide damages.

### *Superiority*

Rule 23(b)(3) provides that certification is warranted if a class-wide resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Where common issues predominate over individual issues, superiority is generally found. *See Messner*, 669 F.3d at 815, n.5.

Further, if denying certification would lead to duplicative litigation, or individual claims are unlikely to be pursued due to the small size of potential recovery, courts generally find a class-wide action to be the superior method. *In re Carbon Black Antitrust Litig.*, No. Civ. A. 03-10191, 2005 WL 102966, at *81 (D. Mass. January 18, 2005) ("Antirust class actions are expensive endeavors and joining forces with other similarly situated Buyers is often the only way to effectuate a case."); *Brand Name Prescription Drugs,* Nos. 94 C 897, MDL 997, 1994 WL 663590, at *6 (N.D. Ill. Nov. 18, 1994) ("We fail to see the logic in Defendant's contention that 50,000 individual actions are less complex than a single class action").

Here, as discussed above, the issue of whether the Herd Retirement Program violated the anti-trust laws of the United States is the predominant legal issue. The only significant issue Producers argue requires individualized analysis is damages. Therefore, the Court finds that denying certification would lead to duplicative and wasteful litigation regarding liability. Further, Dr. Brown's analysis indicates increases of only $0.20 per pound of butter and $0.05 per pound of cheese over a six year period. (Doc. 245, p. 18). Common sense suggests that individual non-retail buyers would be unlikely to pursue their claims because the burden and high cost of complex antitrust litigation overshadows the relatively small size of their potential recovery.

Producers also argue that large retail buyers have the resources to prosecute individual claims and therefore class-wide action is not necessary for those buyers. (Doc. 249 pp. 31-32). But courts routinely hold the presence of large purchasers does not defeat class certification. *See e.g., Scholes v. Moore*, 150 F.R.D. 133, 138 (N.D. Ill. 1993); *In re*

*Cardizem CD Antirust Litig.*, 200 F.R.D. 297, 325 (E.D. Mich. 2001); *Meijer Inc. v. 3M,* Case No. 04-5871, 2006 WL 2382718, at *8 (E.D. Pa. Aug. 14, 2006).

Producers finally argue that because one large grocer has individually brought suit based on the same conduct as alleged here, class certification is not the superior method. (Doc. 249, p. 32). The Court is not convinced the decision by one retailer to file a similar claim indicates an interest on the part of an unknown number of other retail buyers to individually control their own litigation. In fact, the opposite seems more likely—that only one retailer has filed a similar claim suggests a *lack* of interest on the part of the retailers in pursuing their own litigation. *See Moore v. Ulta Salon*, 311 F.R.D. 590, 625 (C.D. Cal. 2015) ("That only two individuals—out thousands of putative class members—have initiated their own litigation suggests that there is little interest among individuals in controlling their own litigation."); *In Re Revco Sec. Litig.,* 142 F.R.D. 659, 669 (N.D. Ohio 1992) ("[T]he fact that few suits have been filed indicates that the class members have no great interest in controlling the prosecution of the litigation.").

Thus, given the difficulties of antitrust litigation, the limited size of potential recovery for non-retail class members, and the apparent lack of interest in individual litigation on the part of larger retail buyers, this Court finds a class action is the superior method of adjudication.[12]

---

[12] Because the Court finds that certification of Buyers' proposed classes is proper under 23(b), the Court need not address Buyers' alternative basis for certification under Rule 23(c)(4).

## CONCLUSION

For the reasons set forth above, Producers' Motion to Strike (Doc. 262) is **DENIED** and Buyers' Second Renewed Motion for Class Certification (Doc. 245) is **GRANTED**.

The following two sub-classes are certified:

(1) All persons and entities in the United States that purchased butter directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013; and

(2) All persons and entities in the United States that purchased cheese directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013.

It is **FURTHER ORDERED** that the parties **SHALL**, on or before **October 31, 2017**, advise the Court in writing what, if any, additional discovery is needed (and explain how much time is needed for that discovery) and submit a proposed schedule for notice to the class and trial.

**IT IS SO ORDERED.**

**DATED:   September 29, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**