UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FIRST IMPRESSIONS SALON, INC., *et al*., | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 3:13-cv-00454 (NJR)(GCS) |
| v. | ) ) | |
| NATIONAL MILK PRODUCERS FEDERATION, *et al*., | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT</u>

Pursuant to Rule 23(e), Plaintiffs hereby seek an order from this Court granting preliminary approval of the proposed class action settlement.  In support of this motion, Plaintiffs state as follows:

## I.    INTRODUCTION

This class action is now more than seven years old and has been actively litigated at the trial and appellate levels.  It has involved the production and review of approximately one million pages of party documents, numerous depositions, dozens of third-party productions, numerous discovery hearings before both Magistrate Judges Williams and Sison, extensive motion practice, summary judgment motions by both sides, *Daubert* motions, a motion to decertify, and motions in limine.  The case has been both vigorously prosecuted by Class Counsel and defended by counsel for Defendants.

On May 22, 2019, the parties began a second round of mediation.  They selected, and this Court appointed, former California state-court judge Daniel Weinstein, Ret. to mediate the

dispute.  That process ran its course for several months, during which all aspects of the litigation actively continued, with the focus on an October 1, 2019 trial date.  The mediation process proved successful.  Shortly before the date scheduled for trial, counsel for the parties determined that there was a basis for the negotiation of a detailed settlement agreement.  Over the course of the succeeding weeks, counsel for the parties worked through settlement terms until negotiations concluded in late November.  The parties signed the Settlement Agreement on November 22, 2019.  *See* Settlement Agreement (Exhibit 1).

Defendants have denied and continue to deny that they are liable and expressly deny that Plaintiffs' allegations have any factual or legal merit.  From Defendants' perspective, they are settling this case to avoid the further expense, inconvenience, and distractions of burdensome and protracted litigation, thus putting to rest with finality this controversy by obtaining complete dismissal of the case and a release by the Class and its members of claims.

As explained more fully below, the proposed settlement requires Defendant National Milk Producers Federation ("National Milk") to pay the Class $220 million to settle Plaintiffs' claims.  All of these monies will go to the Plaintiff Class Members, less attorneys' fees and costs, Court-ordered incentive awards to the Class Representatives, and costs of notice and settlement administration.

This settlement is in the best interests of the Class in order to avoid the uncertainties of continued litigation, and to assure that the benefits of the Settlement Agreement are obtained for the Class Members, all of whom are eligible for monetary payments, and many of whom will receive those payments with minimal effort.  Plaintiffs were prepared to try this case to verdict, but this proposed settlement provides significant relief to Class Members now, and avoids: (1)

risks of a trial; (2) any further delay associated with the inevitable appeals of any successful verdict; or (3) the loss of a successful verdict on appeal.

If the Court grants preliminary approval of the settlement, Plaintiffs anticipate that a final fairness hearing could take place early next year and propose a hearing date of Friday, April 24, 2020.

## II.    STATEMENT OF FACTS

Plaintiffs filed this case on May 10, 2013.  The complaint charged that Defendants engaged in a classic, *per se* unlawful supply restraint and therefore violated the Sherman Antitrust Act.  Specifically, Plaintiffs alleged that, between July 11, 2003 and July 7, 2010, Defendants and their co-conspirators – agricultural cooperatives representing more than two-thirds of the dairy production in the United States – conspired to remove from production milking cows for the express purpose of artificially driving up the prices of butter, cheese, and raw milk.  Plaintiffs alleged that this program, named the "Herd Retirement Program," removed hundreds of thousands of cows from production, eliminated thousands of dairy farms from the market, reduced the national supply of raw milk by billions of pounds, and thereby artificially inflated the prices for butter and cheese.   Plaintiffs contended that Defendants' actions damaged the Class.

Defendants have steadfastly denied liability and mounted a tenacious defense in all phases of the case. Defendants assert that the Herd Retirement Program was a lawful means of helping farmers during tough times and assert that it falls within the antitrust exemptions created by the federal Clayton and Capper-Volstead Acts. Defendants further assert that the program was lawful even if the antitrust laws were to apply and they assert that the Class Members were not damaged in any way by the conduct of the Herd Retirement Program.

