# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

### HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **FIRST IMPRESSIONS SALON, INC.,**<br>**ROY MATTSON,**<br>**KPH HEALTHCARE SERVICES d/b/a**<br>**Kinney Drugs, Inc., and**<br>**PIGGLY WIGGLY MIDWEST, LLC,**<br><br>　　　　　**Plaintiffs,**<br>**v.**<br><br>**NATIONAL MILK PRODUCERS**<br>**FEDERATION, et al.,**<br><br>**Defendants.** | **CASE NO. 3:13-CV-00454-NJR-GCS** |

### DECLARATION RELATED TO PROPOSED SETTLEMENT ALLOCATION PLAN

**Dr. Russell L. Lamb**
**President**
Monument Economics Group
1530 Wilson Blvd, Suite 560
Arlington, Virginia 22209


November 29, 2019

## I.   Introduction and Assignment

1.      I listed my background and qualifications in an Expert Report ("Lamb Report") filed in this matter on January 4, 2019.  I also filed an Expert Reply Report ("Lamb Reply Report") in this matter on May 3, 2019.  I was also deposed by Counsel for Defendants on February 13, 2019 and on May 17, 2019.[1]  An updated copy of my C.V., including a list of the matters in which I have submitted expert testimony in the past four years, is attached to this report as Appendix A. Monument Economics Group is being compensated for my work in this matter at my usual and customary rate of $650 per hour.

2.      I have been asked by Counsel for the direct purchaser Class[2] ("Plaintiffs") in this matter to develop a methodology that can be used to allocate the Net Settlement Fund to members of the Class who submit claims as part of the claims process in a timely manner ("Claimants").  I describe this methodology in detail below.

## II.  Methodology for Net Settlement Fund Allocation

3.      The methodology I have developed for the purposes of allocating the Net Settlement Fund allocates a portion of the Net Settlement Fund to undocumented claims (the "Undocumented Settlement Fund") and the remainder to documented claims (the "Documented Settlement Fund"). The amount allocated to the Undocumented Settlement Fund will be 1% of the Net Settlement Fund and will be distributed equally amongst all valid Undocumented Claims with each Undocumented Claimant allowed to submit one Undocumented Claim.  The maximum payout per undocumented Claim is $5.  If there are funds remaining in the Undocumented Settlement Fund after allocation to all Undocumented Claims at the maximum payout, any remaining funds will transfer into and be included in the Documented Settlement Fund.

---

[1] Deposition of Russell Lamb, February 13, 2019 (hereafter "Lamb Deposition") and Deposition of Russell Lamb, May 17, 2019 (hereafter "Lamb Reply Deposition").
[2] The Court previously certified the following Classes on September 29, 2017:
(1) All persons and entities in the United States that purchased butter directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013 (hereafter the "Butter Class"); and
(2) All persons and entities in the United States that purchased cheese directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013 (hereafter the "Cheese Class").
Doc. 291 (Sept. 29, 2017).

4.      The Documented Settlement Fund, representing 99% of the Net Settlement Fund plus any undistributed monies from the Undocumented Settlement Fund, will be distributed on a *pro rata* basis to all qualified Claimants who filed valid Documented Claims, based on each Claimant's collective direct purchases of 1) cheese from December 6, 2008 to July 31, 2013; 2) butter from December 6, 2008 to July 31, 2013. In particular, my methodology for the *pro rata* allocation of the Documented Settlement Fund to each Claimant is as follows:

1) Calculate the total amount of cheese purchased by Claimant directly from Defendants or members of CWT from December 6, 2008 to July 31, 2013;

2) Calculate the total amount of butter purchased by Claimant directly from Defendants or members of CWT from December 6, 2008 to July 31, 2013;

3) Calculate each Claimant's percentage share of cheese purchases by dividing each Claimant's cheese purchase amounts by the cheese purchased by all Claimants who submit valid, accepted claim forms (the "Cheese Claim Share").

4) Calculate each Claimant's percentage share of butter purchases by dividing each Claimant's butter purchase amounts by the butter purchased by all Claimants who submit valid, accepted claim forms (the "Butter Claim Share").

5) Allocate the Documented Settlement Fund to each Claimant who submits a valid and accepted claim form by multiplying each Claimant's Cheese Claim Share by 63% of the Documented Settlement Fund and each Claimant's Butter Claim Share by 37% of the Documented Settlement Fund.  (So, for example, if Claimant XYZ purchased $100 of cheese and there were $1,000 in total cheese purchased by all Claimants who submitted valid Claim Forms, then, Claimant XYZ would receive an allocation of 10% (100/1,000) of the 63% of the Documented Settlement Fund allocated to the Cheese Class.  If Claimant XYZ purchased $100 of butter and there were $1,000 in total butter purchased by all Claimants who submitted valid Claim Forms, then, Claimant XYZ would receive an allocation of 10% (100/1,000) of the 37% of the Documented Settlement Fund allocated to the Butter Class.)

5.      As noted above, this methodology applies an adjustment factor of 63% to the Documented Settlement Fund to allocate the Documented Settlement Fund to Claimants who

3

purchased cheese directly from Defendants or members of CWT and an adjustment factor of 37% to the Documented Settlement Fund to allocate the Documented Settlement Fund to Claimants who purchased butter directly from Defendants or members of CWT.  These percentages are based on the Cheese Class's and Butter Class's respective share of damages I measured in the Lamb Report and Lamb Reply Report.[3]  In my damages calculation, 63% of the Class's damages were attributable to the Class's purchases of cheese and 37% of class damages were attributable to the Class's purchases of butter.

6.       Using data produced by Defendants and some members of CWT as part of discovery in this matter, along with any additional purchase data submitted by claimants, I am able to determine certain Class members' purchases of cheese and butter from December 6, 2008 to July 31, 2013.  However, these calculations are not final for several reasons including because it is possible that not all Class members will submit claims (in which case the Class members who do will receive higher allocations) and including because I understand that Claimants will have the option to submit their own purchase records as part of their claim.  To the extent that any such submissions by Claimants differ from the sales data produced by Defendants and members of CWT, if necessary, I may analyze those submissions in conference with the Settlement Administrator to finalize the calculations of the cheese and butter purchased by each Class member.

7.       The methodology for *pro rata* allocation of the Documented Settlement Fund discussed above is similar settlement allocation plans accepted by Courts, such as in *In Re: Domestic Drywall Antitrust Litigation* and *In re Polyurethane Foam Antitrust Litigation*.[4]  In my opinion, the methodology described above is reasonable and practical for the purposes of allocation of the Net Settlement Fund to Claimants.  As I discussed, this methodology utilizes sales data produced by Defendants and members of CWT from December 6, 2008 to July 31, 2013.[5]  Furthermore, this methodology accounts for the differences in relative overcharges on Class members' purchases of cheese and butter, and thus does not systematically favor or penalize Claimants who purchased cheese or butter, respectively. Further, with regards to Undocumented Claimants, an equal distribution of the Undocumented Settlement Fund among Undocumented Claimants, who

---

[3] Lamb Report at ¶13; Lamb Reply Report at ¶3.
[4] See, e.g. *In Re: Domestic Drywall Antitrust Litigation*, MDL No. 2437 and 13-MD-2437, Doc. 765; *In re Polyurethane Foam Antitrust Litigation*, 1:10-md-02196-JZ, Doc. 2086.
[5] These data were also used in my damages analysis in the Lamb Report.

are largely individual customers who purchase at Defendant and/or CWT-member owned retail stores, is an equitable way to distribute the Undocumented Settlement Fund among Claimants who are unable to provide documentation.