A.     **Motion Practice**

The history of this case can be gleaned from the extensive and exhaustive motion

practice.  Plaintiffs first filed a Motion for Partial Summary Judgment on May 28, 2013 (Dkt.

10), just weeks after the case was filed.  Defendants responded.  This motion was later mooted.

Soon thereafter, this case was consolidated with another case filed in this district:  *Belle Foods*

*Trust*, *et al. v. National Milk Producers Federation*, *et al*., Case No. 14-cv-01014, on October 10,

2014.  On September 11, 2015, Plaintiffs filed a Third Amended Complaint.  Dkt. 182.

Defendants then sought to dismiss this case under Rule 12(b).  Dkt. 188.  The Court denied that

motion on October 5, 2016.  Dkt. 250.  Next, Plaintiffs moved for class certification.  Briefing

was completed and a class certification hearing was held on August 25, 2017.  The Court

certified the Class on September 29, 2017.  Defendants sought to appeal the ruling under

Fed.R.Civ.P. 23(f), but the Seventh Circuit Court of Appeals denied Defendants' request for

review on January 11, 2018.  Dkt. 307.

The parties each filed motions for summary judgment.  On April 10, 2019, Plaintiffs

renewed their Motion for Partial Summary Judgment arguing (1) that the HRP was *per se* illegal

under the Sherman Act and (2) the Capper-Volstead Act did not provide a defense.  Dkt. 416.

On May 20, 2019, Defendants filed their own Motion for Summary Judgment, contending that

(1) Plaintiffs' claims were barred by the statute of limitations, (2) the Filed Rate Doctrine bars

Plaintiffs' damages claims, and (3) the Herd Retirement Program was entirely legal due to the

protections afforded to dairy farmers under the Capper-Volstead and Clayton Acts.  Dkt. 430.

On May 31, 2019, Defendants filed a *Daubert* motion to exclude Plaintiffs' expert from

testifying at trial.  Dkt. 436.

As the scheduled trial date approached, the parties filed numerous motions *in limine*, and

Defendants moved to exclude the damages and economic testimony of Plaintiffs' expert as well

as filing a motion to decertify the Class. Dkt. 453, 512, 513.  Both sides were preparing for trial

in earnest.  One would be hard pressed to imagine any additional motions that could have been

filed to test Plaintiffs' case.  By virtue of all the motion practice and rulings and appeals in this

case, one thing is abundantly clear:  Plaintiffs thoroughly understand the strengths and

weaknesses of their case, and, based on that understanding, hereby submit that the proposed

settlement is fair, reasonable, and adequate.

B. **Discovery**

Plaintiffs' assessment of the proposed settlement is also informed by the extensive

discovery during the many years of this litigation.  Plaintiffs propounded numerous document

requests, interrogatories, and requests for admissions.  Plaintiffs also reviewed several hundreds

of thousands of pages of documents produced in discovery.  Plaintiffs then took depositions of

the leaders of the CWT/HRP including all of Defendants' corporate representatives.  More

recently, Plaintiffs deposed a group of several farmers who Defendants intended to bring to trial.

Defendants deposed all of the Class Representatives.  All of the Class Representatives, especially

KPH Healthcare, engaged in excruciatingly lengthy document production and management

exercises.  Magistrate Judges Williams and then Sison were actively involved in discovery,

assisting the parties and conducting many hearings over the years.  Not only were the Magistrate

Judges called upon to resolve discovery disputes between and among the parties, but also to

adjudicate discovery requests by Plaintiffs that were directed to numerous third parties, including

the alleged unnamed CWT co-conspirators.

With a fully developed factual record and extensive motion practice, the parties had fully

prepared this case for trial.  Plaintiffs had engaged a trial consultant and had conducted multiple

focus group sessions with multiple mock juries.  Both sides fully discovered, analyzed, and

understood the strengths and weaknesses of their positions, and the proposed resolution of this case comes at a fully mature stage.