I declare that the foregoing is true and correct to the best of my knowledge and belief.

Russell L. Lamb, Ph.D.

November 29, 2019

5

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **FIRST IMPRESSIONS SALON, INC., ROY MATTSON, KPH HEALTHCARE SERVICES d/b/a Kinney Drugs, Inc., and PIGGLY WIGGLY MIDWEST, LLC,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**NATIONAL MILK PRODUCERS FEDERATION, et al.,**<br><br>**Defendants.** | **CASE NO. 3:13-CV-00454-NJR-GCS** |

## DIRECT PURCHASER PLAINTIFFS' [PROPOSED] PLAN OF
## ALLOCATION FOR THE DIRECT PURCHASER CLASS

Direct Purchaser Plaintiffs First Impressions Salon, Inc., Roy Mattson, KPH Healthcare Services d/b/a Kinney Drugs, Inc., and Piggly Wiggly Midwest, LLC (collectively, "Plaintiffs"), on behalf of the previously certified Cheese and Butter Classes,[1] hereby submit this proposed Plan of Allocation to allocate the net settlement proceeds in the amount of $____ million received in the settlement with National Milk Producers Federation ("NMPF"), plus interest, which are net of Court-approved attorneys' fees, Court-approved named plaintiff service awards, and Court-approved expenses, including settlement-related expenses (the "Net Settlement

---

[1] The Court previously certified the following Classes:

(1) All persons and entities in the United States that purchased butter directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013 (hereafter the "Butter Class"); and

(2) All persons and entities in the United States that purchased cheese directly from one or more Members of Defendant, Cooperatives Working Together and/or their subsidiaries, during the period from December 6, 2008 to July 31, 2013 (hereafter the "Cheese Class").

Doc. 291 (Sept. 29, 2017).

Fund").

The proposed Plan of Allocation ("Allocation Plan") allocates the Net Settlement Fund into two separate net settlement funds: one for Class members whose claims of their purchases of cheese and butter products from Defendants or members of CWT during the Class Period have no associated documentation (the "Undocumented Settlement Fund");[2] and a second fund for class members who are able to provide (or there exists otherwise available) documentation of their purchases of cheese and butter products from Defendants or members of CWT during the Class Period (the "Documented Settlement Fund").[3]

Class members who elect to participate in the Undocumented Settlement Fund will be given an amount to be determined up to $5, with any unclaimed amounts transferring to the Documented Settlement Fund.  The award to Class members who elect to participate in the Documented Settlement Fund will be based on each Class member's *pro rata* weighted share of valid claims of cheese or butter dollar purchases made directly from the Defendants and CWT members during the Class Period.  This proposal is similar to the method of allocation that has been approved in similar class actions brought by direct purchasers to recover overcharges arising from alleged horizontal price-fixing agreements.[4]

Plaintiffs' expert, economist Dr. Russell L. Lamb, can calculate each Class member's percentage share of the Documented Settlement Fund using sales data produced by Defendants and CWT members during discovery.[5]  Claimants[6] will also have the option of submitting their

---

[2] These Class Members are largely individuals who made *de minimis* purchases directly from Defendants and/or members of CWT.

[3] Documented Class Members are largely business who make repeat purchases from Defendants and/or members of CWT.

[4] See, e.g. *In Re: Domestic Drywall Antitrust Litigation*, MDL No. 2437 and 13-MD-2437, Doc. 765; *In re Polyurethane Foam Antitrust Litigation*, 1:10-md-02196-JZ, Doc. 2086.

own records or data showing their dollar purchases of (a) cheese, net of returns, from December 6, 2008 to July 31, 2013; and/or (b) butter, net of returns, from December 6, 2008 to July 31, 2013 from Defendants and/or CWT members.   The Settlement Administrator will review any such submissions for approval to determine the final calculations, which may include making any necessary and appropriate adjustments.[7]

The proposed Allocation Plan is practical and efficient, using sales data already obtained from Defendants and CWT members where available.[8]  It also is a reasonable way to allocate the Net Settlement Fund, and is fair to all members of the Class, including those Class members that bought cheese and butter from retail stores owned by Defendants and/or CWT members.[9]

## THE ALLOCATION PLAN

The Allocation Plan works as follows:[10]

---

[5] *See* Declaration of Russell L. Lamb, Ph.D. Related to Proposed Allocation Plan and Net Settlement Fund Allocation ("Lamb Declaration") (filed herewith), ¶6.  Allocations to Claimants whose right to settlement allocation arises by virtue of assignments from Class members would be determined in this same fashion.

[6] A "Claimant" is any entity that timely submits a completed claim form.  A Claimant's percentage share will be zero if that Claimant timely submits a claim form but that Claimant's claim is rejected because, for example, the Claimant did not purchase cheese or butter directly from Defendants and/or CWT members during the Class period and does not have any valid assignment covering any such direct purchases.

[7] Throughout this Allocation Plan, "purchases" refers to dollar purchases made directly from Defendants or members of CWT during the Class Period, or purchases that are covered by a Claimant's assignment from a direct purchaser of such purchases, during the Class Period. Claimants' *pro rata* shares will be based only on qualified cheese and butter purchases made directly from Defendants or members of CWT during the Class Period, and will not be based on Claimants' purchases of cheese and butter from some other entities that buy and resell cheese and butter (unless the claimant has an assignment of rights from the entity that purchased directly from the manufacturer).  In addition, "purchases" throughout refers to net purchases, *i.e.*, gross purchases net of any returns and net of any purchases for which the Claimant or Class member has assigned away its rights to recovery in this litigation.

[8] *See* Lamb Declaration ¶¶6-7.

[9] *See id.* ¶ 7.

[10] The Allocation Plan calculations are set out in detail in the Lamb Declaration filed herewith.

1.      **Allocation of the Net Settlement Fund**

1.1     **Allocation of the Net Settlement Fund into the Undocumented Settlement Fund and the Documented Settlement Fund.** The Net Settlement Fund shall be distributed to Class Members who submit an undocumented claim from the Undocumented Settlement Fund and to Class Members who submit a documented claim by the Documented Settlement Fund. 1% of the Net Settlement Fund shall be allocated to the Undocumented Settlement Fund and 99% of the Net Settlement Fund shall be allocated to the Documented Settlement Fund.[11]

1.2     **Allocation of the Documented Settlement Fund to the Cheese and Butter Classes.** The Documented Settlement Fund shall be further allocated to the Cheese and Butter Classes by the *pro rata* share of the sum of purchases contained in the valid claims submitted to the Settlement Claims Administrator.   According to Dr. Lamb's calculations, 63% of the Class's damages were attributable to the Cheese Class's purchases of cheese and 37% percent were attributable to the Butter Class's purchases of butter.[12]   Accordingly, the Allocation Plan allocates 63% of the Documented Settlement Fund to members of the Cheese Class and 37% of the Documented Settlement Fund to members of the Butter Class.

2.      **Determination of a Recognized Claim**

2.1     **Claim Notification for Known Class Members.**  At the appropriate time and after receiving Court approval to do so, the Settlement Administrator, working with Dr. Lamb's firm Monument Economics Group if necessary, will provide a separate, individualized claim form (the "Claim Form") for each Class member that appears in the transactional data produced in discovery.  The Claim Form will include information identifying each Class member

---

[11] See Lamb Declaration at ¶¶ 3-4.
[12] See Lamb Declaration at ¶¶ 4-5.