### C.      Mediation and Settlement

As described above, after several months of negotiations, Judge Weinstein helped the parties find a path toward the Settlement Agreement.  All while the negotiations were occurring, however, preparations for trial continued.

### D.      The Proposed Settlement

For purposes of preliminary settlement approval, the following summarizes the settlement's terms:

#### 1.      The Class

The "Class" is made up of two sub-classes certified by the Court and consists of the following:

(1)      All persons and entities in the United States that purchased butter directly from one or more members of Defendant, Cooperatives Working Together, and/or their subsidiaries during the period from December 6, 2008 to July 31, 2013 (the "Class Period") who did not timely opt-out of the class pursuant to the class notice approved by the Court in its order dated May 8, 2018 and transmitted to the class on May 31, 2018; and

(2)      All persons and entities in the United States that purchased cheese directly from one or more members of Defendant, Cooperatives Working Together, and/or their subsidiaries during the period from December 6, 2008 to July 31, 2013 who did not timely opt-out of the class pursuant to the class notice approved by the Court in its order dated May 8, 2018 and transmitted to the class on May 31, 2018.

#### 2.      Monetary Relief for Class Members

The settlement requires National Milk to make non-reversionary payments totaling $220 million into the settlement fund.  This amount will be paid in scheduled payments as follows:

(1)      National Milk will pay $30 million into an escrow or trust account for the benefit of the Class ("Class Account") within ten (10) calendar days after preliminary approval;

6

(2)     National Milk will pay $60 million into the Class Account within ten (10) calendar days after the deadline for filing an appeal from final approval (but in no event before July 1, 2020) (if there is an appeal, then the $60 million will be paid into a trust account pending final approval of the settlement);

(3)     National Milk will pay the 1st Installment Payment of $32.5 million plus Accrued Interest with such installment to be paid within ten (10) business days of December 31, 2020, or at least three (3) months after the payment to the Class Account of the $60 million pursuant to Settlement Agreement, ¶ III(1)(1)(b), whichever is later;

(4)     National Milk will pay the 2nd Installment Payment of $32.5 million plus Accrued Interest with such installment to be paid not later than one year from the date on which the 1st Installment Payment was due;

(5)     National Milk will pay the 3rd Installment Payment of $32.5 million plus Accrued Interest with such installment to be paid not later than two years from the date on which the 1st Installment Payment was due;

(6)     National Milk will pay the 4th Installment Payment of $32.5 million plus Accrued Interest with such installment to be paid not later than three years from the date on which the 1st Installment Payment was due.

The term "Accrued Interest" is defined in the Settlement Agreement.  *See* Exhibit 1, III(1)(d).

Defendants have also agreed to provide Plaintiffs with security for the four Installment Payments in exchange for paying via installments in the form of an irrevocable standby letter of credit from CoBank, one of the country's largest agricultural cooperative lenders, which is to be provided within 90 days of the execution of the Settlement Agreement.  CoBank is one of the largest private providers of credit to the U.S. agriculture industry and has over $125 billion in assets.[1]  In the event any of the Installment Payments are not made in accordance with the specific terms in the Settlement Agreement Plaintiffs will immediately be paid the entire remaining balance by CoBank.

---

[1] Attached as Exhibits 2 and 3 are S&P and Fitch Rating Reports demonstrating the financial strength and stability of CoBank. Also attached as Exhibit 4 is a Global Finance 2019 Press Release naming CoBank as the second safest bank in the United States and 45th safest in the world.

The plan is for the Class to receive an initial distribution after final approval (from the combined first two payments by National Milk of $30 million and $60 million) and then subsequent distributions following each installment payment by National Milk, per the installment payment schedule outlined in the Settlement Agreement.

### 3.      The Claims Process

After payment of all costs of notice and claims administration, Court-awarded attorneys' fees and costs, and class representative incentive awards, all remaining funds will be distributed to Class Members through a claims process administered by a Court-appointed settlement claims administrator.  This claims process has been proposed by Epiq Class Action & Claims Solutions, Inc. ("Epiq") who previously provided the notice to the Class and reported to the Court regarding the implementation of the notice plan and opt outs, and Plaintiffs submit it meets Rule 23 and due process requirements.