4

by its name and address.  The Claim Form will also contain totals for the Class member's net purchases of cheese and of butter from Defendants and/or members of CWT from December 6, 2008 to July 31, 2013.  The Claim Form will specifically request that each Class member verify the accuracy of the information contained in the Claim Form and will provide instructions for challenging any of the figures or computations contained in the Claim Form.  If a Class member agrees that the information contained in the Claim Form is accurate, it will be asked to sign and return the Claim Form to the Settlement Administrator.  If a Class member believes that the information contained in its Claim Form is not accurate, that Class member may submit its own purchase records pursuant to the procedures described below. The Claim Form will request the Claimant's full name and mailing address appropriate for correspondence regarding the distribution of the Documented Settlement Fund, and the identity and contact information for the person responsible for overseeing the claims process for the Claimant.  In addition, the Claim Form will include the release language contained in the settlement agreement with Defendants. Each Claimant will be required to execute the Claim Form in exchange for receiving any distribution from the Documented Settlement Fund.

   2.2    **Claim Notification for Unknown Class Members.**  Unknown Class Members will be required to submit a Claim Form to the Settlement Administrator.  If the Class Member elects to participate in the Undocumented Settlement Fund, then the Class Member is only required to fill out a Claim Form and not submit additional documentation.  If a Class member elects to participate in the Documented Settlement Fund, the Class member must submit its own purchase records pursuant to the procedures described below. The Claim Form will request the Claimant's full name and mailing address appropriate for correspondence regarding the distribution of the Documented Settlement Fund, and the identity and contact information for

5

the person responsible for overseeing the claims process for the Claimant.  In addition, the Claim Form will include the release language contained in the settlement agreement with Defendants. Each Claimant will be required to execute the Claim Form in exchange for receiving any distribution from the Documented Settlement Fund or the Undocumented Settlement Fund.

  **2.3**   **Timeliness**.  The submission of the Claim Form to the Settlement Administrator (with any necessary supporting documentation if the Claimant disagrees with the information contained in its Claim Form or if it is an unknown Class member that elects to participate in the Documented Settlement Fund) will be deemed timely if it is received or postmarked within the time prescribed by the Court.

  **3.**    **Allocation of the Undocumented Settlement Fund.**  After all Claimants have submitted undocumented claims, the funds will be distributed equally to all undocumented claimants with each undocumented claimant receiving a maximum of $5 per claim with a maximum of one claim per claimant.  Any undistributed amounts will be reallocated to the Documented Settlement Fund using the same apportionment formula from §1.2.

  **4.**    **Allocation of the Documented Settlement Fund Among Recognized Documented Claimants.**  Each Claimant's allocated share of the Documented Settlement Fund will be set in proportion to each Claimant's net dollar purchases of cheese (or butter) compared to the volume of claimed purchases in the valid claims submitted to the Settlement Administrator, during the period of December 6, 2008 to July 31, 2013 made directly from Defendants and/or members of CWT.  The allocation computation will be based on the following information (whether from the data already produced in discovery or from submissions by the Claimants):  (a) each Claimant's net dollar purchases of cheese during the period of December 6, 2008 to July 31, 2013 made directly from Defendants and/or members of CWT (b) each

Claimant's net dollar purchases of butter during the period of December 6, 2008 to July 31, 2013 made directly from Defendants and/or members of CWT; (c) the combined total of net dollar purchases of cheese during the period of December 6, 2008 to July 31, 2013 made directly from Defendants and/or members of CWT made by Claimants with valid claims submitted to the Settlement Claims Administrator; and (d) the combined total net dollar purchases of butter during the period of December 6, 2008 to July 31, 2013 made directly from Defendants and/or members of CWT made by Claimants with valid claims submitted to the Settlement Claims Administrator. To calculate the *pro rata* share for each Claimant of the Documented Settlement Fund Settlement Fund, the Settlement Administrator, working with Dr. Lamb, will:

(1)     Allocate each Cheese Claimant's share of the Documented Settlement Fund by multiplying the Documented Settlement Fund allocated to the Cheese Class by each Claimant's *pro rata* share of the net purchase volume of cheese in the valid claims submitted to the Settlement Administrator. So, for example, if Claimant XYZ purchased $100 of cheese and there were $1,000 in total cheese purchased by all Claimants who submitted valid Claim Forms, then, Claimant XYZ would receive an allocation of 10% (100/1,000) of the 63% of the Documented Settlement Fund allocated to the Cheese Class.

(2)     Allocate each Butter Claimant's share of the Butter Documented Settlement Fund by multiplying the Documented Settlement Fund allocated to the Butter Class by each Claimant's *pro rata* share of the net purchase volume of butter in the valid claims submitted to the Settlement Administrator. So, for example, if Claimant XYZ purchased $100 of butter and there were $1,000 in total butter purchased by all Claimants who submitted valid Claim Forms, then, Claimant XYZ would receive an allocation of 10% (100/1,000) of the 37% of the Documented Settlement Fund allocated to the Butter Class.

Each Claimant's total *pro rata* share of the Documented Settlement Fund will be the total of (1) and (2) above.

**5.      Processing of Claims.**

5.1      **Acceptance and Rejection.**  All Claims will be reviewed and processed by the Settlement Administrator, with assistance from Dr. Lamb and his staff at Monument Economics Group as required and appropriate.  The Settlement Administrator shall first determine whether a Claim Form received is timely, properly completed, and signed.  If a Claim Form is incomplete, the Settlement Administrator shall communicate with the Claimant via First Class Mail, email, or telephone regarding the deficiency.  Claimants will then have 30 days from the date they are contacted by the Settlement Administrator regarding the deficiency to cure any such deficiency.  If any Claimant fails to correct the deficiency within this time, the claim may be rejected, and the Claimant shall be notified by letter stating the reason for rejection.

5.2      **Approval of Claims.**  All timely Claim Forms that are properly completed shall be approved by the Settlement Administrator (the "Approved Claims").  All late Claims Forms that are otherwise complete will be processed by the Settlement Administrator but marked as "Late Approved Claims."  If Class Counsel conclude that, in their judgment, any such "Late Approved Claims" should ultimately not be accepted,[13] the Claimant will be timely notified, and then may seek review by the Court via the appeals process described in §6.2 below.

5.3      **The Pro Rata Distribution Calculation**.  The Settlement Administrator, in conjunction with Dr. Lamb, will be responsible for determining the total amount each Claimant will receive from the Net Settlement Fund.  Once the Settlement Administrator has determined the number of Approved Claims, it will work with Dr. Lamb to calculate each

---

[13] *Cf. Kuehbeck v. Genesis Microchip Inc.*, No. C02-05344 JSW, 2007 WL 2382030, at *1 (N.D. Cal. Aug. 17, 2007) (authorizing distribution to timely filed claims and valid claims that were submitted late).

Claimant's *pro rata* share of the Net Settlement Fund as determined by the calculation described above in Sections 3 and 4 above.

6.     **Processing Challenged Claims.**

6.1     **Review of Challenged Claims.** The Settlement Administrator shall review any and all written challenges by Claimants to the determinations of the Settlement Administrator and if necessary will confer with Dr. Lamb and Class Counsel.  If upon review of a challenge and supporting documentation, the Settlement Administrator decides to amend or modify its determination of the distribution amounts to a Claimant, it shall advise the Claimant who made the challenge.   These determinations shall be final, subject to the appeals process described in § 6.2 below.

6.2     **Claims Appeal Process.**  Where the Settlement Administrator determines that a challenge requires additional information or documentation, it will so advise the Claimant and provide that Claimant an opportunity to cure the deficiency within 30 days.  If that Claimant fails to cure the deficiency within that time, the challenge may be rejected and the Claimant will be notified of the rejection by mail, which notification shall be deemed final subject to any appeal and decision by the Court.  If the Settlement Administrator concludes that it has enough information to properly evaluate a challenge and maintains that its initial determinations were correct, it will so inform the Claimant in writing, which notification shall be deemed final subject to any appeal and decision by the Court.