The claims process will proceed in three steps.

**Step 1:  Division Between Non-Documented and Documented Claims.**

The settlement fund will be divided into two "pools:" 1% of the settlement fund will be disbursed to qualified Class Members with non-documented generally "de minimis" claims (likely individual consumers) (the "Non-Documented" pool/claims) and 99% of the settlement pool will be disbursed to pay qualified Class Members with documented and generally higher claims (likely businesses) (the "Documented" pool/claims).

**Step 2:  Identify Claims**

**Non-Documented Claims**

All Non-Documented claims must be submitted by the Class member using the submission tools provided by the Court-appointed Settlement Administrator.

**Documented Claims**

Documented claims will be adjudicated by the Settlement Administrator through two methods.   First, claims will be generated for direct purchasers identified in the sales data produced during the litigation ("Generated Claim").  Second, Class Members may initiate claims by submitting claims with supporting documentation ("Submitted Claim").

For Generated Claims, the Class Members will receive notification of their total purchases of both cheese and butter identified in the sales data produced during the litigation.  The Claim Form will specifically request that each Class member verify the accuracy of the information contained in the Claim Form and will provide instructions for challenging any of the figures or computations contained in the Claim Form.  If a Class member agrees that the information contained in the Claim Form is accurate, it will be asked to sign and return the Claim Form to the Settlement Administrator.  If the Class member disputes the amount of previously identified total purchases provided in the Generated Claim, that Class member may reject the Generated Claim and submit a claim with the necessary documentation as a Submitted Claim, for the consideration by the Settlement Administrator.  The Settlement Administrator has discretion in approving or disapproving Submitted Claims.  This kind of claim process is routinely used in class settlements.[2]

**Step 3:  Allocate and Pay Settlement Funds**

**Non-Documented Claims**

---

[2] *See*, *e.g.*, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 41 (E.D.N.Y. 2019) ("Claimants will have the opportunity to 'contest the accuracy of the statement or estimates' made by the Class Administrator."); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1030 (N.D. Ill. 2000) ("A class member who believes the list of his or her transactions is incomplete may list additional transfers on the claim form and return it."); *Trombley v. National City Bank*, 759 F. Supp. 2d 20, 28  (D.D.C. 2011) ("Class Members need only provide their name and address and check one of two boxes; additional information does not have to be submitted unless their claims are contested….").

The Non-Documented claims will be allocated to those Class Members who cannot document that they made such direct purchases during the Class Period, but who purchased cheese products directly from any of the members of the CWT and to Class Members who cannot document that they made such direct purchases during the Class Period, but who purchased butter directly from any of the members of the CWT.  The Non-Documented claims will be processed and paid first from the initial disbursement and only from the funds allocated to the Non-Documented pool.

The Non-Documented pool will be allocated by distributing up to $5 per claim (with a limit of one claim for the purchase of butter and one claim for the purchase of cheese during the Class Period) by direct purchasers who cannot document purchases made from any of the members of the CWT.  The Non-Documented pool will be capped at 1% of the Settlement Amount and any unused portion of this pool will pour-over to the Documented pool for distribution to the Class Members with Documented claims.

**Documented Claims**

The Documented claims will be allocated between Class Members who purchased cheese products directly from any of the members of the CWT and to Class Members who purchased butter directly from any of the members of the CWT.  Plaintiffs' experts have apportioned those amounts based on the share of class-wide damages in Dr. Lamb's Expert Report, 63% for cheese and 37% for butter.

The Documented pool/claims will be allocated to each class member based on their proportional share of total qualifying purchases claimed.   A Class Member's proportional share shall be calculated by dividing a Class Member's qualifying/eligible purchases of cheese (or butter) by the total qualifying/eligible Documented claims of cheese (or butter).   A Class

Member's payment shall be calculated by multiplying the Class Member's proportional share of cheese (or butter) by the portion of the Documented Pool apportioned to cheese (or butter). Qualifying claims will be deemed eligible by the Settlement Administrator. Any and all disputes shall be resolved by the Settlement Administrator.