7.     **Report to Court Regarding Distribution of Net Settlement Fund.**  After the Settlement Administrator reviews all submitted claims and works with Dr. Lamb and his staff to determine the amount each Claimant is entitled to receive from the Net Settlement Fund, the Settlement Administrator will prepare a final report for the Court's review and approval.  The report will explain the tasks and methodologies employed by the Settlement Administrator in

processing the claims and administering the Allocation Plan.  It will also contain (a) a list of

Class members or other Claimants (if any) who filed Claim Forms that were rejected and the

reasons, (b) a list of any challenges to the estimated distribution amounts that were rejected and

the reasons, and (c) the date any such Claimant whose challenge was rejected was informed by

the Settlement Administrator for purposes of calculating the timeliness of any appeal using the

procedures set forth below.  Finally, the final report shall contain an accounting of the expenses

associated with the Allocation Plan, including bills from Monument Economics Group and the

Settlement Administrator, any taxes that are due and owing, and any other fees or expenses

associated with the settlement allocation process.

8.      **Payment to the Claimants.**

8.1      **Distribution of Net Settlement Fund.** Upon Court approval of the final

report and declaration of the Settlement Administrator, the Settlement Administrator shall issue a

check payable to each Claimant who has submitted a complete and valid Claim Form. It is

anticipated that the entire Net Settlement Fund will be distributed in multiple installments.  The

first distribution will be of the Undocumented Settlement Fund.  Any unclaimed monies from the

Undocumented Settlement Fund will be added to the Documented Settlement Fund which will be

distributed second.  If any monies remained undistributed, then, subject to further order of the

Court, any monies from the Net Settlement Fund that remain unclaimed shall, if feasible, be

distributed to Claimants in an additional distribution or distributions on the basis of the same

calculations of the Claimants' *pro rata* allocation of the Documented Settlement Fund described

in §4 above.

8.2      **Distribution of Residual or Unclaimed Funds.**  Insofar as the Net

Settlement Fund includes residual funds after distribution or distributions as set forth in the

preceding paragraph that cannot be economically distributed to the Claimants (because of the costs of distribution as compared to the amount remaining), Class Counsel shall make an application to the Court, with notice to Defendants, for such sums to be used to make *cy pres* payments for the benefit of members of the Class.

9.  **Resolution of Disputes.** In the event of any disputes between Claimants and the Settlement Administrator on any subject (*e.g.*, timeliness, required completeness or documentation of a claim, or the calculation of the Claimant's unit purchases, share of the net settlement fund, and/or amount payable), the decision of the Settlement Administrator shall be final, subject to the Claimant's right to seek review by the Court.  In notifying a Claimant of the final rejection of a Claim or a challenge thereto, the Settlement Administrator shall notify the Claimant of its right to seek such review by issuing notice to the Settlement Administrator and Class Counsel. Any such appeal by a Claimant must be submitted in writing to the Court, with copies to the Settlement Administrator and Class Counsel, within 21 days of the Settlement Administrator's final rejection notification to the Claimant.

Dated: _19 Nov 2019_

Respectfully submitted,

Russell Lamb, Ph. D.



## Russell Lamb, Ph.D.

President
Monument Economics Group
Phone: (703) 615-3474
Email: rlamb@megconsulting.com

### Professional Summary

Russell Lamb is an expert in antitrust economics and has testified concerning antitrust liability, impact, and damages.  He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing.  He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues including class-certification and economic damages in antitrust, RICO and consumer fraud matters.  In addition, he has provided expert advice to client attorneys at all levels of the litigation.  Dr. Lamb has an extensive background in the analysis of domestic and international agricultural markets and has authored more than 50 articles in peer-reviewed economics journals, trade press, and major newspapers.

Dr. Lamb's work has been cited by courts in certifying classes in the United States and Canada.  For example, in In re Aftermarket Automotive Lighting Products Antitrust Litigation, the court held that his analysis provided "a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid."  In certifying the Class in In re: Titanium Dioxide Antitrust Litigation, the Court said, "This Court finds that Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case."  In In Re: Domestic Drywall Antitrust Litigation, the Court cited extensively to Dr. Lamb's analysis in its decision to certify the Class: "Dr. Lamb's expert opinion fits the facts of the case, is relevant, and is therefore admissible to show classwide injury and measurable damages in support of Plaintiffs' Motion for Class Certification. [...]

The Court […] has thoroughly considered Dr. Lamb's opinion in its decision on the DPPs' Class Certification Motion."  In the Canadian LCD Competition Act Class Action, the Court held that Dr. Lamb's analysis provided "evidence of a viable methodology for the determination of loss on a class-wide basis."  In In re: Puerto Rican Cabotage Litigation, the Court held that "Dr. Lamb [had] set forth a reputable and workable model for determining damages as to individual class members."  In certifying the class in Clarke and Rebecca Wixon, et al. v. Wyndham Resort Development Corp., et al., the Court held that "Dr. Lamb [had] presented a plausible class-wide method of proof."  In certifying the class in Eugene Allan, et al., v. Realcomp II, Ltd., et al., the Court held that "the Plaintiffs have produced sufficient evidence that common proofs will yield a finding of class-wide damages that predominates over any specific individualized damages. The Lamb Report and Lamb Reply are sufficient to establish this fact."  Furthermore, Dr. Lamb was the Indirect Purchaser Plaintiffs' expert in the In re: Polyurethane Foam Antitrust Litigation matter, which was certified by the Court in April 2014.

With regard to agricultural economics, Dr. Lamb has a particular expertise in agricultural markets and has undertaken extensive original research and econometric analysis on markets for agricultural commodities.  His articles on agricultural economics have been published in peer-reviewed journals, trade press, and major newspapers.  Dr. Lamb regularly presents at conferences on topics including the state of the U.S. Economy and farm policy.

Prior to co-founding Monument Economics Group, Dr. Lamb was a Senior Vice President at Nathan Associates Inc., where he directed the firm's litigation consulting practice nationally.  Dr. Lamb previously served as a Principal at AACG in Arlington, VA, and as Managing Director and DC Office Head at Econ One Research.  He earlier served as an Assistant Professor of Agricultural Economics and faculty member of the Graduate Group in Economics at North Carolina State University and as an Economist and Senior Economist in the Federal Reserve System of the United States, at the Federal Reserve Board and the Federal Reserve Bank of Kansas City.