It is not possible to predict the precise amount of the payments to Class Members until claim forms are received. However, the proposed claim process is designed to maximize Class member participation and payments and to meet the due process requirements of Rule 23, by providing essentially automatic payments to many Class Members through the Generated Claims, providing a simple claims submission process for the remaining Class Members, providing a pool for undocumented claims and not allowing for any reversion. Additionally, if after the Settlement Administrator makes diligent effort to notify Class Members who have failed to timely cash or redeem check payments, there remains a small, unredeemed balance in the Settlement Fund, Class Counsel will determine whether it makes economic sense to send a supplemental payment at the end of the installments to the other Documented Class Members or whether that amount will be distributed *cy pres* to the National FFA Organization pursuant to the Settlement Agreement. *See* Exhibit 1, XI(13).

This claims process will involve many Class Members that are larger businesses so the claims process allocation and disbursements will occur after the Court's final approval of this settlement.

### 4.      Class Release

In exchange for the benefits made available under the settlement, Class Members agree to release Defendants from all past, present, and future claims relating to the allegations contained in this lawsuit. *See* Exhibit 1, IV(1-4).

### 5.      Class Representatives Service Awards

Prior to the final fairness hearing, the Class Representatives will ask the Court to award them incentive awards in light of the time and effort they have invested in this case.  The settlement is not contingent on the Court granting such awards.

### 6.      Attorneys' Fees and Costs

Also prior to the final fairness hearing, Class Counsel will apply to the Court for an award of attorneys' fees and costs from the common fund.  The application will recommend the following:  (1) the percentage award made by the Court will be applied to the gross amount to be distributed to the Class; (2) fees may be paid at least no sooner than in installments at the same time as Class Members are paid and/or fees shall be paid after the Class Members have been fully paid all payments and installments described in paragraph II(D)(2) above; (3) Co-Lead Counsel shall have sole discretion as to when and how these attorney fees are distributed to all plaintiff counsel; and (4) reimbursement of all incurred litigation expenses and incentive payments, in contrast, be completely made at one time promptly following final approval.

The settlement is not in any way contingent on Court-approval of an award of attorneys' fees or costs.

### 7.      Settlement Administration and Escrow Agent

Plaintiffs have selected and propose for this Court's appointment Epiq to serve as both the Court-appointed settlement claims administrator ("Settlement Administrator") and settlement fund escrow agent ("Escrow Agent").  Epiq, in consultation with its notice expert, Cameron R. Azari, Esq. of Hilsoft Notifications, previously provided the notice to the Class and reported to the Court regarding the implementation of the prior notice plan and opt-outs.  From that effort, Epiq and Hilsoft have gained a familiarity with the nature of the Class and are ideally situated to

move expeditiously going forward to implement the settlement Notice Plan.  Epiq has also

served as Escrow Agent for hundreds of class settlements.

### 8.      Class Notice

Upon entry of an order granting preliminary settlement approval, Epiq and Hilsoft will

begin implementation of the attached Notice Plan.  Class Members for whom Epiq has identified

addresses will receive direct mail notice informing them about the settlement and their rights to

object.  Class Members who have already opted out of the Class will be excluded from any

recovery.  In addition, Epiq and Hilsoft will publish notice of the settlement in the same

publications used in the prior Court-approved notice plan and on social media.  *See* Azari

Declaration with Notice Plan (Exhibit 5).  *See also Mangone v. First USA Bank*, 206 F.R.D. 222,

232 (S.D. Ill. 2001) (finding that the class notice sent by direct mail, published in publications as

well as on the internet fully complied with the specific notice requirements imposed by F.R.C.P.

23(c)(2)(A), (B), and (C)).

Further, the Court-appointed Settlement Administrator will continue to maintain and

monitor the Court-approved litigation website (www.butterandcheeseclassaction.com), and that

website will include all of the materials relating to the settlement, including the Settlement

Agreement itself, the claim form and all information relating to the final fairness hearing.