**Education**

- Ph.D., Economics, University of Pennsylvania, 1994
- M.A., Economics, The University of Maryland, 1989
- B.A., Economics, The University of Tennessee, 1987

**Expert Testimony Offered**

**2019**  *First Impressions Salon, Inc., et al., v. National Milk Producers Federation, et al.*

- United States District Court for the Southern District of Illinois
- Case No. 3:13-cv-00454-NJR-SCW
- Expert Report, January 4, 2019
- Testified at deposition, February 13, 2019
- Expert Reply Report, May 3, 2019
- Testified at deposition, May 17, 2019
- Opinion concerning class certification and damages issues
- Retained by Barrett Law Group, NastLaw LLC, and Roberts Law Firm

*Sheridan Chevrolet Cadillac Ltd., et al., v. JTEKT Corporation, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-478644-00CP
- Expert Report, January 2, 2019
- Opinion concerning class certification issues
- Retained by Sotos LLP

**2018**  *Sheridan Chevrolet Cadillac Ltd., et al., v. Hitachi Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-14-506683-00CP
- Expert Report, October 4, 2018
- Opinion concerning class certification issues
- Retained by Sotos LLP

*In Re Suboxone Direct Purchaser Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- Case No. 2:13-MD-02445-MSG
- Expert Report, September 18, 2018
- Testified at deposition, October 30, 2018
- Merits Expert Report, November 30, 2018
- Expert Rebuttal Report, January 11, 2019
- Testified at deposition, January 17, 2019
- Expert Merits Rebuttal Report, April 26, 2019
- Testified at deposition, June 12, 2019
- Opinion concerning class certification, merits, and damages issues
- Retained by Berger & Montague, P.C.; Garwin Gerstein & Fisher LLP; and Faruqi & Faruqi LLP

*William Rushing, et al. v. Williams-Sonoma, Inc., et al.*

- United States District Court Northern District of California, San Francisco Division
- Case No. 3:16-cv-01421-WHO

- Expert Report, July 25, 2018
- Opinion concerning class certification issues
- Retained by Rose Law Group, PC

*The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee, et al. v. Momenta Pharmaceuticals, Inc., et al.*

- United States District Court Middle District of Tennessee Nashville Division
- Civil Action No. 15-cv-1100
- Testified at deposition, October 10, 2018
- Expert Report, June 22, 2018
- Expert Reply Report, September 21, 2018
- Testified at class certification hearing, May 13, 2019
- Declaration, May 21, 2019
- Expert Merits Report, May 24, 2019
- Declaration, June 18, 2019
- Expert Report, July 5, 2019
- Expert Supplemental Reply Report, July 5, 2019
- Testified at hearing, July 12, 2019
- Expert Merits Reply Report, July 29, 2019
- Testified at deposition, August 13, 2019
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2017** *Fady Samaha and Urlin Rent a Car Ltd. v. Yamashita Rubber Co., Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-472262-00CP
- Expert Report, December 4, 2017
- Supplemental Report, July 13, 2018
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re Lamictal Direct Purchaser Antitrust Litigation*

- United States District Court New Jersey
- Case No. 1 2-95 -WHW-MCA
- Expert Report, November 6, 2017
- Revised Expert Reply Report, April 16, 2018
- Testified at deposition, June 6, 2018
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*In Re Namenda Direct Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV- 07488
- Expert Report, September 15, 2017

- Amended Expert Report, September 20, 2017
- Expert Reply Report, October 25, 2017
- Amended Expert Reply Report November 9, 2017
- Testified at deposition, October 6, 2017
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.; and Garwin Gerstein & Fisher LLP

*In Re Capacitors Antitrust Litigation*

- United States District Court Northern District of California San Francisco Division
- Case No. 3:14-CV-03264 -JD
- Expert Declaration, February 24, 2017
- Expert Reply Declaration, April 28, 2017
- Testified at deposition, May 17, 2017
- Expert Trial Declaration, November 30, 2018
- Expert Trial Reply Declaration, April 19, 2019
- Testified at deposition, May 23, 2019
- Opinion concerning class certification issues regarding indirect purchasers
- Retained by Cotchett, Pitre & McCarthy, LLP

**2016** *Deere Construction, LLC, v. Cemex Construction Materials Florida, LLC, et al.*

- United States District Court Southern District of Florida
- Case No. 15-24375-CIV-ALTONAGA/O'Sullivan
- Expert Report, September 14, 2016
- Testified at deposition, September 27, 2016
- Opinion concerning class certification issues
- Retained by Kozyak Tropin & Throckmorton, LLP; Harke Clasby & Bushman, LLP; and McCallum, Methvin & Terrell, P.C.

*Luke Begonja v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-010943)*

*Gerrit Brouwer, Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008533)*

*Gary Gottschalk, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001957)*

*Susan Hatzipetro, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-007996)*

*Shelly Keegan, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001953)*

*Yvonne Klebba, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008535)*

*Adriane McConville, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001960)*

*Ernest W. Yeager Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008054)*

- In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida
- Expert Report, September 14, 2016
- Testified at deposition, October 27-28, 2016
- Testified at deposition, March 2-3, 2017
- Expert Report, May 19, 2017
- Testified at deposition, August 29, 2017
- Opinion concerning damages issues
- Retained by Badham & Buck, LLC

*In Re: Evanston Northwestern Healthcare Corporation Antitrust Litigation*

- United States District Court for the Northern District of Illinois Eastern Division
- No. 07-C-4446
- Expert Report, July 28, 2016
- Expert Reply Report, January 25, 2017
- Testified at deposition, September 20, 2016
- Testified at deposition, February 22, 2017
- Opinion concerning damages issues
- Retained by Miller Law LLC

*In Re: Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation*

- United States District Court for the District of New Jersey
- Civ. No. 12-711 (AET)(LHG)
- Declaration, May 27, 2016
- Reply Declaration, March 31, 2017
- Testified at deposition, July 8, 2016
- Opinion concerning class certification, merits, and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; and Kaplan Fox & Kilsheimer LLP

*Nestlé Purina Petcare Company v. Blue Buffalo Company, Ltd.*

*Blue Buffalo Company, Ltd. v. Nestlé Purina Petcare Company, et al.*

*Blue Buffalo Company, Ltd. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Custom AG Commodities, LLC, et al.*

- United States District Court for the Eastern District of Missouri Eastern Division
- Cause No.: 4:14-CV-00859 RWS
- Affidavit, March 17, 2016
- Opinion concerning pricing issues
- Retained by Lashly & Baer, P.C.

*In Re: Cast Iron Soil Pipe and Fittings Antitrust Litigation*

- United States District Court Eastern District of Tennessee at Chattanooga
- Case No.: 1:14-md-2508
- Declaration, March 4, 2016
- Testified at deposition, May 19, 2016
- Opinion concerning class certification and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; Cera LLP; and Kaplan Fox & Kilsheimer LLP

*Darren Ewert v. Denso Corporation, et al.*

- Supreme Court of British Columbia
- Case No. S-135610
- Expert Report, February 12, 2016
- Expert Reply Report, January 5, 2017
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman

*Serge Asselin v. Hitachi, LTD & al.*

- Cour Supérieure Disctirct de Québec
- Case No. 200-06-000180-144
- Expert Report, February 11, 2016
- Opinion concerning class certification issues
- Retained by Siskinds LLP

**2015**   *Thomas Mervyn v. Atlas Van Lines, Inc., et al.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:13-CV-03587
- Expert Declaration, September 3, 2015
- Expert Report, February 4, 2016
- Opinion concerning data issues
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Thomas Mervyn v. Nelson Westerberg, Inc.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:11-CV-06594
- Expert Report, July 27, 2015
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.*

- United States District Court Western District of Washington at Seattle
- No. 2:12-cv-01181-BJR
- Expert Report, March 23, 2015

- Testified at deposition, May 21, 2015
- Opinion concerning damages issues
- Retained by Nix, Patterson & Roach, L.L.P.; and Kessler Topaz Meltzer & Check, LLP

*BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.*

- In the Circuit Court for Cocke County, Tennessee
- Civil Action No. 32941-II
- Expert Report, January 23, 2015
- Opinion concerning impact and damages issues
- Retained by Miller Law LLC

*In Re: Domestic Drywall Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2437 13-MD-2437
- Trial Expert Report, January 23, 2015
- Reply Expert Report, April 23, 2015
- Expert Report concerning class certification, August 3, 2016
- Expert Reply Report concerning class certification, January 9, 2017
- Affidavit, July 11, 2019
- Testified at deposition, February 25, 2015
- Testified at deposition, August 30, 2016
- Testified at deposition, February 17, 2017
- Testified at class certification hearing, April 27, 2017
- Expert Supplemental Report, July 31, 2017
- Opinion concerning merits issues regarding direct purchasers
- Opinion concerning class certification issues, impact and damages regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC; Berger & Montague, P.C.; and Spector Roseman Kodroff & Willis, P.C.