## III.      ARGUMENT

### A.      The Settlement Approval Process

As the Seventh Circuit has recognized, federal courts strongly favor and encourage

settlements, particularly in class actions and other complex matters, where the inherent costs,

delays, and risks of continued litigation might otherwise overwhelm any potential benefit the

class could hope to obtain:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980) (citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); 4 *Newberg on Class Actions* § 11.41 (4th ed. 2002) (citing cases).

The *Manual for Complex Litigation* (Fourth) (2004) § 21.63 describes a three-step procedure for approval of class action settlements:

(1)   Preliminary approval of the proposed settlement at an informal hearing;

(2)   Dissemination of mailed and/or published notice of the settlement to all affected Class Members; and

(3)   A "formal fairness hearing" or final settlement approval hearing, at which Class Members may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement may be presented.

This procedure, used by courts in this Circuit and endorsed by *Newberg*, safeguards Class Members' due process rights and enables the Court to fulfill its role as the guardian of class interests. 4 *Newberg* § 11.25.

The purpose of preliminary evaluation of proposed class action settlements is to determine whether the settlement is within the "range of possible approval," and thus whether notice to the class of the settlement's terms and holding a formal fairness hearing would be

14

worthwhile.  *Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2011 U.S. Dist. LEXIS 84219, at *32-33 (N.D. Ill. July 26, 2011) (citing *Armstrong*, 616 F.2d at 314).

When determining whether a settlement is fair, adequate, and reasonable at the final approval stage, courts in this circuit consider the following factors:

    (1)    the strength of plaintiffs' case compared to the terms of the proposed settlement;

    (2)    the likely complexity, length, and expense of continued litigation;

    (3)    the amount of opposition to settlement among affected parties;

    (4)    the opinion of competent counsel; and

    (5)    the stage of the proceedings and the amount of discovery completed.

*Isby*, 75 F.3d at 1199; *accord Holmes v. Roadview, Inc.*, No. 15-CV-4-JDP, 2016 WL 1466582, at *4 (W.D. Wis. Apr. 14, 2016).  *See also Kaufman v. American Express*, 877 F.3d 286 (7th Cir. 2017); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002); *In re: Southwest Vouchers Litigation*, 799 F.3d 701 (7th Cir. 2015).  In reviewing these factors, courts view the facts "in a light most favorable to the settlement."  *Isby*, 75 F.3d at 1199.  In addition, courts "should not substitute their own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel."  *In re: Sears, Roebuck & Co. Front-loading Washer Products Liab. Litig.*, No. 06 C 7023, 2016 WL 772785, at *7 (N.D. Ill. Feb. 29, 2016) (citing *Armstrong*, 616 F.2d at 315).

Granting preliminary approval of this settlement will allow all Class Members to receive notice of the proposed settlement's terms and the date and time of the final fairness hearing, at which Class Members may voice approval of or opposition to the settlement, and at which time the parties and Class Members may present further evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement.  *See Manual for Compl. Lit.*, at §§ 13.14, 21.632.

**B.     The Proposed Settlement is Well Within the "Range of Reasonableness" for Preliminary Approval.**

Plaintiffs respectfully submit that the proposed Settlement Agreement meets all of the factors relevant to *final* settlement approval, and, as such, the settlement should be preliminarily approved.

**1.     The Settlement Provides Substantial Relief for Class Members, Particularly in Light of the Otherwise Inevitable Appellate Challenges.**

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel Techs, Inc. v. DHL Express (USA), Inc*., 463 F.3d 646, 653 (7th Cir. 2006) (internal quotes and citations omitted).  Nevertheless, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig*., 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citations omitted).