*In Re: Processed Egg Products Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2002
- Expert Declaration, January 22, 2015
- Expert Reply Declaration, April 3, 2015
- Testified at deposition, May 7, 2015
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Straus & Boies, LLP

**2014**   *In Re: Class 8 Transmission Indirect Purchaser Antitrust Litigation*

- United States District Court for the District of Delaware
- Civil Action No. 11-cv-00009 (SLR)
- Declaration, November 3, 2014
- Reply Declaration, March 6, 2015

- Trial Declaration, March 27, 2015
- Trial Reply Declaration, July 2, 2015
- Testified at deposition, December 17, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Glancy Binkow & Goldberg LLP

*Mark S. Wallach, et al., v. Eaton Corporation, et al.*

- United States District Court District of Delaware
- Civil Action No. 10-260-SLR
- Expert Report, November 3, 2014
- Expert Reply Report, March 6, 2015
- Trial Expert Report, March 27, 2015
- Trial Expert Reply Report, July 2, 2015
- Testified at deposition, December 16, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding direct purchasers
- Opinion concerning merits and damages issues regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC

*Sheridan Chevrolet Cadillac Ltd., et al., v. Furukawa Electric Co. Ltd., et al.*

*Sheridan Chevrolet Cadillac Ltd., et al., v. Mitsubishi Electric Corporation, et al.*

- Ontario Superior Court of Justice
- Court File Nos. CV-12-446737-00CP / CV-14-496994-00CP
- Expert Report, April 15, 2016
- Expert Report, October 14, 2014
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*Resco Products, Inc., v. Bosai Minerals Group Co., Ltd., et al.*

- United States District Court for the Western District of Pennsylvania
- Civil Action No.: 2:06-cv-235-JFC
- Expert Report, September 24, 2008
- Expert Report, September 29, 2014
- Supplemental Expert Report, December 15, 2014
- Testified at deposition, February 13, 2015
- Opinion concerning damages
- Retained by Boies, Schiller & Flexner LLP

*Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.*

- United States District Court Eastern District of Wisconsin
- Case No.: 2:09-cv-00852-LA
- Affidavit, August 1, 2014
- Affidavit, November 4, 2014
- Declaration, April 24, 2015
- Expert Report, July 15, 2015
- Expert Reply Report, November 24, 2015
- Expert Surreply Report, January 15, 2016
- Expert Trial Report, August 18, 2016
- Expert Trial Reply Report, December 20, 2016
- Testified at deposition, October 1, 2015
- Testified at deposition, February 13, 2017
- Opinion concerning class certification and damages issues
- Opinion concerning Defendants' replacement data
- Opinion concerning Defendant and LKQ transaction-level data
- Opinion concerning merits and damages issues
- Retained by Stueve Siegel Hanson, LLP

*Meredith Corporation, et al., v. SESAC, LLC, et al.*

- United States District Court for the Southern District of New York
- 09 Civ. 9177 (PAE)
- Expert Report, July 10, 2014
- Opinion concerning class certification issues
- Retained by Weil, Gotshal & Manges LLP

*Janet Skold, et al., v. Intel Corporation, et al.*

- Superior Court of the State of California for the County of Santa Clara
- Case No. 1-05-CV-039231
- Expert Report, June 14, 2007
- Testified at deposition, August 31, 2007
- Testified at deposition, January 10, 2014
- Opinion concerning class certification issues
- Opinion concerning damages issues
- Retained by Girard Gibbs LLP

*In Re: Polyurethane Foam Antitrust Litigation*

- United States District Court Northern District of Ohio Western Division 8
- MDL No. 2196
- Declaration, June 11, 2013
- Reply Declaration, October 23, 2013
- Trial Declaration, March 18, 2014
- Reply Trial Declaration, June 30, 2014

- Testified at deposition, August 20, 2013
- Testified at deposition, November 20, 2013
- Testified at class certification hearing, January 15, 2014
- Testified at deposition, April 14, 2014
- Testified at deposition, July 14, 2014
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues
- Retained by Miller Law LLC

## Professional Experience

### Economic Consulting Positions

**Monument Economics Group**, Oct. 11, 2016 - Present

**Nathan Associates, Inc.**, Arlington, VA, *Senior Vice President*, Jan. 2013 – Sep. 20, 2016

**Advanced Analytical Consulting Group, Inc.**, Washington, DC, *Principal*, Mar. 2011– Jan. 2013

**Econ One Research, Inc.**, Washington, DC, Managing Director and DC Office Head, Jul. 2006 – Mar. 2011

- Opened and staffed the DC office; managed office affairs on a daily basis

- Retained as an expert witness for damages and class certification issues in antitrust, breach of contract, product liability and RICO cases; representative testimony includes determination of liability and damages in a case involving resale price maintenance in consumer products, class certification in a horizontal price-fixing case involving international travel in the airline industry, class certification in a consumer class action involving RICO claims in state court

- Industry pre-litigation analyses for consumer products, chemicals, and other industries

**Navigant Consulting, Inc.**, Washington, DC, *Associate Director*, Feb. 2006 – Jul. 2006

- Case manager for damages analysis in asbestos litigation and personal injury claims

**Nathan Associates, Inc.**, Arlington, VA, *Managing Economist*, Jul. 2004 – Feb. 2006

- Case manager for economic analysis of class certification and damages issues in antitrust and RICO cases involving the chemical, consumer products, and tobacco industries

- Retained as expert on damages for direct purchasers of NBR in the Crompton Global Settlement; submitted an Affidavit on damages and appeared before the Special Master for the Crompton Global Settlement (the Hon. Kenneth Feinberg)

### Board Membership

- Board of Advisors, American Antitrust Institute, Washington, DC

- Department of Economics Advisory Council, University of Tennessee, Knoxville, Chairman, Spring 2006 – April 2011

**Teaching Positions**

- The George Washington University, Washington, DC, *Adjunct Assistant Professor of Economics*, Fall 2004 – present
- North Carolina State University (NCSU), *Assistant Professor* (Department of Agricultural and Resource Economics), Fall 1999 – Spring 2004
- The University of Pennsylvania, *Adjunct Instructor*, Summer 1990 – Spring 1994

**Additional Teaching Experience**

- The Wharton School Evening Division, Philadelphia, PA, summer 1993
- Rutgers University, Camden, NJ, summer 1993
- Philadelphia College of Textiles and Science, Philadelphia, PA, fall 1992
- The Pennsylvania State University, Media, PA, 1991
- St. Mary's College of Maryland, St. Mary's City, MD, summer 1989
- The University of Maryland University College, College Park, MD, 1988-1989

**Courses Taught**

- Managerial Economics for MBA students (George Washington University)
- Law and Economics (George Washington University)
- Intermediate Microeconomics – graduate level (George Washington University)
- Latin American Economic Development (George Washington University)
- International Trade: Theory and Policy (George Washington University)
- International Finance: Theory and Policy (George Washington University)
- Agricultural Production and Supply – Ph.D. field course (North Carolina State University)
- U.S. Agricultural Policy (North Carolina State University)
- Microfinance: Theory, Practice and Regulation (Superintendencia de Banca y Seguros)
- Statistical Analysis for Economics (University of Pennsylvania)
- Principles of Microeconomics (University of Maryland, St. Mary's College of Maryland)
- Principles of Macroeconomics (University of Pennsylvania, The Wharton School, Penn State University)
- Fundamentals of Micro/Macro Economics (University of Maryland)