**a.     The Monetary Amount of the Proposed Settlement and Proposed Allocation of the Net Settlement Proceeds.**

The settlement requires Defendants to pay the substantial sum of $220 million.  The settlement proceeds will be disbursed as follows:  After deducting Court-awarded attorneys' fees and costs, the cost of notice and claims administration, and class representative incentive awards, the entirety of the remaining monies will be allocated to eligible Class Members and will be distributed to them on a proportionate and pro rata basis based on purchase volume during the Class Period, pursuant to the allocation plan as proposed by Dr. Russell Lamb.  A second allocation may be required in that any monies left after the scheduled payments listed in Section II(D)(2) above to Class Members (*e.g.*, uncashed checks) will be paid on a proportionate and pro rata basis based on purchase volume during the Class Period to eligible participating Class

16

Members in an additional payment.  These allocations will be paid according to the allocation plan provided by Dr. Russell Lamb, an expert econometrician.  *See* Declaration of Dr. Lamb with Allocation Plan (Exhibit 6). Any remaining funds, after allocation of the final distribution to the Class from the last installment payment by National Milk, will be paid to the Court-approved *cy pres* recipient.  There is no reversion of any part of the settlement money to Defendants.

A proposed escrow agreement with Epiq will be filed for this Court's consideration in the near future.  Plaintiffs move this Court to approve this escrow agreement so that funds may be deposited into this escrow account for the benefit of Plaintiffs and the Class.  Per the proposed Settlement Agreement, assuming this Court grants this motion for preliminary approval of the settlement, the Defendants shall deposit the initial payment of the settlement proceeds as described above into the escrow account within 10 days of the entry of the Order granting preliminary approval.

### b.      The Strength of Plaintiffs' Case.

Class Counsel have worked hard to get this case prepared for trial.  Class Counsel and the Class Representatives have lived this case for years, which made the decision to settle on the eve of trial difficult.  Plaintiffs have argued that their damages exceed $1 billion due to Defendants' HRP program.  On the other hand, Defendants have maintained throughout the case – and would have argued on appeal from any verdict for the Plaintiffs – that the HRP was not a violation of the Sherman Act, that the Capper-Volstead and Clayton Acts create complete legal immunity from liability for the Defendants' HRP, that, in any event, the HRP was legal, that the Filed Rate Doctrine precludes Plaintiffs from pursuing a damage remedy and  that the HRP did not, in fact, damage the Class.

Class Counsel continue to believe that their claims against Defendants have merit and were prepared to prove as much at trial.  Nevertheless, the Class would face a number of risks

17

and difficult challenges if the litigation were to continue.  Among these are the relative shortage of direct legal precedent regarding the standard of antitrust liability – per se or Rule of Reason that applies here; the question of whether the otherwise broad immunizing reach of the Capper-Volstead and Clayton Acts protect a supply restraint like the HRP; whether the Filed Rate Doctrine protect Defendants against a damages verdict and the many factual and expert opinion issues that surround the calculation of damages. And even if all of those issues were finally resolved by this Court in the Plaintiffs favor, there remains the certainty of an appeal of a successful trial verdict.  Plaintiffs would have to overcome each and every one of the challenges made by the defense on appeal, as well as the propriety of class certification, and losing any one issue could result in the loss of a judgment and dismissal of the entire case.  Although the Court has ruled in Plaintiffs' favor on some issues, there is certainly no guarantee that the Seventh Circuit (or the United States Supreme Court) would do the same.  Because of these risks, Plaintiffs have determined that the proposed settlement – which would ensure that Class Members receive a real recovery in the readily foreseeable future -- is in the best interests of the Class.

## 2.     Continued Litigation is Likely to Take Several More Years.

Continued litigation would likely delay this case for several more years due to the inevitable post-trial motions and appeal to the Seventh Circuit.  If certiorari were granted by the United States Supreme Court, also not unlikely given the nature of this case, then resolution of the case would take still more years.

Instead of facing the uncertainty of a potential award in their favor years from now, the proposed settlement allows Class Members to receive immediate and certain relief upon final approval.  *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011)

("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.") (citation omitted).