- Environmental and Natural Resource Economics (Rutgers)

**Federal Reserve Experience**

Federal Reserve Bank of Kansas City, *Senior Economist* Jan. 1998 – Aug. 1999; *Economist*, Jan. – Dec. 1997

- Analysis of regional, macroeconomic developments in agriculture, and energy
- Research on public policy towards agriculture in the U.S., especially the impact of farm policy reform
- Briefings to the Bank president and outside groups on the regional economy, agriculture, agricultural trade

Board of Governors of the Federal Reserve System**,** *Economist*, Jun. 1994 – Dec. 1996

- Analysis of macroeconomic conditions, commodity markets, and prices (CPI, PPI, Core prices)
- Forecasting of agricultural output, prices, and income
- Briefings to the Board of Governors on agriculture and food-price developments

**Other Consulting Experience**

World Perspectives, Inc., 2003 - 2004

- Analysis of trade barriers for U.S. exports of feed ingredients, pet food ingredients, and food ingredients
- Analysis of the impact of a Free Trade Area of the Americas on U. S. soybean producers
- Analysis of the potential for U.S. Halal-certified meat exports to the Middle East

Womble Carlyle Sandridge & Rice, LLP, 2003 - 2004

- Provided expert testimony related to the estimation of business profitability Smith-Moore, 2002 - 2003
- Provided economic analysis of the U.S. Tobacco Program

Superintendencia de Banca y Seguros (Lima, Peru), 1998 - 2000

- Developed and taught a class on Microfinance issues (in English) to students enrolled in a training program for bank examiners; the program was sponsored by the Inter-American Development Bank.

World Bank, Africa Technical Department, 1992 – 1993

- Summarized and provided an overview of data available on African economic and social indicators

ACG-Afrique, January 1993

- Provided critical review of a study document outlining the impact of structural adjustment on African agriculture

## Professional Organizations

- National Association for Business Economics
- American Economic Association

## Papers, Publications, and Speeches

### Papers Published in Refereed Journals

- "Government Regulation and Quality in the U.S. Beef Market," (with Peyton Ferrier) *Food Policy*, Vol. 32, No. 1, February 2007, 84-97

- "Rent-seeking in U.S.-Mexican Avocado Trade," *Cato Journal*, Vol. 26, No. 1, December 2006, 159-177

- "Consolidation in U.S. Agriculture and the Role of Public Policy," *The ICFAI Journal of Agricultural Economics,* Vol. 1, 2004, 7-16

- "Fertilizer Use, Risk, and Off-farm Labor Markets in the Semi-Arid Tropics of India," *American Journal of Agricultural Economics,* Vol. 85, No. 2, May 2003, 359-371

- "Inverse Productivity: Land Quality, Labor Markets, and Measurement Error," *Journal of Development Economics,* Vol. 71, No. 1, June 2003, 71-95

- "A Market-Forces Policy for the New Farm Economy?" *Review of Agricultural Economics,* Vol. 24, No. 1, 1 March 2002, 15-30

- "Food Crops, Exports, and the Short-run Policy Response of Agriculture in Africa," *Agricultural Economics,* Vol. 22, No. 3, April 2000, 271-298

- "FAIR Act Implications for Land Values in the Corn Belt," (with Jason Henderson) *Review of Agricultural Economics,* Vol. 22, No. 1, Summer – Spring 2000, 102-119

- "Why are Estimates of Agricultural Supply Response So Variable?" (with Francis X. Diebold) *Journal of Econometrics,* Vol. 76, No. 1-2, January – February 1997, 367-373

### Non-refereed Publications, Articles, and Editorials

- "The Predominance Requirement for Antitrust Class Actions – Can Relevant Market Analysis Help?" (with Jeffrey Leitzinger) American Bar Association – Section of Antitrust Law, *Economics Committee Newsletter*, Vol. 7, No. 1, Spring 2007, 17-22

- "Reform of U.S. Farm Policy in an Integrating World Economy," *Developing Countries in the WTO System*, 2006

- "New Farm Economy," *Regulation*, Winter 2003-2004, Cato Institute for Public Policy Research, 2003

- "What Road Will U.S. Economy Take in 2003?" *Southeast Farm Press*, 5 February 2003

- "Fast Track for the Tax Cuts," guest editorial, *News and Observer*, 18 January 2003

- "The 2002 Farm Bill," (with Blake Brown and Michele Marra) *NC State Economist,* November – December 2002

- "Economy-minded Tax Cuts: Bush's Reductions Provided the Boost to Lift U.S. From Recession," guest editorial, *News and Observer*, 2 July 2002

- "Policy Only Effective if Farm Economy is Recognized," special report to *Feedstuffs*, 5 June 2000

- "Aid During Crisis of Little Long-term Help to Farmers," guest editorial, *Kansas City Star,* 23 August 1999

- "Survey of Agricultural Credit Conditions," Federal Reserve Bank of Kansas City," *Regional Economic Digest*, various issues, 1997-1999

- "U.S. Agriculture at the Crossroads in 1999," *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 84, No. 1, 1999, 73-91

- "Can U.S. Oil Production Survive the 20th Century?" *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 84, Quarter I, 1999

- "Will the Tenth District Catch the Asian Flu?" (with Ricardo Gazel) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter II, 1998, 9-26

- "From the Plains to the Plate: Can the Beef Industry Regain Market Share?" (with Michelle Beshear) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter IV, 1998, 49-66

- "U.S. Agriculture: Another Solid Year in 1998?" (with Mark Drabenstott) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, No. 1, Quarter I, 1998, 55-74

- "How Will the 1996 Farm Bill Affect the Outlook for District Farmland Values?" *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 82, Quarter IV, 1997, 85-101

- "Food Prices and the Farm Sector," monthly *Greenbook*, Federal Reserve Board of Governors, various issues 1994-1996

- "Hedge to Arrive Contracts," Memo to the Board of Governors, Federal Reserve Board of Governors, 5 June 1996

- "Prices in the May Greenbook," Federal Reserve Board of Governors, 19 May 1996

- "Prices in the March Greenbook," Federal Reserve Board of Governors, 24 March 1996

- "Commodity Price Developments," Weekly memo to the Board of Governors, Federal Reserve Board of Governors, August 1994 – December 1996

## Conference Presentations

- "Class Action Developments," panelist at the American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC: 4 December 2012

- "Consequences for Antitrust Thought and Practice," presented at the American Antitrust Institute Invitational Symposium: Antitrust Challenge of Multi-Channel Distribution in the Internet Age, Washington, DC: 22 June 2011

- "The U.S. Economy in the Year Ahead," presented at the Long Company Annual Conference, Chicago, IL: 11 September 2009 and 19 September 2008

- "The U.S. Economic Outlook," presented at the Industry Outlook Conference, Chicago, IL: 17 October 2006 and 18 October 2005

- "How Will the Economy Impact Your Business?" presented at the Long Company Annual Conference, Las Vegas, NV: 14 August 2004

- "Focus on The Economy" presented at *Milling and Baking News* Annual Purchasing Managers' Conference, Kansas City, MO: 14 June 2004, 10 June 2003 and 11 June 2002

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Chicago, IL: October 2003

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Breckenridge, CO: 7 April 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 24 September 2001

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 5 June 2001

- "The Great American Growth Machine," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 27 September 2000