### 3. Class Counsel Endorse the Settlement.

Class Counsel endorse this settlement.  Class Counsel's opinion on the settlement is entitled to considerable weight, particularly because: (1) Class Counsel are well-qualified and experienced in class action litigation; (2) Class Counsel have been actively involved in the prosecution, discovery, and trial preparation of the action since 2013;  (3) Class Counsel fully prepared this case for trial; and (4) the proposed settlement was reached at arm's length through negotiations by experienced counsel and with the help of an experienced mediator.  *See McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 812 (E.D. Wis. 2009) (factors including that "counsel endorses the settlement and it was achieved after arms-length negotiations facilitated by a mediator . . . suggest that the settlement is fair and merits final approval"); *see also In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d at 1020 (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys").  This factor therefore weighs in favor of preliminary approval.

### 4. The Late Stage of the Proceedings and the Amount of Discovery Completed Support Preliminary Approval.

The mature stage of the proceedings also favors preliminary approval of the proposed settlement. Indeed, the parties in this case have completed virtually all fact discovery, all expert discovery, extensive summary judgment and other motion practice, and the case was in very late stages of being readied for trial.  As a result, Class Counsel possesses all the information necessary to properly evaluate the case, and, in their estimation, the proposed settlement is fair, reasonable, and adequate.  *See Woods v. Club Cabaret, Inc.*, Case No. 1:15-cv-01213 (JEH), 2017 WL 4054523, *8 (C.D. Ill. May 17, 2017) ("With the discovery conducted there was more

19

than adequate information for the parties to understand their cases and reach a reasonable settlement. This supports a finding that the settlement is fair and adequate.").

### C.     The Best Practicable Notice Will Be Provided.

"Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all Class Members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." *Manual for Compl. Lit., supra*, at § 21.312.  The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The proposed forms of notice, attached as exhibits to the Notice Plan, satisfy all of the criteria above as well as due process.  The Notice Plan provides for direct, individual notice to approximately 14,158 direct purchasers by U.S. Mail.  Because these addresses have previously been confirmed as a result of the notice following class certification, this process should proceed expeditiously.  In addition, reasonable and adequate publication notice will advise these and other Class Members of the details of the settlement.  Also, notice will be provided to Class Members online through the settlement website.  *See* Azari Declaration, Exhibit 5.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court:

(1)     order all deadlines, dates and discovery in this litigation shall be stayed and suspended until further order of the Court, except as necessary to implement the settlement or comply with the terms of the Settlement Agreement;

(2)     preliminarily approve the proposed Settlement Agreement including Plaintiff's Plan of Allocation as being within the range of possible final settlement approval;

(3)     re-appoint Epiq as the notice provider, approve the proposed Notice Plan, appoint Epiq as the Court-appointed Settlement Administrator and Escrow Agent, and approve the escrow agreement form;

(4)     schedule a Final Fairness Hearing to determine whether:

   i.     the proposed settlement as set forth in the Settlement Agreement, should be finally approved as fair, reasonable and adequate;

   ii.    the application for Class Representative incentive awards and an award of attorneys' fees, costs and expenses of litigation in this matter should be approved; and

(5)     schedule the following deadlines:

| February 26, 2020 | Deadline for: (1) Motion and Memorandum in Support of Final Approval; (2) Class Counsel Motion for Attorneys' Fees, Costs and Class Representative Service Awards |
| March 6, 2020 | Deadline for Notice to the Court of Completion of Class Notice Program |
| March 17, 2020 | Deadline for Class Members to file Objections |
| April 10, 2010 | Deadline for Parties to File the responses to any Objections |
| April 24, 2020 | Final Fairness Hearing at 9:00 a.m. |

Dated:  December 4, 2019.

Respectfully submitted,


 */s/ Charles Barrett*
Charles Barrett
NEAL & HARWELL, PLC
1201 Demonbreun St., Suite 1000
Nashville, Tennessee 37203
(615) 244-1713
cbarrett@nealharwell.com

Michael Roberts
ROBERTS LAW FIRM, P.A.
20 Rahling Circle
P.O. Box 241790
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us

*Co-Lead Class Counsel*

Don Barrett
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095-0927
(662) 834-9168
dbarrett@barrettlawgroup.com
*Co-Lead Class Counsel*

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
dnast@nastlaw.com
*Co-Lead Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2019, I served the foregoing on all counsel of record via the Court's ECF filing system.

_/s/ Charles Barrett_____