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 6 June 2000

- "The Outlook for the U.S. Pork Sector," presented to the Industry Outlook Conference, Las Vegas, NV: 17 April 2000

- "The National Economic Outlook: The Road Ahead," presented to the Food Industry Outlook Conference, Breckenridge, CO: 11 April 1999

- "Farm Policy for the New Millennium," presented to Federal Reserve Bank of Kansas City, Division of Bank Supervision and Regulation, Bank Examiners' Annual Training Conference, 7 January 1999

- "The Impact of the 1996 Farm Bill on Farmland Values," (with Jason Henderson) first place poster presentation at the annual meetings of the American Agricultural Economics Association, Salt Lake City, UT: 4 August 1998

- "A Note on the Inverse Productivity Relationship," presented at the annual meetings of the Western Economic Association International, Seattle, WA: July 1997

- "Off-farm Labor Supply and Fertilizer Use in the Semi-Arid Tropics of India," presented at the annual meetings of the American Agricultural Economics Association, August 1995

- "Prices for Food-Away-From-Home and Core Inflation: Some Empirical Relationships," (with James E. Kennedy) presented at the Federal Reserve System Committee on Agriculture, Richmond, VA: October 1995

- "Some Simple Dynamics of Farming," presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL: August 1993

- "Structural Adjustment and Food Security," (with W. Graeme Donovan), presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL:  August 1993

- "Structural Adjustment and African Agricultural Supply Response to Exchange Rate and Price Movements," (with W. Graeme Donovan), presented at the annual meetings of the Southern Agricultural Economics Association, Tulsa, OK: January 1993

**Other Presentations**

- Panelist, "Antitrust Class Actions – Where Are We? A 360 Degree Perspective," NYSBA Annual Antitrust Law Section Meeting," 30 January 2014

- Panelist, Retrospective on the Baby Products Litigation, ABA Section of Antitrust Law: Pricing Conduct Committee, 31 July 2013

- Panelist, Economic Forecasting Summit, Northern Indiana Workforce Investment Board, Inc., 29 March 2007

- "The Welfare Benefits of USDA Beef Quality Certification Programs" (with Peyton Ferrier), presentation memo, 2007

- "Reform of U.S. Farm Policy in an Integrating World Economy," presented to the Cordell Hull Institute, Trade Policy Roundtable on Reform of U.S. Farm Policy and the WTO System, Washington, DC: 31 March 2006

- "The Case for a Market-forces Farm Policy in the U.S." presented at the Cordell Hull Institute Trade Policy Roundtable, Washington DC: 26 May 2005

- "How Will the Economy Impact Your Business?" presented at the Apple Processors Association annual meeting, Homewood Resort, 20 June 2004

- "The U.S. and International Economic Outlook," presented at the AgFirst Loan Officer's Seminar, Atlanta, GA: 30-31 October 2002

- "Will the U.S. Economy Bounce or Crawl?" presented to the Eastern Bankruptcy Institute, North Myrtle Beach, SC: 1 June 2002

- "The U.S. Economic Outlook and Agriculture," presented to the National Pork Producers Pork Action Group, Washington, DC: 10 April 2002

- "The U.S. Economic Outlook" presented to the Risk Management Associates, Raleigh, NC: 7 February 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the National Pork Producers Pork Action Group, Marco Island, FL: 14 November 2001

- "Consolidation in Agriculture and the Role of Public Policy," paper presented to the Southern Extension Meetings, Williamsburg, VA: 13 June 2000

- "The New Farm Economy," presented at the annual meetings of the National Association of County Agricultural Agents, Omaha, NE: 14 September 1999
- "Regional Economic Update," presented to bankers in Kansas, Nebraska, Missouri, and Oklahoma as part of the Regulatory Update Seminar, Federal Reserve Bank of Kansas City, April 1999
- "The National Economic Outlook," presented to Oklahoma State University Advanced Cattle Management Seminar, Stillwater, OK: 11 March 1999
- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 November 1998
- "Can the Tenth District Survive the Asian Flu?" The Federal Reserve Bank of Kansas City Economic Forums, nine presentations to bankers in Wyoming, Oklahoma, and New Mexico, 21 September – 21 October 1998
- "The Impact of Asian Economic Developments on Tenth District Agriculture," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 30 January 1998
- "The Outlook for the Nebraska Economy," The Federal Reserve Bank of Kansas City: Nebraska Economic Forums, six presentations to bankers in Nebraska, 6-15 October 1997
- "Update on the Macroeconomy and Special Briefing on Forecast Performance at the Kansas City Fed," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 August 1997
- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 14 May 1997 and 21 March 1997
- "Producer Prices, Retail Sales, and Agricultural Commodity Markets," presented to the Board of Governors of the Federal Reserve System, 15 July 1996

## Referee Experience

### Referee for the Following Academic Journals

- World Development, 1993
- Journal of Development Economics, 1994, 1995
- International Economic Review, 1995
- Journal of Human Resources, 1997
- Journal of Business and Economics Statistics, 1997
- American Journal of Agricultural Economics, 1999, 2001, 2002
- Agricultural Economics, 2000, 2001, 2004
- Agricultural Finance Review, 2000, 2004
- Review of Agricultural Economics, 2000, 2002, 2004

- Journal of Agricultural and Resource Economics, 2000, 2001, 2002
- Emerging Markets Review, 2001
- Contemporary Economic Policy, 2004

## Fellowships, Honors, and Awards

### Fellowships

- Departmental Fellowship, University of Pennsylvania, 1989-1990
- Dean's Fellowship, University of Pennsylvania, 1991-1992
- Graduate School Fellowship, University of Maryland, College Park, 1987-1989

### Honor Societies and Professional Organizations

- Phi Eta Sigma National Honor Society
- Mortar Board National Honor Society
- Golden Key National Honor Society
- Vice President for Professional Activities, Delta Sigma Pi

### Awards

- Top Graduate in Liberal Arts, University of Tennessee, Knoxville, Spring 1987
- Chancellor's Citation for Extraordinary Professional Promise, University of Tennessee, Knoxville
- Chancellor's Citation for Outstanding Academic Achievement, University of Tennessee, Knoxville
- First place poster presentation, American Agricultural Economics Association annual meetings, August 1998 (with Jason Henderson)
- Honorable mention, American Agricultural Economics Association, Essay for the 21st Century, 2001, "A Market Forces Policy for the New Farm Economy"
- Honorable mention, American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work on *In Re Titanium Dioxide Antitrust Litigation matter*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work on *In Re Domestic Drywall Antitrust Litigation matter*)

### External Funding

- "Unmanufactured Flue-Cured Tobacco Exports and the Export Component of the Quota Formula." $13,890 NC Tobacco Foundation. With Blake Brown 2000 – 2001.

## Professional Activities and Services

### **Graduate Student Advising**

M.A. degree, North Carolina State University

- Joe Weinberg (Political Science)

Master of Economics, North Carolina State University

- William Pole (2000)
- Dwight Wilder (Chairman, 2002)
- Adrian Atkeson (2002)
- Sarah Spivey
- Li Zhang (Chairman, 2003)
- Nia Atmadja (2003)

Doctor of Philosophy, North Carolina State University

- William Deese (2003)
- Peyton Ferrier (Chairman, 2004)
- Yang Wang (2003)
- Bobby Huggett (2003)
- Syed Wadood (Chairman, 2004)
- Henry Kuo

## Economic and Statistical Modeling Skills

- Experience with all major statistical software including SAS, STATA, LIMDEP and C++; applied econometric modeling skills in damage analysis of consumer industries, chemicals industries, and agricultural markets, correlation analysis for class certification.